NO. 05-107C
(Judge Firestone)

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

UNITED PACIFIC INSURANCE
COMPANY, RELIANCE INSURANCE
COMPANY, and RELIANCE NATIONAL,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

# DEFENDANT'S MOTION TO DISMISS

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JAMES M. KINSELLA
Deputy Director

MICHAEL O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

OF COUNSEL:
WILLIAMS M. LACKERMANN, JR.
Air Force Materiel Command Law Office
Wright Patterson Air Force Base
Dayton, OH

March 28, 2005 Attorneys for Defendant

## TABLE OF CONTENTS


TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

DEFENDANT'S MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

I. Nature Of The Case . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II. Statement Of Facts And Procedural History . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

I. Standard Of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 11

II. United's Claims Are Time Barred . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

A. United's Claims Are Untimely . . . . . . . . . . . . . . . . . . . . . . . . . 13

B. United's Alleged Lack Of Knowledge Of The Purported Illegality Does Not Save Its Claims . . . . . . . . . . . . . . . . . . . . . 15

1. The Tucker Act Cannot Be Equitably Tolled . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

2. The Facts Of This Case Do Not Provide A Compelling Justification For Equitable Tolling . . . . . . 17

III. Even If The Contract Was Illegal, There Is No Remedy For United . . . . . . . 18

IV. United Has Waived Its Implied Contract Claims . . . . . . . . . . . . . . . . . . . . . . 23

1. United's Claims Are Barred By The Election Doctrine . . . . . . 23

2. United Has Waived It's Claims By Waiting Until Contract Completion To Assert Them . . . . . . . . . . . . . . . . . . . 24

V. This Court Does Not Possess Jurisdiction To Consider Quantum Meruit Claims . . . . . . . . . . 24

VI. United's Claims Are Barred By Collateral Estoppel . . . . . . . . . . 26

CONCLUSION . . . . . . . . . . 29

# TABLE OF AUTHORITIES

## CASES

American Ins. Co. v. United States,
62 Fed. Cl. 151 (2004) .......... 26

American Nat'l Bank & Trust Co. v. United States,
22 Cl. Ct. 7, 18 (1990) .......... 12

American Telecom Corp. v. United States,
59 Fed.Cl. 467 (2004) .......... 24

American Telephone & Telegraph Co. v. United States, (A T & T I)
32 Fed. Cl. 672 (1995) .......... 18

American Telephone & Telegraph Co. v. United States, (A T & T II)
124 F.3d 1471 (1997) .......... 18

American Telephone & Telegraph Co. v. United States, (A T & T III)
177 F.3d 1368 (Fed. Cir. 1999) .......... 18

American Telephone & Telegraph Co. v. United States, ( A T & T IV)
48 Fed. Cl. 156 (2000) .......... 18

Ammex, Inc. v. United States,
384 F.3d 1368 (Fed. Cir. 2004) .......... 27, 28

Baltimore & Ohio R.R. Co. v. United States,
261 U.S. 592 (1923) .......... 10

Borough of Alpine v. United States,
923 F.2d 170 (Fed.Cir. 1991) .......... 13, 14

City of Cincinnati v. United States,
153 F.3d 1375 (Fed. Cir. 1998) .......... PASSIM

City of El Centro v. United States,
922 F.2d 816 (Fed. Cir. 1990) .......... 10

Colon v. United States,
35 Fed. Cl. 337 (1996) .......... 13

Contel of Calif., Inc. v. United States,
37 Fed. Cl. 68 (1996) ........................................................ 25

Federal Crop Ins. Co. v. Merrill,
332 U.S. 380 (1947) ........................................................ 15

Gould, Inc. v. United States,
935 F.2d 1271 (Fed. Cir. 1991) ........................................................ 13

Graybill v. U.S. Postal Serv.,
782 F.2d 1567 (Fed.Cir. 1986) ........................................................ 27, 29

Gregory Lumber v. United States,
229 Ct. Cl. 762 (1982) ........................................................ 13

Hohri v. United States,
586 F. Supp. 769 (D.D.C. 1984), aff'd, 847 F.2d 779 (Fed. Cir.), cert. denied,
488 U.S. 925 (1988) ........................................................ 16

Holley v. United States,
124 F.3d 1462 (Fed. Cir. 1997) ........................................................ 11, 12

Holloway v. United States,
60 Fed. Cl. 254 (2004) ........................................................ 16

Hopland Band of Pomo Indians v. United States,
855 F.2d 1573 (Fed. Cir. 1988) ........................................................ 14

Indium Corp. of America v. Semi-Alloys, Inc.,
781 F.2d 879 (Fed. Cir. 1985) ........................................................ 12

Irwin v. Dep't of Veterans Affairs,
498 U.S. 89 (1990) ........................................................ 17

J&E Salvage Co. v. United States,
37 Fed. Cl. 256 (1997), aff'd, 152 F.3d 945 (Fed. Cir. 1998) .................................. 12

Kinne v. United States,
21 Cl. Ct. 104 (1990) ........................................................ 12

Laidlaw Environmental Services (GS), Inc. v. United States,
43 Fed. Cl. 44 (1999) ........................................................ 14

Mark Dunning Industries, Inc. v. United States,
58 Fed. Cl. 216 (2003) ........ 22

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003) ........ 17

Perri v. United States,
340 F.3d 1337 (Fed. Cir. 2003) ........ 25

Rochman v. United States,
27 Fed. Cl. 162 (1992) ........ 13

Saladino v. United States,
62 Fed.Cl. 782 (2004) ........ 27, 28

Scheuer v. Rhodes,
416 U.S. 232 (1974) ........ 12

Soriano v. United States,
352 U.S. 270 (1957) ........ 16

Thomas v. United States,
34 Fed. Cl. 619 (1995), aff'd, 101 F.3d 714 (Fed. Cir. 1996) ........ 12

Trauma Service Group v. United States,
104 F.3d 1321 (1997) ........ 11

United Pac. Ins. Co. v. Roche,
380 F.3d 1352 (Fed. Cir. 2004) ........ 4, 11

United States v. Beauchamp,
519 U.S. 347 (1997)) ........ 16

United States v. Johnson,
529 U.S. 53 (2000) ........ 17

United States v. Seaboard Surety Co.,
817 F.2d 956 (2nd Cir. 1987) ........ 10

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) ........ 24

## STATUTES

**Legislative History**

H.R. 97-612, 1982 U.S.C.C.A.N. 441, 446 .................. 21

**United States Codes**

10 U.S.C. § 2805 .................. PASSIM

26 U.S.C. § 6511 .................. 16

28 U.S.C. § 2501 .................. PASSIM

31 U.S.C. § 1301(a) .................. 22

31 U.S.C. § 1341(a) .................. 23

31 U.S.C. § 1349 .................. 23

41 U.S.C. § 602(a) .................. 23, 24

41 U.S.C. §605(a) .................. 14

41 U.S.C. § 609(a)(3) .................. 1, 13

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED PACIFIC INSURANCE COMPANY, RELIANCE INSURANCE COMPANY, and RELIANCE NATIONAL, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 05-107C (Judge Firestone) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S MOTION TO DISMISS

Pursuant to Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims (RCFC), defendant respectfully requests that this Court dismiss the complaint of plaintiffs United Pacific Insurance Company, Reliance Insurance Company, and Reliance National (collectively "United") for lack of jurisdiction and failure to state a claim.

STATEMENT OF THE ISSUES

1. Whether United's claims are time barred by the statutes of limitation contained in the Contract Disputes Act, 41 U.S.C. § 609(a)(3), and the Tucker Act, 28 U.S.C. § 2501.

2. Whether the Court possesses jurisdiction to consider claims United never presented to the contracting officer and raised for the first time in its complaint here.

3. Whether the Tucker Act may be equitably tolled.

4. Whether there is a compelling justification for equitable tolling of the Tucker Act.

5. Whether, even if this procurement violated a statute or regulation, the statute or regulation at issue provides a monetary remedy for United.

6. Whether United waived its illegal contract claims by taking over the work of its defaulted principal and completing the work pursuant to a takeover agreement before it complained of the alleged illegality of the contract.

7. Whether this Court possesses jurisdiction to consider a claim based upon a contract implied-in-law.

8. Whether United's claims are barred by collateral estoppel.

## STATEMENT OF THE CASE

### I. Nature Of The Case

This is an action arising out of a surety's (United's) completion of the work of its defaulted principal pursuant to a takeover agreement. United alleges that the original 1995 contract between its principal, Castle Abatement Corp. ("Castle") and the Government, to which contract United was not a party, was illegal, thereby creating a cause of action for United against the Government.

### II. Statement Of Facts And Procedural History

#### Introduction

In 2000, United filed a complaint against the Air Force at the Armed Services Board of Contract Appeals ("board" or "ASBCA"). The complaint attempted to allege causes of action which included pretakeover claims, claims which purportedly arose pursuant to the takeover agreement, and a single illegal contract count consisting of 13 paragraphs. The basic underlying factual allegation in both that illegal contract count and this action is the same, that is, the 1995 contract between the Air Force and Castle was illegal. However, the

current complaint now contains six illegal contract counts, and has expanded from 13-paragraphs to 67. The expanded complaint necessarily adds new factual allegations concerning the purported illegality which United has raised in 2005 for the first time, more than nine years after the events in question. Thus, for the first time in this complaint, United alleges that the Government knew in 1995 that the Castle contract was illegal. Complaint ("Compl.") at ¶¶ 27, 35, 46. United does not explain why it did not raise this allegation until 2005. Similarly, United now claims for the first time that, had it known of the alleged illegality, it would not have entered into the takeover agreement. Id. It does not explain why it did not raise this allegation until 2005.

This matter has already been the subject of two lengthy decisions by the ASBCA and a published decision by the United States Court of Appeals for the Federal Circuit. Undeterred by its defeats in those fora, it now attempts to assert the illegal contract claims by adding factual allegations never before raised. In United Pac. Ins. Co., 01-2 BCA (CCH) ¶ 31,527, ASBCA No. 53051, 2001 WL 865380 ("UP I") (App.[1] 1-11), the board dismissed the pre-takeover agreement claims of United. The board subsequently conducted nine days of hearings in 2002. In its 2003 final decision, it made extensive findings of fact. Based upon these findings of fact, it ruled that United lacked standing to assert that the contract between the Air Force and Castle was illegal, and that the board lacked jurisdiction to consider this claim. The board dismissed a substantial portion of United's claims because it lacked jurisdiction, and denied the remaining claims upon the merits. United Pac. Ins. Co., 03-2

[1] "App." refers to the appendix to our brief.

BCA (CCH) ¶ 32267 at 159,604, 2003 WL 21350374 (UP II). App. 12-59. The court of appeals then affirmed the board's decisions in full. United Pac. Ins. Co. v. Roche, 380 F.3d 1352 (Fed.Cir. 2004) (UP III). App. 60-65.

We summarize the facts that are relevant to this dispute. Unless otherwise noted, all facts are taken from the board's decision in UP II.

Background

The Air Force awarded the contract to Castle on September 21, 1995. FF 1,[2] App. 12. The substance of the contract was the work to renovate Buildings 2401, 2402, and 2403 at McGuire Air Force Base, New Jersey. Id. The contract's basic requirement was for "all work to renovate Bldg 2401." Id. This work included a line item for renovation which Castle priced at $563,861, and a line item for new construction, "which had a cost limitation of $300,000,[3] and which Castle priced at $297,400." Id. The work for Buildings 2402 and 2403 was set out as optional requirements in virtually the same manner as Building 2401. Id. The work on Buildings 2403 and 2402 was optional requirement nos. 1 and 2, respectively. Id. Castle priced the new construction line items for Building 2402 and 2403 at $297,423 for each building. Castle priced the not-to-exceed total (renovation and new construction) for building 2403 work at $1,074,623.50 and Building 2402 work at $1,196,517. Id.

Optional requirement No. 3 was for all work to construct two walkways to connect the three buildings. Id. The Air Force evaluated the connectors by prorating the amounts

---

[2] "FF" refers to the board's findings of fact.

[3] In 1995, 10 U.S.C. § 2805 allowed the use operations and maintenance funds of up to $300,000 for unspecified minor construction.

between the buildings to ensure the combined amount for the new construction line items did not exceed the cost limitation of $300,000 per building. Id. Thus, the price for the Building 2401 new construction line items with the addition of the prorated connector cost was $298,900, and the price for the corresponding line items for the other buildings with the prorated connector cost was $298,173 each. Id. The board found that:

> The reason for including various items as options was to prevent redesigning and repackaging the entire effort if statutory limits were exceeded. By not buying certain options, a contract within statutory limits could still be awarded. (Tr. 1326-27) Since statutory limits were not exceeded, the contract total included all optional items.

Id.

Air Force Instruction 32-1032, (11 May 1994), Planning and Programming Real Property Maintenance Projects Using Appropriated Funds, implemented relevant statutory requirements at the time of the solicitation, including 10 U.S.C. § 2805. Minor new construction projects are defined in the instruction as military construction projects with an approved cost of $1,500,000. FF 4, App. 16. Minor construction projects costing $300,000 or less may be funded from the Air Force's operations and maintenance ("O&M") appropriation without prior congressional approval. Id. Examples of minor construction projects include construction of a new building or system, an expansion of a building, conversion to a new primary function, and repair-type work which exceeds 70 percent of replacement cost. Id. Accordingly, prior to issuing the solicitation, Air Force personnel determined that Building 2402 (the only building to receive a new peaked roof) would be the most expensive building of the three. The Air Force performed an analysis and concluded

that the work on Building 2402 would not exceed 70 percent of replacement cost. Id. Classification of the work was necessary because the contract was a combination of repair work and new construction and the statutory limit of $300,000 on minor construction work funded with O&M funds needed to be tracked. Id. It was Air Force policy to have bidders break down their bids to show minor construction costs. Id.

The contract work was treated as three projects for funding purposes pursuant to Air Force policy, with separate work orders and project numbers. FF 5; App. 16. Funds for the contract work were reserved individually and ultimately funded with separate procurement requests. Id. The deputy base civil engineer testified that a McGuire Air Force Base employee consulted with Air Mobility Command to determine if construction of the walkways between the buildings might create a situation where Buildings 2401, 2402 and 2403 had to be treated as one building for programming purposes. He determined that, as long as the walkways were not "conditioned space,"[4] they remained separate buildings. Id. Accordingly, the Air Force programmed the contract as three separate projects with three separate statutory limits on minor construction. Id.

United issued performance and payment bonds to Castle. FF 7, App. 17. The bonds expressly bound United to the Government, and thus the Air Force, for the penal sum. Id. The Government was not a party to the bonds. Id. Other than issuance of the bonds, there was no evidence of United's participation in the contracting process or that United was in a

---

[4] Conditioned space is space built to house people. FF 5, fn. 5, App. 5, 56. The connectors were walkways between the buildings not meant to house people. Id.

position to be part of the contracting process. Id.

During contract performance, Castle did not comply with contract requirements in several respects and "had taken actions which could only have been motivated by an intent to conceal and deceive." FF 32; App. 30. For example, Castle had installed some electrical boxes with wires that dropped down four or five feet and were not connected to anything. Castle then sheetrocked the walls, concealing this condition, and had done similar things with some outlets, switches and thermostats. Id. The Government's inspector was not aware of Castle's deception. Id.

The Air Force terminated Castle for default on July 21, 1997. FF 25; App. 21. Neither Castle nor United contested the termination for default and it is now final. FF 25, App. 22.

The Government and United entered into a takeover agreement on August 5, 1997, which provided that United would complete the contract work in exchange for the remaining contract funds. FF 29, App. 25. United did not seek bids or a fixed-price contract from replacement contracts, but instead awarded the work to Lattimer & Associates LLP ("L&A") on a time and materials basis. FF. 27, App. 22.; FF 30; App. 30. The Air Force received beneficial occupancy of the buildings in 1998. FF 37, App. 32.

On April 12, 2000, United filed a properly certified Request for Equitable Adjustment (the "claim"). FF 38; App. 32. Id. The claim included an alternative claim for illegal contract, for which it sought $3,525,430.00. Id. On September 12, 2000, the contracting officer denied United's claim. FF 58, App. 41.

With respect to its 2000 illegal contract claim, United contended "that the contract was illegal and that an implied-in-fact contract between it and the Air Force arose from its ashes. UPI assert[ed] that it should recover on a *quantum meruit* basis." App. 47. United's claim was "premised on its argument that the contract involved only one building because the connectors made Buildings 2401, 2402 and 2403 interrelated to such a degree that their individual character was lost." Id. It argued that, if there was only one building involved rather than three, the statutory limit upon O&M funds was violated and the contract was illegal. Id. It further argued that Castle's $3,000 price per connector was "a sham." Id.

United argued at the board and at the Federal Circuit, and now argues here, that the project was one project, not three projects (count three); that the Air Force purposely split the project into three projects to meet the threshold requirement (count three); and that the project was new construction, not renovation (counts one and two).

Despite United's conclusory argument that the contract was all new construction, the testimony of Air Force witness Scott Wilson, Deputy Base Civil Engineer, was unrebutted at the board. He testified that the Air Force calculated that the renovation project would cost only 66 percent of new construction on the most expensive building (thus coming under the 70 percent cap upon repair projects (FF 4, App. 16)), and that the 66 percent calculation actually proved to be too conservative and the renovation cost ultimately proved to be lower. App. 67-71. United's counsel upon cross examination attempted to lead Mr. Wilson into testifying that the projects were mostly new construction, with little of the old buildings left, to no avail:

Q. But in this project, almost everything is being replaced either arguably as a repair or as new construction. There wasn't very much left of the original construction on these buildings. Isn't that correct?

A. Not from my perspective.

Q. Well, you had foundations, you had some structural members and the roofs remained, with the exception of the one that was replaced. And other than that almost everything is new in these buildings. Isn't that correct?

A. All of the parking remained. All of the central utility system feeds to those buildings remained. The structure for the entire building remained, the sheathing remained. The roofing remained. That's a significant cost item . . .

App. 71A. Thus, despite United's arguments to the contrary, the board upheld the Air Force's classification of the work between new construction and renovation. It found that the "substance" of the contract was "renovation," and that approximately one-third of the work was new construction. FF 1, App. 12.

Similarly, at the Federal Circuit and now here, United has repeatedly derided the buildings as "long abandoned barracks." Compl. at ¶ 25. This conflicts with Mr. Wilson's testimony that much of the original buildings remained, and the board's factual finding that two of the buildings had been used as temporary administrative offices. FF 1, App. 12.

The board observed that the "real essence of UPI's contention is that it would not have entered into the bonding agreement with Castle if it had known that the underlying Air Force contract was illegal." Id. The board noted that if it followed United's argument to what the board "believe[s] is its logical conclusion, any obligation of the Government was implied-in-law, not implied-in-fact," a type of claim for which the board did not possess jurisdiction.

App. 47-48. The board nonetheless considered United's contention that there was an implied-in-fact contract between it and the Air Force. App. 48.

The board correctly stated that "an implied-in fact contract is one 'founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding.'" Id. at 48 (quoting Baltimore & Ohio R.R. Co. v. United States, 261 U.S. 592, 597 (1923)). An implied-in-fact contract with the United States requires the plaintiff to demonstrate: "1) mutuality of intent to contract; 2) consideration; . . . 3) lack of ambiguity in offer and acceptance" and 4) the Government representative whose conduct is relied upon must have actual authority to bind the government in contract. Id. (quoting City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990)). United argued that all of these elements were present in the Castle - Air Force contract. App. 49.

The board found that the "first flaw" in United's argument was that it referred to the Castle - Air Force contract and that there was "no evidence that UPI participated in negotiations with the Air Force or otherwise placed itself in a position through which a contract could have been formed by 'conduct of the parties showing . . . their tacit understanding.'" App. 49 (quoting City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998)). Thus, if "there were funding irregularities and an illegal unbalanced bid, they related to a contract to which UPI was not a party." Id. The board further held that the performance bond did not create contractual privity between United and the Government. Id. (citing United States v. Seaboard Surety Co., 817 F.2d 956, 961 (2nd Cir. 1987)).

The board also held that the express contract between Castle and the Air Force was "a bar to, not proof of, an implied-in-fact contract." Id. (quoting Trauma Service Group v. United States, 104 F.3d 1321, 1326 (1997)).

The board noted United's contention that the contract between Castle and the Air Force was incorporated in the takeover agreement. However, the board noted that the: "problem with this argument is that the work done by UPI was pursuant to the takeover agreement, about which UPI raises no issue as to legality . . ." Id.

The board concluded that "the contractual elements necessary to a contract implied-in-fact that UPI would have us find as inherent in the contract between Castle and the Air Force and the bond are not established." Id. It held as a matter of fact that "no implied-in-fact contract came into being between the Air Force and UPI." As a result of this factual finding, it dismissed the illegal contract claim for lack of jurisdiction. Id.

The Federal Circuit affirmed the board's decision in full. UP III, 380 F.3d 1352. With respect to the illegal contract claim, the court observed that: "United's illegality claims all involve events that occurred long before the takeover agreement and relate to a contract to which United was not a party." Id., 380 F.3d at 1357.

## ARGUMENT

### I. Standard Of Review

In deciding a RCFC 12(b)(1) motion, "determination of jurisdiction starts with the complaint, which must be well-pleaded in that it must state the necessary elements of the plaintiff's claim, independent of any defense that may be interposed." Holley v. United

States, 124 F.3d 1462, 1464 (Fed. Cir. 1997) (citations omitted). Where this Court's subject matter jurisdiction is placed into issue, the non-moving party bears the burden of establishing jurisdiction. J&E Salvage Co. v. United States, 37 Fed. Cl. 256, 260 (1997), aff'd, 152 F.3d 945 (Fed. Cir. 1998) (table), cert. denied 525 U.S. 827. "In ruling on a motion to dismiss for lack of jurisdiction, the court is not confined to an examination of the complaint, but may take into account 'evidentiary matters outside the pleadings.'" Thomas v. United States, 34 Fed. Cl. 619, 621 (1995) (quoting Indium Corp. of America v. Semi-Alloys, Inc., 781 F.2d 879, 884 (Fed. Cir. 1985), cert. denied, 479 U.S. 820 (1986)), aff'd, 101 F.3d 714 (Fed. Cir. 1996) (table).

Pursuant to RCFC 12(b)(6), the Court may dismiss a complaint if, as a matter of law, it fails to state a claim upon which relief can be granted, even assuming the truth of its allegations. Unlike a RCFC 12(b)(1) disposition, however, "dismissal of plaintiff's complaint . . . for failure to state a claim does not have the legal effect of divesting this court of jurisdiction," and thus operates as a final adjudication, with prejudice, upon the merits. American Nat'l Bank & Trust Co. v. United States, 22 Cl. Ct. 7, 18 (1990). As the Supreme Court has held, dismissal for failure to state a claim is appropriate whenever "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).

In resolving a motion to dismiss for failure to state a claim, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." Kinne v. United States, 21 Cl. Ct. 104, 107 (1990) (quoting Scheuer, 416

U.S. at 236). Thus, the Court "must . . . indulge in all reasonable inferences in favor of the nonmovant." Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991). Nonetheless, the Court should not place any weight upon any assertions in the complaint other than allegations of fact, because "legal conclusions, deduction, or opinions couched as factual allegations are not given a presumption of truthfulness." Rochman v. United States, 27 Fed. Cl. 162, 168 (1992) (citation omitted).

II. United's Claims Are Time Barred

A. United's Claims Are Untimely

The contracting officer denied United's claims on September 12, 2000. FF 58, App. 41. To the extent that United seeks recovery pursuant to the Contract Disputes Act ("CDA"), United was required to file an action in this Court within one year of its receipt of the contracting officer's final decision. 41 U.S.C. § 609(a)(3). Since this action was not filed in this Court until January 2005, it is untimely by more than three years. E.g., Borough of Alpine v. United States, 923 F.2d 170 (Fed.Cir. 1991). The one year CDA statute of limitation may not be tolled. Gregory Lumber v. United States, 229 Ct. Cl. 762, 763 (1982) ("Congress has set the twelve-months limit, and this court cannot and should not read into it exceptions and tolling provisions Congress did not contemplate or authorize.")

Count five of United's complaint ("breach of contract") apparently seeks relief pursuant to the CDA. Similarly, count six ("misrepresentation as inducement to contract") is either a tort claim for which this Court does not possess jurisdiction (Colon v. United States, 35 Fed. Cl. 337, 342-43 (1996)), or a superior knowledge type of claim for which the Court

could possess jurisdiction only pursuant to the CDA. Laidlaw Environmental Services (GS), Inc. v. United States, 43 Fed. Cl. 44 (1999). Neither of these claims were included in United's 2000 claim to the contracting officer. App. 75-95. Because submission of claims to the contracting officer is a prerequisite to this Court's CDA jurisdiction, the Court does not possess jurisdiction to consider these claims. 41 U.S.C. § 605(a)[5]. However, to the extent that United's failure to submit these claims to the contracting officer does not prevent the Court from considering them, both counts five and six are untimely by more than three years. E.g., Borough of Alpine, 923 F.2d 170.

Similarly, to the extent that United is seeking relief apart from the CDA, its claims would be barred by the six-year statute of limitations set forth in the Tucker Act at 28 U.S.C. § 2501. The Tucker Act provides that an action is barred unless it is filed in the Court of Federal Claims "within six years after such action first accrues." Id. An action "first accrues" when all the events have occurred which fix the alleged liability of the defendant and entitle the plaintiff to institute an action. Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988).

Here, as set forth at length in the board's decision, all of the alleged improper actions of the Government occurred prior to July 21, 1997 when the contracting officer terminated Castle's contract for default, and most likely occurred prior to contract award in September

[5] Similarly, United's new allegations that the Government knew that the 1995 contract was illegal and that, had United known of the alleged illegality, it would not have entered into the takeover agreement, were not presented to the contracting officer and cannot be considered by this Court.

1995. FF 1, App. 13; FF 25, App. 21. Thus, all of the events which had fixed the alleged liability of the Air Force had occurred by July 21, 1997, and the statute of limitations began to run no later than July 21, 1997. As stated above, United filed its action in this Court in January 2005, more than six years after the statute of limitations began to run. Its claims are thus time barred pursuant to 28 U.S.C. § 2501.

### B. United's Alleged Lack Of Knowledge Of The Purported Illegality Does Not Save Its Claims

United attempts to avoid the bar of its untimely filing by asserting for the first time in January 2005 that it "did not discover that the subject Contract was illegal, and had no reason to believe otherwise, until approximately January 2000 . . ." Complaint at ¶ 17. United contends that the Government's contract with Castle was illegal because the Government violated various procurement statutes and regulations including 10 U.S.C. § 2805, and Air Force Instruction 32-1032. Castle contends that construction work was improperly classified as renovation (complaint counts I & II); and that the project was really one project rather than three (count III).

The first flaw in this argument is that it hinges upon United's purported lack of knowledge of the statutes and regulations which it contends rendered the contract illegal. However, it is black letter law that United is presumed to know the contents of statutes and regulations. E.g., Federal Crop Ins. Co. v. Merrill, 332 U.S. 380, 385 (1947). Therefore, this surety's claimed ignorance of the law does not save its claim.

Second, United apparently argues that the statute of limitations did not begin to run until January of 2000 when it claims it first became aware that the contract was illegal. In

other words, it argues that the six-year Tucker Act statute of limitations did not begin to run until January 2000. Although United does not state as such in its complaint, we construe this to be an argument that the Tucker Act statute of limitations should be equitably tolled in these circumstances.

1. The Tucker Act Cannot Be Equitably Tolled

The statute of limitations contained at 28 U.S.C. § 2501 is a condition upon the sovereign's consent to suit and United's failure to comply with the statute places its claims beyond the Court's power to consider them. Soriano v. United States, 352 U.S. 270, 273, 276 (1957). Because the statute of limitations is jurisdictional, it cannot be waived or equitably tolled. Hohri v. United States, 586 F. Supp. 769, 786 n.22 (D.D.C. 1984), aff'd 847 F.2d 779 (Fed. Cir.), cert. denied, 488 U.S. 925 (1988).

Although the Court of Appeals for the Federal Circuit has not definitively ruled whether the Tucker Act can be equitably tolled, at least one recent decision from this Court appears to adopt our position that it cannot. In Holloway v. United States, 60 Fed. Cl. 254, 260, n.12 (2004), this Court stated that it is "doubtful" that the statute of limitations can be equitably tolled since it is a condition to the waiver of sovereign immunity. Moreover, the Court further observed that the Tucker Act contains a contrary congressional intent because it "contains explicit exceptions to its basic time limits, and those specific exceptions simply do not include a provision for equitable tolling." Id. (citing United States v. Beauchamp, 519 U.S. 347, 351-52 (1997)) (declining to apply equitable tolling to the statute of limitations in a tax statute, 26 U.S.C. § 6511, because Congress "sets forth limitations in a highly detailed

technical manner, that linguistically speaking, cannot easily be read as containing implicit exceptions"). Here, because § 2501 specifically permits tolling only in two specific instances, where the plaintiff is under a legal disability or "beyond the seas," there is a strong inference that Congress did not intend the statute to be tolled under any other circumstances. United States v. Johnson, 529 U.S. 53, 58 (2000). Thus, the six-year statute of limitations for bringing Tucker Act claims before this Court is not subject to equitable tolling.

2. The Facts Of This Case Do Not Provide A Compelling Justification For Equitable Tolling

Equitable tolling against the government is a narrow doctrine. Martinez v. United States, 333 F.3d 1295, 1318 (Fed. Cir. 2003) (en banc). "There must be a compelling justification for delay, such as 'where the complainant has been induced or tricked by his adversary's misconduct into allowing the filing deadline to pass.'" Id. (quoting Irwin v. Dep't of Veterans Affairs, 498 U.S. 89, 96 (1990)). Here, it is so clear that the doctrine would not apply, the Court may not need to reach the issue of whether the statute can be equitably tolled. There is no evidence that Government misconduct induced or tricked United's late filing. The statutes and regulations upon which United relies could not have been hidden from United, and the nature of the contract work and the connectors which United alleges transformed three buildings into one were explicitly set forth in the solicitation. FF 1, App. 13.[6]

[6] Moreover, the board specifically found that both a representative of the surety and its completion contractor visited the site prior to United entering into the takeover agreement in 1997. FF 28, App. 24-25. To the extent that United bonded a multi-million dollar construction project without familiarizing itself with the nature of the work, it had ample

Through counsel, United freely chose to pursue its illegal contract claim at the board for years, even though the board does not possess jurisdiction to entertain an illegal contract claim of the nature pled by United. Prior to the hearing upon United's claims at the board, Judge Dicus even warned United's counsel of the error of its pursuit of this claim at the board:

> JUDGE DICUS: Thank you Mr. Wilson. I do have to caution you that I hope somebody at your firm put quantum meruit through Lexus or Westlaw because it's my understanding that we've never taken jurisdiction on a quantum meruit basis and that whenever an illegal contract has been found before the Board because there is no contract at that point, that we are without jurisdiction. So, I caution you to make sure you want to present that evidence on that aspect of the claim because it seems to me it could backfire but having said that, you know, it's your call obviously . . .

App. 66. (Emphasis added). Despite this unequivocal warning from the board, United freely chose to present its illegal contract claim to the board and continued to pursue it through an appeal to the Federal Circuit. United should not be relieved from the consequences of a litigation strategy that, as Judge Dicus cautioned, did not succeed.

## III. Even If The Contract Was Illegal, There Is No Remedy For United

Even if United could establish that the Air Force violated procurement law, its claim must still be dismissed because the statute at issue provides no remedy for United. American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) (AT&T III).[7] In AT&T I, the trial Court held that the Navy violated section 8118 of the

---

opportunity to remedy this oversight in the 1997 site visits.

[7] AT&T I is a decision of this Court published at 32 Fed. Cl. 672 (1995). AT&T II was a Federal Circuit panel decision that was vacated and withdrawn. 124 F.3d 1471 (1997). AT&T IV was this Court's decision upon remand. 48 Fed. Cl. 156 (2000). The Federal

Defense Appropriations Act of 1987 which prohibited certain fixed price development contracts in excess of $10 million. AT&T III, 177 F.3d at 1370. The trial Court held that the Navy violated the statute by awarding such a contract greater than the statutory limit. Id. The trial Court held that the contract was void ab initio and that the contractor was entitled to quantum meruit damages. Id.

Although the Federal Circuit agreed with the trial Court that the Navy had violated a procurement statute, it reversed the trial Court with respect to the consequences of such a ruling. First, the court of appeals observed that:

> Invalidation of the contract is not a necessary consequence when a statute or regulation has been contravened, but must be considered in light of the statutory or regulatory purpose, with recognition of the strong policy of supporting the integrity of contracts made by and with the United States.

Id. at 1374. If the statute does not specifically provide for invalidation of contracts made in violation of its terms, a court will not invalidate such a contract unless invalidation is consistent with and essential to effectuate the public policy embodied in the statute. Id. The invalidation of contracts after they have been performed is not favored. Id. at 1375. Moreover, the court of appeals observed that contracts that had been nullified by it or its predecessor court based upon a failure to meet a statutory or regulatory requirement were contracts that had not been substantially performed. Id. The court of appeals remanded to this Court to determine what remedy, if any, was available to the contractor. Id. at 1377.

Upon remand, this Court dismissed the complaint for failure to state a claim because

---

Circuit's decision in AT&T V is published at 307 F.3d 1374 (2002).

there was no remedy available to the contractor as a result of the illegality. AT&T IV, 48 Fed. Cl. 156. The Federal Circuit affirmed, holding that the statute at issue "provides for legislative oversight and enforcement" but "does not create a cause of action inviting private parties to enforce the provision in courts." AT&T V, 307 F. 3d at 1379. The court of appeals also found support for its holding in separation of powers principles because Congress sustains agencies, is the ultimate guardian of the welfare of the people, and must be trusted to correct whatever defects exist in the procurement process. Id. Finally, with respect to the contractor's argument that the Navy also violated various procurement regulations and directives, the court of appeals held that such "cautionary and informative" regulations and directives provide only internal Government direction and do not create a cause of action in the courts. Id. at 1380.

The statute that United contends that the Air Force violated is 10 U.S.C. § 2805, entitled "unspecified minor construction." Complaint ¶¶ 26, 34, 37. At § 2805(b)(1), the statute currently prohibits the performance of an unspecified military construction project in excess of $750,000 ($500,000 in 1995 when this contract was let) unless approved in advance by the secretary of the agency. At § 2805(c)(1), it provides that unspecified construction projects up to $750,000 ($300,000 in 1995) may be funded with O&M funds. The statute contains no remedy for a private party in the event of a Government violation of the statute.

Congress added this statute in 1982 by Public Law 97-214, § 2(a). The House Report accompanying the statute demonstrates that Congress intended the statute to provide

"legislative oversight and enforcement" like the statute in the AT&T cases. In its summary of "major provisions of the bill" the House Report stated that there would be annual report requirements for various activities, including unspecified minor construction. H.R. 97-612, 1982 U.S.C.C.A.N. 441, 446. The House Report stated that:

> Information supplied should enable the appropriate committees of congress to monitor the relationships between budget requests and obligations for unspecified minor construction projects funded from military construction appropriations and unspecified minor construction projects funded from operations and maintenance appropriations. The maintenance and repair backlog at the end of the prior fiscal year will be used to evaluate the ratio of expenditures between minor construction and maintenance and repair. Data for the two fiscal years prior to the budget year should be supplied to evaluate trends.

1982 U.S.C.C.A.N. at 446. The House Report goes on to describe previous statutes which provided for minor construction projects. After noting that since 1958 "minor construction" referred to the accomplishment of urgent requirements that had not been included as a specified project in an annual appropriations act, it stated that:

> In the 1978 military construction authorization act, the minor construction authority was modified. The objectives set forth at that time were: (1) to provide the department of defense and the military departments increased flexibility and (2) to reduce by approximately half the number of projects the appropriate committees of congress examine in detail each year.
> The first objective was concerned with the unspecified (out-of-budget cycle) requirements that may be budgeted for only in a lump sum. The second objective was concerned with what is known as 'specified locations minor construction '; that is, the known and programmable requirements below the minor construction project ceiling amount . . .

Id. at 448. The House Report then describes the reasons for the changes:

> Since the 1978 changes were made, some disadvantages have surfaced . . .
> One disadvantage is that authorizing appropriations for specified location minor construction projects separately from the total amount for an installation

> obscures the total authority being provided for an installation. It would be advantageous to include the known minor construction, the specified location projects, under the amount for an installation. This could be achieved by separating the specified location minor construction projects from the unspecified minor construction projects. Another disadvantage is that a lack of distinguishing language for specified location and unspecified projects has complicated the administration and execution of those projects at specified locations.

Id. There is no indication in the House Report that Congress intended to create a cause of action upon the part of private parties. Rather the congressional intent appears to be to strike a balance between an appropriate level of congressional oversight of unspecified minor construction projects and the use of O&M funds while at the same time granting the military necessary discretion in spending those funds.

In 1984, the Comptroller General had the opportunity to consider the consequences of a violation of 10 U.S.C. § 2805 by the Department of Defense ("DOD") in constructing certain facilities in Honduras.[8] 63 Comp. Gen. 422 (1984). The Comptroller General held that to the extent that construction exceeded the then statutory threshold of $200,000, the Government violated 10 U.S.C. § 2805 and 31 U.S.C. § 1301(a), which prohibits the application of appropriations to objects other than those for which the funds were appropriated. The Comptroller General held that the result of the violation was that DOD must reimburse the applicable O&M funds from the proper funding sources. 63 Comp. Gen. at 424. To the extent that adjustment of accounts was not possible because all other funds

---

[8] Although not binding upon this Court, decisions of the Comptroller General are often accorded deference by the Court in recognition of the expertise and role of the Government Accountability Office in procurement issues. E.g., Mark Dunning Industries, Inc. v. United States, 58 Fed. Cl. 216, 221, n. 4 (2003).

had been obligated, a violation of the Antideficiency Act, 31 U.S.C. § 1341(a) had occurred and DOD should take appropriate disciplinary actions against the employee responsible pursuant to 31 U.S.C. § 1349. 63 Comp. Gen. at 424. Thus, the Comptroller General's decision also demonstrates that the purpose of the statute is legislative oversight and enforcement, not the creation of a cause of action for private parties.

Although no violation of a procurement statute has occurred here, assuming for the purposes of this motion that there was, the Federal Circuit's decisions in AT&T III & V are dispositive. First, as the court of appeals noted, invalidation of contracts after they have been performed is not favored. AT&T V, 307 F.3d at 1375. As in the AT&T cases, the statute at issue here "provides for legislative oversight and enforcement" but "does not create a cause of action inviting private parties to enforce the provision in courts." Id. at 1379. Also as in AT&T, the legislative history here evinces no congressional intent to create a cause of action for private parties. Invalidation would, therefore, not be consistent with and essential to effectuate the public policy embodied in the statute. Id. at 1374. In light of "the strong policy of supporting the integrity of contracts made by and with the United States" there is no basis upon which this Court could invalidate the contract. Id. Thus, United's complaint should be dismissed for failure to state a claim.

IV. United Has Waived Its Implied Contract Claims

1. United's Claims Are Barred By The Election Doctrine

Pursuant to the CDA, a contractor may assert a claim for an express or implied contract in either a board of contract appeals or this Court. 41 U.S.C. §§ 602(a), 607(d).

Although the CDA allows the contractor to appeal to the board in § 607 or to bring a direct action in this Court pursuant to § 609, it may not pursue dual avenues of appeal. Rather, the contractor has to elect one forum or the other. Once the contractor files its appeal in a forum which possesses jurisdiction to consider its action, this constitutes the election pursuant to the election doctrine and this precludes the contractor from pursuing its claims in the alternate forum. E.g., American Telecom Corp. v. United States, 59 Fed.Cl. 467 (2004). Here, because the board possesses jurisdiction to consider implied-in-fact contract claims pursuant to 41 U.S.C. § 602(a), and because United has already filed such claims at the board, this Court does not possess jurisdiction to consider these claims.

2. United Has Waived It's Claims By Waiting Until Contract Completion To Assert Them

The Federal Circuit's opinion in Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997) expressly bars United's claim that the Castle - Air Force contract is void as illegal. In Whittaker, the Court held that, when the original contractor never objected to the purported illegality of the contract, the takeover contractor agreed to takeover the work without objecting to the illegality, and then completed the work "constituted a waiver of the grounds for rescinding or voiding the contract." Id. at 1446. Thus, because Castle never objected to the contract as illegal and United took over the contract without objection to the purported illegality and completed the work, United has waived its claim for illegality.

V. This Court Does Not Possess Jurisdiction To Consider *Quantum Meruit* Claims

Although only count four of its complaint specifically seeks recovery in quantum meruit, United seeks $2,864,244.94 in damages in all six counts of its complaint. As it

explains in paragraph 55 of the complaint, this amount represents the total amount it spent on the project, $3,525,757.25, minus Government payments of $661,512.31. This Court's jurisdiction over claims founded upon an express or implied contract with the United States "extends only to contracts either express or implied in fact, and not to claims on contracts implied in law." Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003). A contract implied-in-law is one in which no actual agreement between the parties occurred but where a duty is imposed by equity to prevent injustice. Contel of Calif., Inc. v. United States, 37 Fed. Cl. 68, 72 (1996). Quantum meruit is the measure of recovery for a contract implied-in-law. Perri, 340 F.3d at 1343.

Factually, the board has already found that, other than its issuance of the bonds, "there is no evidence of UPI's participation in the contracting process or that UPI was in a position to be part of the contracting process." FF 7, App. 17. Nonetheless, United has complained continuously at the board, and now here, that the contract between Castle and the Air Force was illegal. Although there was no agreement (prior to the takeover agreement) between the Air Force and United, the consistent theme which United has asserted at all fora has been that the Government owed some undefined duty to United not to violate procurement laws when it entered into the contract with Castle. United alleges that, if it had known of the Government's alleged violations, it would not have bonded the project. App. 47. Since there was no contract between United and the Air Force at that time, United apparently attempts to impose such a duty by equity. Thus, the board correctly stated: "[f]ollowing UPI's argument to what we believe is its logical conclusion, any obligation of the Government was implied-

in-law, not implied-in-fact." App. 47. The board further observed that: "[i]mplied-in-fact contracts, which are within the jurisdiction of the Court of Federal Claims, differ significantly from implied-in-law contracts, which impose duties that are deemed to arise by operation of law and are outside the jurisdiction of the Court of Federal Claims." App. 48 (quoting City of Cincinnati v. United States, 153 F.3d 1375, 1377 (Fed. Cir. 1998). Thus, United's claims must be dismissed for failure to state a claim.

VI. United's Claims Are Barred By Collateral Estoppel

United attempts to avoid the preclusive effect of the board's rejection of its claims by correctly noting that the board dismissed its illegal contract claim for lack of jurisdiction. It contends that it "has not received a decision on the merits of its illegal contract claim against the government." Complaint at ¶ 16. This argument gives short shrift to the board's opinion. After nine days of hearings, the board dismissed the claim based upon its factual finding that, even if the Castle contract "was illegal, and we have not so found, no implied-in-fact contract came into being between the Air Force and UPI." App. 49. Without an implied-in-fact contract, United's argument collapses. It cannot recover against the Government because it is "left to argue, sans decisional support, that the Air Force breached some undefined fiduciary or equitable duty" which "duties are ordinarily viewed as giving rise, if anything, to torts, the subject matter of which plainly is outside this court's jurisdiction." American Ins. Co. v. United States, 62 Fed. Cl. 151, 158 (2004). Thus, even if the Court allowed United to revisit the issue of whether the contract was illegal, it would still be foreclosed from a remedy against the Government because of the board's factual finding that no implied-in-fact

contract came into existence. Thus, these claims should not be revisited by this Court.

While it is correct that the board dismissed the illegal contract claim for lack of jurisdiction, this does not save United's claim. While a dismissal for lack of jurisdiction may save a claim from the bar of res judicata, it does not save a claim from the bar of collateral estoppel, also known as issue preclusion. Ammex, Inc. v. United States, 384 F.3d 1368 (Fed. Cir. 2004); Saladino v. United States, 62 Fed.Cl. 782 (2004). Whether collateral estoppel applies depends upon whether: (1) the issues decided at the board are identical to those before this Court; (2) those issues were actually litigated in the prior proceeding; (3) the board's resolution of those issues was necessary to its resulting judgment; and (4) United was afforded a full and fair opportunity to litigate its position. Ammex, 384 F.3d at 1371. The application of collateral estoppel contributes to efficient judicial administration, serves the public interest in judicial economy, as well as the parties interest in finality, certainty of affairs, and avoidance of unnecessary relitigation. Graybill v. U.S. Postal Serv., 782 F.2d 1567, 1571 (Fed.Cir. 1986).

In Saladino, a tax preparer attempted to prosecute claims for tax refunds upon behalf of his clients, and had previously filed other such suits. Saladino, 62 Fed.Cl. at 784. One of the prior actions was dismissed by this Court for lack of jurisdiction because Mr. Saladino did not have standing to assert a nonparty's claim for a tax refund. Id. at 790. The Court observed that it is: "well established that a dismissal for lack of jurisdiction does not constitute a final judgment on the merits and therefore has no res judicata effects." Id. However, the issue for the Court then became: "whether a plaintiff is collaterally estopped

from litigating the question of subject matter jurisdiction and/or standing based on materially indistinguishable allegations in a complaint that a court in a prior action had ruled to be insufficient to establish jurisdiction." Id. Relying in part upon the Federal Circuit's decision in Ammex, this Court held that a previous decision based upon lack of subject matter jurisdiction can act as a bar on collateral estoppel grounds in a subsequent proceeding. Id.

This Court also relied upon the Restatement (Second) of Judgments, § 20, comment b: "which explicitly adopts the rules of issue preclusion to dismissals for lack of jurisdiction despite their lack of claim -preclusive effects." Id. The Court further relied upon Restatement § 12, comment c, which provides:

> When the question of the tribunal's jurisdiction is raised in the original action, in a modern procedural regime there is no reason why the determination of the issue should not thereafter be conclusive under the usual rules of issue preclusion.

Id.

Here, the board's decision in UP II satisfies all of the requirements for issue preclusion. First, the issues are identical, namely, whether United was a party to the original contract between the Government and Castle, and whether there arose an implied contract between the Air Force and United. Second, these issues were actually litigated before the board and the board discussed these issues at length in its post-hearing decision. App. 47-49. Third, the board's decision of these issues was necessary because the board had to make factual findings to determine its jurisdiction. Thus, the board required testimony to determine whether, in 1995, United participated in negotiations with the Air Force or otherwise placed itself in a position through which a contract could have been formed by

"conduct of the parties showing . . . their tacit understanding." App. 49 (quoting City of Cincinnati, 153 F.3d at 1377). The board held that there was no such evidence, and dismissed for lack of jurisdiction. FF 7, App. 17. Finally, the board afforded United a full and fair opportunity to present its claims, as evidenced by the board's discussion of the illegal contract claims. App. 47-49. The board's opinion discusses United's various contentions at length, including United's contention that: "[c]learly no surety would have bonded an illegal Contract being improperly funded by the Government which was engaging in project-splitting . . ." App. 47 (quoting United's brief).

These are the same claims United is pursuing here. Where the claims have received a full and fair hearing, the policy considerations cited by the Federal Circuit in Graybill must be strongly considered. By not relitigating a case which has already received a nine-day hearing at the board, as well as a published decision from the Federal Circuit, the interests of judicial economy and efficient judicial administration will be served, as well as the parties' interest in finality, certainty of affairs, and finality. Graybill, 782 F.2d at 1571. The illegal contract claims should, therefore, be dismissed by the Court.

## CONCLUSION

For the foregoing reasons, defendant respectfully requests that the Court dismiss United's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/James M. Kinsella
JAMES M. KINSELLA
Deputy Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
ATTN: Classification Unit
1100 L Street, N.W.
Washington, DC 20530
Tel: (202) 353-1618
Facsimile: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
WILLIAM M. LACKERMANN, JR.
Air Force Materiel Command Law Office
Wright Patterson Air Force Base
Dayton, OH

DATED: March 25, 2005

CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of March 2005, a copy of the foregoing Motion to Dismiss was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Gary Alan Wilson
Post & Schell, P.C.
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103-2808

s/Michael N. O'Connell