IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED PACIFIC INSURANCE COMPANY, RELIANCE INSURANCE COMPANY, and RELIANCE NATIONAL, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 05-107C (Judge Firestone) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

APPENDIX TO DEFENDANT'S BRIEF


| Document | Pages |
|---|---|
| First ASBCA Decision (2001) | 1-11 |
| Final ASBCA Decision (2003) | 12-59 |
| Federal Circuit Decision | 60-65 |
| Board Transcript excerpts | 66-71 |
| ASBCA complaint excerpt | 72-74 |
| United Claim excerpt | 75-95 |

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| United Pacific Insurance Co. | ) | ASBCA No. 53051 |
| | ) | |
| Under Contract No. F28609-95-C-0036 | ) | |

APPEARANCES FOR THE APPELLANT: Gary A. Wilson, Esq.
Salil P. Patel, Esq.
Duane, Morris & Heckscher LLP
Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT: COL Alexander W. Purdue, USAF
Chief Trial Attorney
William M. Lackermann, Jr., Esq.
Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE DICUS ON APPELLANT'S MOTION FOR PARTIAL SUMMARY JUDGMENT AND RESPONDENT'S MOTION TO DISMISS PRE-TAKEOVER AGREEMENT CLAIMS FOR LACK OF STANDING

This appeal arises from a claim by a surety that completed performance under a takeover agreement. The Government moves to dismiss for lack of standing the portion of appellant's claim that arose before the takeover agreement was executed. Appellant insists that it has standing to prosecute the claim, and moves instead for summary judgment on selected aspects. For the reasons discussed *infra*, we grant the Government's motion in part and deny appellant's motion.

FINDINGS OF FACT
FOR PURPOSES OF THE MOTIONS

1. On 21 September 1995, the Department of the Air Force (Air Force or Government) awarded contract F28609-95-C-0036 (contract) to Castle Abatement Corp. (Castle) at a price of $3,152,174. The contract called for the renovation and repair of three World War II-era buildings at McGuire AFB, New Jersey. As required by the contract and the Miller Act, 40 U.S.C. §§ 270a *et seq.,* Castle furnished to the Government performance and payment bonds valued at $3,152,174 and $1,576,087, respectively. United Pacific Insurance Co. (United or appellant) was surety on the bonds tendered by Castle. United was not a party to the contract between Castle and the Air Force. (R4, tab 1; App. Supp. R4, tab 1)

2. Castle and United entered into a "Continuing Agreement of Indemnity" (the indemnity agreement) whereby Castle agreed to compensate United for losses or expenses incurred in connection with the bonds issued by United (app. resp., ex. B). As part of the indemnity arrangement, Castle pledged to United as collateral "[a]ll rights, actions, causes of action, claims and demands of the undersigned in, or arising from or out of, [contract F28609-95-C-0036] or any extensions, modifications, changes or alterations thereof or additions thereto" (*id.* at ¶ 4). The Government was not a party to the indemnity agreement, and there is no indication in the record that the Government ever approved, or consented to, that agreement.

3. After performance was underway, Castle requested in a 27 May 1997 letter that the Air Force forward to United, "Attn. Mr. Frederick Zauderer," any future payments due to Castle under the contract. Castle advised the Air Force that "[t]his direction is irrevocable in accordance with an agreement between Castle Abatement Corp. and The United Pacific Insurance Company. Please, therefore, do not permit any change or deviation from this request without your receiving written consent to any suggested change from The United Pacific Insurance Company." (App. Supp. R4, tab 33) The contracting officer, Kathleen DeMito, thereafter telephoned Mr. Zauderer. As she did not believe the 27 May 1997 letter had any legal effect, she told him a contract modification would be necessary. Mr. Zauderer reportedly told Ms. DeMito that he did not want to modify the contract as he hoped United would not have to assume total responsibility for the contract. (R4, tab 98)

4. By letter of 17 June 1997, Castle requested financial assistance from United in order to complete the project. Castle warned United that:

> [F]inancial assistance is absolutely necessary if Castle Abatement Corporation is to continue its performance of the contract, and to cure its current default of its bond and contract obligations. Should you refuse to furnish the requested assistance, we regret to advise you that we will be unable to cure our default and continue with work. Thus, we will have to abandon performance of the aforesaid contract.

(Rule 4, tab 49) The contracting officer was not aware of the letter until 8 July 1997 (R4, tab 98).

5. In a 26 June 1997 response to Castle's 27 May 1997 request, an Air Force official informed United that progress payment no.12, in the amount of $116,962.05, would be transmitted shortly, and that he had "requested payment be mailed to your office" (App. Supp. R4, tab 34). Castle had submitted Request for Payment No. 12 on 25 June 1997 and it was approved by the contracting officer on that same date. The Government released progress payment no.12 to Castle, not United. (Rule 4, tabs 87, 98) According to United, Castle did not relay the proceeds to United (App. R4 Supp, tab 41). Appellant

maintains that it "has not received any information that [Castle] used the monies paid by the Government to satisfy obligations related to the Original Contract" (app. mot. at 4). The record is otherwise silent on how Castle used the funds.

6. United rejected Castle's plea for assistance and notified the Air Force of its decision (R4, tab 50). On 15 July 1997, the Government ordered Castle to show cause why the contract should not be terminated for default (R4, tab 52). Castle responded that, "due to the discontinuance of financial support from our bonding company," Castle was suspending operations and laying off its employees (R4, tab 53). On 21 July 1997, the Government terminated the contract for default (R4, tab 55). There is no evidence that Castle appealed or otherwise contested the default termination.

7. On 5 August 1997, the Air Force and United entered into a takeover agreement whereby United agreed to complete the remaining work under the contract. Castle was not a party to the takeover agreement. By unilateral contract Modification P00008, the Government formally incorporated the takeover agreement into the contract. (R4, tab 56)

8. The takeover agreement provided in part that:

> SURETY [*i.e.,* United] expressly reserves all prior rights including but not limited to the Government's overpayment to the Contractor, equitable liens and rights to subrogation that would be the United States', the laborers' or materialmens's or the contractor's under the CONTRACT or at law or equity, as well as its own rights dating back to the execution of the performance and payment bonds, including, but not limited to those rights and remedies that may accrue during the completion of the CONTRACT. No waiver of such rights is agreed to or implied or intended regardless of any provisions of this TAKEOVER AGREEMENT to the contrary. Any disagreement between the GOVERNMENT and SURETY shall be considered a dispute within the Disputes Clause contained within the CONTRACT and SURETY shall be entitled to exercise such rights as are afforded by the Disputes Clause and the Contract Disputes Act of 1978, as amended.

(R4, tab 56 at ¶ 10)

9. The takeover agreement did not address United's right to prosecute preexisting claims belonging to Castle, and did not mention the indemnity arrangement between Castle and United. The takeover agreement made no reference to the assignment of any identifiable claim that Castle might have had against the Air Force. No three-party

agreement between Castle, United, and the Air Force was ever reached with regard to any claim that might be asserted against the Air Force. (R4, tab 56)

10. United engaged the firm of Lattimer & Associates to complete the remaining contract work (App. R4 Supp. tab 42). Although the contracting officer concedes in her affidavit that the job was substantially completed by Lattimer, she maintains that uncorrected performance deficiencies still exist. She also disputes the amount of the contract balance. According to her, United's claim therefor of $175,745.62 includes an amount "for estimated quantities which United Pacific did not do after the takeover agreement." (R4, tab 98; complaint and answer, ¶ 9)

11. In April 2000, appellant submitted a certified claim to the contracting officer (R4, tabs 64 and 65). The claim sought relief, *inter alia,* for alleged delays and changes that occurred during Castle's performance of the contract (*id.*). Upon receipt of the claim, the contracting officer informed United that a final decision would be forthcoming "on or about" 12 September 2000 (R4, tab 68). United insisted that a decision be issued "on or before" 12 September 2000 (*id.,* emphasis in original). On 18 September 2000, United appealed to this Board on grounds of a deemed denial (R4, tab 67). On that same day, United received the contracting officer's decision denying its claim (R4, tabs 66 and 68). There is no evidence that Castle authorized, or in any way participated in, the filing of the claim or the prosecution of this appeal.

## DECISION

United now moves for summary judgment on selected aspects of its claim. The Government opposes appellant's motion, and moves to dismiss for lack of standing that portion of United's allegations which arose before execution of the takeover agreement. We address the Government's motion first because the issue presented is jurisdictional. We then consider United's motion for summary judgment.

### Government's Motion to Dismiss

Pursuant to the Contract Disputes Act of 1978 (CDA), as amended, 41 U.S.C. §§ 601 *et seq.*, the Board's jurisdiction extends only to appeals brought by a "contractor." A "contractor" is defined as "a party to a Government contract other than the Government." 41 U.S.C. § 601(4). In the instant case, United entered into a takeover agreement with the Government on 5 August 1997. (Finding 7) Thus, United plainly is a "contractor" with respect to claims arising during performance of the takeover agreement. The issue to be resolved here is whether United also has standing to prosecute claims that emerged *before* execution of the takeover agreement. At that time, United was a surety on behalf of Castle, the prime contractor. (Finding 1) Appellant has the burden of establishing that it has standing, *Hackney Group and Credit General Ins. Co.,* ASBCA No. 51453, 00-2 BCA ¶ 30,931 at 152,682, citing *Maniere v. United States,* 31 Fed. Cl. 410 (1994), and that we

have jurisdiction, *Reynolds v. Army and Air Force Exchange Service,* 846 F.2d 746, 748 (Fed. Cir. 1988); *Security Ins. Co. of Hartford,* ASBCA No. 51759, 00-2 BCA ¶ 31,021 at 153,210.

Prior decisions of this Board have held that a surety, because it lacks privity of contract with the Government, has no standing to prosecute pre-takeover CDA claims for affirmative relief, unless there has been a valid assignment of those claims from the defaulted contractor to the surety. *United Pacific Ins. Co.,* ASBCA No. 52419, 01-1 BCA ¶ 31,296 at 154,507, on appeal *sub nom. United Pacific Ins. Co. v. Delaney*, Fed. Cir. No. 01-1242 ("without an assignment by the contractor to the surety to which the contracting officer consents or some other agreement between the Government, the contractor and the surety amounting to an assignment, a surety lacks standing to pursue pre-takeover agreement claims."); *Fireman's Fund Ins. Co.*, ASBCA No. 50657, 00-1 BCA ¶ 30,802 at 152,070, *aff'd on recons.,* 00-1 BCA ¶ 30,905, on appeal *sub nom. Fireman's Fund Ins. Co. v. Pirie*, Fed. Cir. No. 00-1420 ("Absent such an assignment, novation, or takeover agreement incorporating the defaulting contractor's assignment, a surety lacks standing to prosecute claims for affirmative relief, since the proper party to bring such claim must have privity of contract with the Government at the time the claim arose."); *Engineering Tech. Consultants, S.A.,* ASBCA Nos. 44237 *et al.*, 94-1 BCA ¶ 26,334. In the instant case, no formal agreement was ever reached between Castle, United, and the Air Force whereby all three parties approved the transfer of pre-takeover causes of action from Castle to United. (Finding 9) Thus, appellant will have standing to pursue pre-takeover agreement claims only if it can establish that the Government somehow agreed or acquiesced to the assignment of those claims.

United contends that, under the terms of the indemnity agreement, United acquired from Castle the right to pursue causes of action belonging to Castle under the contract. (Finding 2) Although the Government was not a party to the indemnity agreement, United maintains that the Government, by later executing the takeover agreement, recognized and accepted United's right to pursue claims that once belonged to Castle. Appellant maintains that the two agreements, when read in combination, amount to a *de facto* assignment from Castle to United of the right to pursue pre-takeover agreement claims.

We find this argument without merit. As we have noted, the Government was not a party to the indemnity agreement, and did not participate in the preparation of that agreement. (Finding 2) Since the indemnity agreement was merely a bargain between two private entities without any Government involvement, it provides no basis for our jurisdiction. *Admiralty Constr., Inc. v. Dalton,* 156 F.3d 1217, 1222 (Fed. Cir. 1998) ("The CDA gives neither this court nor the Board power to enforce or construe [the contractor's indemnity agreement with the surety]."); *United Pacific Ins. Co.,* 01-1 BCA at 154,506 ("Board jurisdiction on behalf of a surety is not obtained through the provisions of an indemnity agreement between the surety and a contractor."). Nor are we persuaded that the Government might have consented to the terms of the indemnity agreement by later

executing the takeover agreement. The takeover agreement made no reference to the indemnity agreement, or to the assignment of any claims from Castle to United. (Finding 9) Indeed, there is no reason to believe that the Government even was aware of the indemnity agreement's existence until after the takeover agreement was executed. It is true that the takeover agreement did contain language reserving United's right to pursue litigation against the Air Force. (Finding 8) However, we construe the language in question as addressing causes of action that would be available to a surety by way of equitable subrogation. (*Id.*) Accordingly, we see no indication, either in the takeover agreement or elsewhere in the record, that the parties intended and bargained for United to pursue claims belonging to Castle that arose before execution of the takeover agreement. We conclude that the Government did not consent to the purported transfer of claims. Because no valid assignment occurred, appellant lacks standing to pursue pre-takeover agreement claims belonging to Castle. *Cf. Ins. Co. of the West*, ASBCA No. 35253, 88-3 BCA ¶ 21,056 (surety was entitled to prosecute an appeal in its own name when the Government, the surety, and the defaulting contractor entered into a three-party takeover agreement that specifically assigned to the surety the right to pursue the defaulted contractor's claims).

The parties also debate the extent to which United might pursue pre-takeover agreement allegations under a theory of equitable subrogation. Generally, "to maintain a claim for equitable subrogation, a surety must either take over contract performance or finance the completion of the defaulted contract under its performance bond." *Admiralty Constr., Inc. v. Dalton,* 156 F.3d at 1222. Under equitable subrogation, a surety has standing to claim funds held by the Government or funds improperly disbursed to a third party. *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1161-63 (Fed. Cir. 1985); *Peerless Ins. Co.*, ASBCA No. 28887, 88-2 BCA ¶ 20,730 at 104,740. However, equitable subrogation does not provide a basis for a surety to prosecute claims belonging to the original contractor that arose before execution of a takeover agreement. *United Pacific Ins. Co.,* 01-1 BCA at 154,508; *Fireman's Fund Ins. Co.,* 00-1 BCA at 152,071; *Westech Corp. v. United States,* 20 Cl. Ct. 745, 749-50 (1990) (refusing to allow surety to recover via equitable subrogation for alleged delays and acceleration suffered by prime contractor, because "a surety's recovery of such damages suffered by a contractor is simply beyond the scope of equitable subrogation.").

The Air Force maintains that a recent Supreme Court decision, *Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255 (1999), may have restricted, or even abolished, the doctrine of equitable subrogation. (Gov. mot. at 11-14) In *Blue Fox*, the Supreme Court considered a suit by a subcontractor against the Government under the Administrative Procedure Act, 5 U.S.C. § 702. The subcontractor sought an "equitable lien" on contract proceeds not paid to the prime contractor. In a unanimous decision, the Supreme Court determined that the subcontractor's suit was barred under the doctrine of sovereign immunity. Furthermore, addressing a line of equitable subrogation cases, the Supreme Court declared that these decisions "do not in any way disturb the established rule that, unless waived by Congress, sovereign immunity bars subcontractors and other creditors

from enforcing liens on Government property or funds to recoup their losses." *Blue Fox,* 525 U.S. at 265. Relying on *Blue Fox*, the Air Force suggests that "the Supreme Court's statements call into question all of the equitable subrogation cases that have not included an analysis of sovereign immunity in the decision." (Gov. mot. at 13)

In response, United invokes an even more recent decision in which the Court of Appeals for the Federal Circuit considered the impact of *Blue Fox* on the doctrine of equitable subrogation. *Ins. Co. of the West,* 243 F.3d 1367 (Fed. Cir. 2001). In its decision, the Court of Appeals found that the United States has waived sovereign immunity for equitable subrogation claims by a surety against the Government. *Ins. Co. of the West,* 243 F.3d at 1372-75. According to the Federal Circuit, *Blue Fox* -- which did not involve an equitable subrogation issue at all -- "did not upset the longstanding rule that [an equitable subrogation] suit is not barred by the doctrine of sovereign immunity." *Ins. Co. of the West,* 243 F.3d at 1369.

The Federal Circuit's interpretation of *Blue Fox* is controlling precedent for this Board. *E.g., Mendenhall v. Cedarapids, Inc.,* 5 F.3d 1557, 1570 (Fed. Cir. 1993), *cert. denied*, 511 U.S. 1031 (1994). Accordingly, following *Ins. Co. of the West,* we find that, to the extent that United could have pursued a claim for equitable subrogation before *Blue Fox*, it may also do so now. Thus, appellant would have standing under equitable subrogation to assert a claim for funds retained by the Government or improperly disbursed to Castle. On the other hand, neither the Supreme Court nor the Federal Circuit appear to have *expanded* the doctrine of equitable subrogation so as to permit a surety, without privity of contract, to pursue claims belonging to the original contractor that arose before execution of a takeover agreement. Therefore, in accordance with our above analysis, United has no standing to prosecute claims arising from Castle's performance prior to the 5 August 1997 takeover agreement.

The Government's motion to dismiss is granted except as to its argument that the doctrine of equitable subrogation has been altered by *Blue Fox*. We retain jurisdiction of the post-takeover portions of the appellant's allegations, as well as its equitable subrogation claims for the contract balance and improper disbursement of funds.

Appellant's Motion for Summary Judgment

United has moved for summary judgment. We evaluate the motion under the established standard that:

> Summary judgment is properly granted only where there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law. . . . The moving party bears the burden of establishing the absence of any genuine issue of

> material fact and all significant doubt over factual issues must be resolved in favor of the party opposing summary judgment.

*Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed. Cir. 1987); FED. R. CIV. P. 56. Moreover, as the movant with the burden of proof at trial, appellant's position requires a positive showing. *Calderone v. United States*, 799 F.2d 254, 259 (6th Cir. 1986), citing W. Schwarzer, *Summary Judgment Under the Federal Rules: Defining Issues of Material Fact*, 99 FRD 465, 487-88 (1984).* Finally, in deciding a motion for summary judgment, our task is not to resolve factual disputes, but to ascertain whether material disputes of fact are present. *General Dynamics Corp.*, ASBCA Nos. 32660, 32661, 89-2 BCA ¶ 21,851.

United seeks summary judgment on two principal issues. First, United maintains that it fully performed its contractual obligations under the takeover agreement, and therefore is entitled to recover the unpaid contract balance. Second, appellant insists that the Government improperly released progress payment no.12 to Castle, even though the Government previously had been advised that such payments should be made only to United. According to appellant, the misdirected payment harmed United by forcing it to expend additional funds from its own resources to complete the contract.

Regarding the issue of the unpaid contract balance, a surety that finances a contract to completion is subrogated to the contractor's property rights in that unpaid balance. *Balboa Ins. Co.,* 775 F.2d at 1161. The Government here disputes whether United and Lattimer have actually completed the contract work in a satisfactory fashion. (Finding 10) According to the Government, the work did not fully conform to contract requirements, and the claimed amount includes estimated quantities which appellant did not provide. (Resp. reply at 9) The Government supports its position with the contracting officer's affidavit (finding 10). We are thus confronted with a material dispute of fact concerning whether United completed the contract, thereby placing its entitlement to the unpaid contract balance at issue. As the party opposing summary judgment, the Government is entitled to the benefit of all inferences that can reasonably be drawn from the facts. *Mingus Constructors, supra.* Appellant, on the other hand, is the party with the burden of proof at trial and it must make a stronger showing than it has here. *Calderone, supra.* We conclude that appellant has not established that it is entitled to judgment as a matter of law on this issue.

---

* When the movant does not have the burden of proof at trial, it may be sufficient to show that the nonmoving party cannot meet its burden. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322-23 (1986); Schwarzer, *supra* at 487. Here, United has the burden at trial and it cannot place the ball in respondent's court without affidavits or other evidence sufficient to establish its case.

Appellant also contends that it is entitled to summary judgment concerning the Government's disbursement of progress payment no.12. According to appellant, progress payment no.12 was improperly forwarded to Castle even after the Government was notified that future progress payments should be made to United. (Findings 3-5) While acknowledging that it received the notification, the Government insists that its payment to Castle was appropriate.

It is settled law that, once a surety notifies the Government that the surety's interest is in jeopardy because of default by the contractor, the Government becomes a "stakeholder" for the remaining contract proceeds. *E.g., Ransom v. United States*, 900 F.2d 242, 245 (Fed. Cir. 1990). If the Government unreasonably fails to protect the surety's interest, such as by improperly releasing payments to the defaulted contractor, the Government may be liable to the surety for its actions. On the other hand, the Government also has an interest in the timely and efficient completion of contract work, and therefore is entitled to exercise discretion in overseeing performance and making payments. *Balboa Ins. Co. v. United States,* 775 F.2d 1158 (Fed. Cir. 1985). Thus, the Government's obligations as "stakeholder" do not necessarily take precedence over other considerations of contract administration. Rather, the Government is charged with a "duty to exercise its discretion responsibly and to consider the surety's interest in conjunction with other problems encountered in the administration of the contract." *Balboa*, 775 F.2d at 1164 (quoting *Argonaut Ins. Co. v. United States,* 434 F.2d 1362, 1368 (Ct. Cl. 1970)). The Federal Circuit has identified eight criteria to be considered in determining whether the Government exercised reasonable discretion in distributing funds. *Balboa*, 775 F.2d at 1164-65.

In the instant case, there is a dispute of fact as to whether the Air Force had sufficient notice that United's interest was imperiled, such as to give rise to a "stakeholder" relationship. Ms. DeMito telephoned United's representative, Mr. Zauderer, and explained that the contract needed to be modified for payments to be forwarded. According to her, he declined to take the necessary steps and told her he hoped United would not have to assume total responsibility for the contract (finding 3). Ms. DeMitio was not aware of Castle's 17 June 1997 letter until after payment no. 12. This falls short of the factual predicate necessary for judgment.

Moreover, assuming that the Government was a "stakeholder," it does not follow that any payment made to Castle would necessarily be improper. Instead, our decision would turn on whether the Government acted reasonably in making the payment to Castle rather than United. We have generally refused to grant summary judgment where the reasonableness of conduct was at issue. *United Technologies Corporation/Pratt & Whitney,* ASBCA No. 43645, 94-3 BCA ¶ 27,241*; see also U.S. Fidelity & Guaranty Co. v. United States,* 16 Cl. Ct. 541, 546 (1989) (refusing to decide on summary judgment whether the Government abused its discretion by forwarding progress payments to the contractor after notice of default because "[t]he resolution of this issue depends on the

factors enumerated in *Balboa*, for which there is an insufficient record upon which this court can render judgment."). Finally, even if it were clear that the Government's payment to Castle was improper, it would still be "relevant to consider what the contractor did with the released funds. If the unauthorized payments were expended for the purposes of the contract so that the extent of the surety's subsequent performance was reduced thereby, any injury to the surety would to that extent be mitigated." *National Surety Corp. v. United States,* 118 F.3d 1542, 1548 (Fed. Cir. 1997). Here, we are offered little information as to how Castle chose to expend the proceeds in question. (Finding 5) As the proponent of the claim, the burden is on United and it may not be granted summary judgment with no more than its statement that it has no information that Castle used the funds in contract performance (finding 5). *Calderone, supra.* Accordingly, a more detailed record is necessary before we could determine whether the Government's handling of progress payment no.12 was an abuse of discretion, and whether United suffered any resulting injury. The existing record is insufficient to conclude that appellant is entitled to judgment as a matter of law on these issues.

## Conclusion

The Government's motion to dismiss is granted except as to equitable subrogation. Appellant's motion for summary judgment is denied.

Dated: 20 July 2001

CARROLL C. DICUS, JR.
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

EUNICE W. THOMAS
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 53051, Appeal of United Pacific Insurance Co., rendered in conformance with the Board's Charter.

Dated:

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals

ARMED SERVICES BOARD OF CONTRACT APPEALS

| | | |
|---|---|---|
| Appeal of -- | ) | |
| | ) | |
| United Pacific Insurance Company | ) | ASBCA No. 53051 |
| | ) | |
| Under Contract No. F28609-95-C-0036 | ) | |

APPEARANCES FOR THE APPELLANT: Gary A. Wilson, Esq.
Salil P. Patel, Esq.
Duane Morris LLP
Philadelphia, PA

APPEARANCES FOR THE GOVERNMENT: COL Alexander W. Purdue, USAF
Chief Trial Attorney
William M. Lackermann, Jr., Esq.
Senior Trial Attorney
MAJ Brian T. Varn, USAF
Trial Attorney

OPINION BY ADMINISTRATIVE JUDGE DICUS

This appeal is taken from a contracting officer's decision denying appellant's claim for an equitable adjustment in the amount of $3,591,362.62.[1] The underlying contract was for work to renovate Buildings 2401, 2402 and 2403 at McGuire Air Force Base, New Jersey. The original contractor, Castle Abatement Corp. (Castle), was terminated for default and United Pacific Insurance Company (UPI),[2] as surety to Castle, entered into a takeover contract with the Air Force for completion of the contract. Both entitlement and quantum are at issue. We dismiss a substantial portion of the appeal for lack of jurisdiction and deny the remainder.

BACKGROUND

Portions of UPI's claim sought recovery for alleged changes which arose during Castle's performance. The Air Force filed a motion to dismiss on jurisdictional grounds those claim items that arose before the takeover agreement, and argued further that UPI was not entitled to recover under the principle of equitable subrogation because of the U.S. Supreme Court's decision in *Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255

12

(1999). We dismissed the pre-takeover agreement claim items but held that our jurisdiction to resolve equitable subrogation claims remained intact. *United Pacific Insurance Co.,* ASBCA No. 53051, 01-2 BCA ¶ 31,527 (*UP 1*).[3] In light of the Federal Circuit's decision in *Fireman's Fund Insurance Co. v. England,* 313 F.3d 1344 (Fed. Cir. 2002), we revisit the latter holding *infra*.

## FINDINGS OF FACT

### The Programming Process and the Contract with Castle

1. Contract No. F28609-95-C-0036, in the amount of $3,152,174, was awarded to Castle as low bidder on 21 September 1995. The substance of the contract and the underlying solicitation was the same, calling for work to renovate Buildings 2401, 2402 and 2403. (R4, tabs 1, 4) Buildings 2402 and 2403 had previously been used as temporary administrative offices (tr. 1645-46). The contract's basic requirement, as set out in CLIN 0001, was for "[a]ll work to renovate Bldg 2401" and was "inclusive of CLINs 0001-0005AH." CLIN 0001AA was for "[c]onstruction costs for renovation of Bldg 2401," which had a cost limitation of $300,000, and which Castle priced at $297,400. CLIN 0001AB was for "[r]epair costs for renovation," which Castle priced at $563,861. CLINs 0002 through 0005AH were estimated quantities to be priced at fixed unit prices. The not-to-exceed total for CLINs 0001-0005AH was $878,033.50. Work for Buildings 2402 and 2403 was set out as optional requirements in virtually the same manner as work for Building 2401. Building 2403 (CLINs 0006 through 0010AH) was Optional Requirement No. 1 and Building 2402 (CLINs 0011 through 0015AH) was Optional Requirement No. 2. Castle priced the not-to-exceed total for Building 2403 work at $1,074,623.50 and Building 2402 work at $1,196,517. Optional Requirement No. 3 (CLIN 0016) was for "[a]ll work to construct building connectors from Bldg. 2402, 2401 and 2403." The connectors were to be evaluated by prorating the amounts between the buildings "to ensure the combined amount [for CLINs 0001AA, 0006AA and 0011AA] does not exceed the cost limitation of $300,000." The process of prorating was to apply one-half of CLIN 0016 to CLIN 0001AA, with the remainder split between CLINs 0006AA and 0011AA. Castle priced the connectors at $3,000. Castle priced CLINs 0006AA and 0011AA at $297,423. Thus, the price for CLIN 0001AA with the addition of the prorated connector cost was $298,900, and the price for CLINs 0006AA and 0011AA with the prorated connector cost was $298,173 each. (R4, tab 1 at 1-13 of 46) The reason for including various items as options was to prevent redesigning and repackaging the entire effort if statutory limits were exceeded. By not buying certain options, a contract within statutory limits could still be awarded. (Tr. 1326-27) Since statutory limits were not exceeded, the contract total included all optional items.

2. The contract incorporated by reference the following clauses: FAR 52.232-5 PAYMENTS UNDER FIXED-PRICE CONSTRUCTION CONTRACTS (APR 1989); FAR 52.233-1 DISPUTES (DEC 1991); FAR 52.243-4 CHANGES (AUG 1987); FAR 52.246-12 INSPECTION

OF CONSTRUCTION (JUL 1986); FAR 52.246-12 WARRANTY OF CONSTRUCTION (APR 1984); and FAR 52.249-10 DEFAULT (FIXED-PRICE CONSTRUCTION) (APR 1984). Also incorporated was FAR 52.236-6 SUPERINTENDENCE BY THE CONTRACTOR (APR 1984) which requires a full-time superintendent on-site at all times. (R4, tab 1 at 15, 25, 26 of 46)

3. The contract specification included the following relevant provisions:

MECHANICAL
SECTION 15400
PLUMBING, GENERAL PURPOSE

. . . .

D. Operational Test

Upon completion of and prior to acceptance of the installation, the Contractor shall subject the plumbing system to operating tests to demonstrate satisfactory functional and operational efficiency. Such operating tests shall cover a period of not less than 8 hours for each system and shall include the following information in a report with conclusion as to the adequacy of the system:

1. Time, date, and duration of test.

2. Water pressures at the most remote and the highest fixtures.

3. Operation of each fixture and fixture trim.

4. Operation of each valve, hydrant, and faucet.

5. Pump suction and discharge pressures.

6. Temperature of each domestic hot-water supply.

7. Operation of each floor and roof drain by flooding with water.

8. Operation of each vacuum breaker and backflow preventer.

9. Complete operation of each water pressure booster system, including pump start pressure and stop pressure.

. . . .

MECHANICAL
SECTION 15556
FORCED HOT WATER HEATING SYSTEM USING WATER

. . . .

3.14 TESTING AND CLEANING

A. Pressure Testing

The Contractor shall notify the Contracting Officer 15 days before the tests are to be conducted. The tests shall be performed in the presence of the Contracting Officer. The Contractor shall furnish all instruments and personnel required for the tests. Electricity, steam, and water will be furnished by the Government. All test results shall be accepted before thermal insulation is installed. The entire low temperature heating system, including heat exchanger, radiators and fittings, shall be hydrostatically tested and proved tight under a pressure of 45 psig for a period of four hours.

. . . .

ELECTRICAL
SECTION 16415

. . . .

3.16 TESTS

After the interior-wiring-system installation is completed, and at such time as the Contracting Officer may direct, the Contractor shall conduct an operating test for approval. The equipment shall be demonstrated to operate in accordance with the requirements of this specification. The test shall be performed in the presence of the Contracting Officer. The Contractor shall furnish all instruments and personnel required

> for the tests, and the Government will furnish the necessary electric power. No part of the electrical distribution system shall be energized prior to the resistance testing of that systems [sic] ground rods and submission of test results to the Contracting Officer. Test reports shall indicate the location of the rod and the resistance and the soil conditions at the time the test was performed.

(R4, tab 3 at 15400-1, -27, -28, 15556-1, -19, 16415-1, -21)

4. Air Force Instruction 32-1032, 11 May 1994, Planning and Programming Real Property Maintenance Projects Using Appropriated Funds (APF), implemented relevant Air Force policy at the time of the solicitation for Contract No. F28609-95-C-0036. Minor construction projects are defined therein as military construction projects with an approved cost of $1,500,000. Minor construction projects costing $300,000 or less may be funded from the Air Force's operations and maintenance (O&M) appropriation. Examples of minor construction projects include construction of a new building or system, an expansion of a building, conversion to a new primary function, and repair-type work which exceeds 70 percent of replacement cost. (Ex. G-16 at 4) Accordingly, prior to issuing the solicitation Air Force personnel determined that Building 2402[4] would be the most expensive part of the contract. An analysis was performed and it was concluded that the work on Building 2402 would not exceed 70 percent of replacement cost. (App. R4 supp. C, tab 212; tr. 1351-55) Classification of the work was necessary because the contract was a combination of repair and construction and the statutory limit of $300,000 on minor construction work funded with O&M funds needed to be tracked (tr. 1232). It was Air Force policy to have bidders break down their bids to show minor construction costs (tr. 1364-65).

5. The contract work was treated as three projects for funding purposes under Air Force policy, with separate work orders and project numbers. Funds for the contract work were reserved individually and ultimately funded with separate procurement requests. O&M funds were reserved and allocated as follows: Building 2401 - $97,000 and $298,900; Building 2402 - $213,000 and $298,200; and Building 2403 - $213,000 and $298,200. (R4, tabs 6, 7) A McGuire employee consulted with Air Mobility Command to determine if construction of the connectors might create a situation where Buildings 2401, 2402 and 2403 had to be treated as one building for programming purposes. He was told that as long as the connectors were not "conditioned space"[5] they remained separate buildings. (Tr. 1344-45) Accordingly, McGuire programmed the contract as three separate projects with three separate statutory limits on minor construction (tr. 1359).

6. The $3,000 price placed on the connectors by Castle was significantly less than the Government estimate of $134,000 and the other bidders' bids of $344,000, $290,000 and $260,000 (R4, tab 17). Castle was asked to confirm its bid with particular emphasis on



16

the connectors and it did so (R4, tabs 19, 20). One of the bidders filed a bid protest, which was withdrawn prior to award of the contract (R4, tab 23; tr. 1582-83).

7. UPI issued performance and payment bonds to Castle. The bonds expressly bound UPI to the Government, and thus the Air Force, under the contract for the penal sum. The Government was not a party to the bonds. Other than issuance of the bonds, there is no evidence of UPI's participation in the contracting process or that UPI was in a position to be part of the contracting process. The penal sum of the performance bond was $3,152,174 and the penal sum of the payment bond was $1,576,087. (App. R4 supp. A, tab 1) Castle and UPI entered into an indemnity agreement in which Castle pledged to UPI as collateral, *inter alia,* "[a]ll rights, actions, causes of action, claims and demands of the undersigned in, or arising from or out of, [the contract] or any extensions, modifications, changes or alterations thereof or additions thereto" (app. R4 supp. B, tab 2, ¶ 4(b)).

8. Changes were made to the contract between December 1996 and June 1997 through Modification (Mod.) Nos. P00003-P00006 which increased the price by $394,857.96 to $3,452,106.96 (R4, tabs 41, 45, 47, 48) and extended the completion date to 29 August 1997 (R4, tab 47).

<u>Castle's Performance, Financial Difficulties and Events Leading to Default</u>

9. Notice to proceed was issued on 16 October 1995. Castle was given 10 days to commence work and 300 days from 16 October 1995 to complete the contract. (R4, tab 27) Castle was thus to complete by 11 August 1996.

10. On 22 March 1996, Castle submitted a progress schedule (Revision 5). Percentages of completion were projected as follows:

| | Percentages by Building | | |
|---|---|---|---|
| Work Elements | Bldg. 2401 | Bldg. 2402 | Bldg. 2403 |
| Bonds | .30 | .40 | .40 |
| Mobilization | 1.20 | 1.50 | 1.50 |
| Demolition | 2.18 | 2.76 | 2.76 |
| Asbestos Abatement | .60 | 1.70 | 2.40 |
| Sitework | .96 | 1.22 | 1.22 |
| Concrete | 1.84 | 2.33 | 2.33 |
| Masonry | 2.30 | 5.10 | 4.40 |
| Metal | .70 | 1.40 | 1.40 |
| Carpentry | .70 | 3.66 | 1.14 |
| Thermal/Moisture | .14 | .18 | .18 |
| Doors/Windows | 2.70 | 3.40 | 3.40 |
| Finishes | 3.00 | 4.00 | 4.00 |
| Specialties | .42 | .54 | .54 |
| Furnishings | .24 | .33 | .33 |
| Mechanical | 4.80 | 5.60 | 5.66 |
| Electrical | 4.00 | 4.10 | 4.10 |
| Total | 26.08% | 38.22% | 35.70% |

(R4, tab 31)

11. During contract performance, the Air Force construction inspector was Mr. Robert Jaques. Mr. Jaques tried to visit the site everyday. His visits lasted from 15 minutes to an hour. (Jaques dep. at 10, 21-22, 103) He reported the contractor's progress to the contracting officer and progress payments were made based on Mr. Jaques' estimate of progress (tr. 1663-64). He understood his responsibilities to include reporting deficiencies in contractor performance to the project superintendent or manager, and then to the contracting officer (Jaques dep. at 71-72). He did not check electrical work or plumbing insulation before the walls were sheetrocked. He considered that to be the responsibility of quality control, which in Mr. Jaques' view was the contractor's job. (Jaques dep. at 118-19)

12. Castle's slow progress caused concern (exs. A-14 through -17). In May of 1996, Castle had only completed 17.5 percent of the work when its progress schedule showed it should have been 66.73 percent complete. Mr. Jaques requested that the contracting officer obtain a written explanation from Castle. (R4, tab 150) On 11 August 1996, Castle was only 27 percent complete (Jaques dep. at 129).

13. Castle began to experience significant financial difficulty that caused UPI to take a more active role. On 3 December 1996, Mr. Frederick M. Zauderer, Vice President and Claims Counsel for Reliance National, wrote to Castle that UPI was "very concerned" about Castle's nonpayment of subcontractors in the total amount of $400,000 and claims against Castle's bonds. Mr. Zauderer demanded that Castle resolve these issues within 10 days. He stated that UPI was considering establishing reserves for the claims. The letter notes a copy to Andrew J. Ruck, Esq., UPI counsel. (R4, tab 100) Mr. Zauderer made all of the surety's decisions relevant to this appeal (tr. 113).

14. In a 6 December 1996 letter to Castle, also copied to Mr. Ruck, Mr. Zauderer took exception to Castle's representation that it had paid one of its subcontractors and referenced discussion about "bounced" checks (R4, tab 102). During this period, UPI orally requested that the current payment to Castle be held "pending investigation" (R4, tab 76). On 11 December 1996, Mr. Ruck wrote to Mr. Saul Lefkowitz, Air Force contract specialist (tr. 1150),[6] and consented to payment to Castle (R4, tab 39). However, by letter of 13 December 1996 Mr. Ruck wrote to Mr. Lefkowitz and requested that Payment Request No. 8 be withheld (R4, tab 40). This request was withdrawn by letter of 23 December 1996 (R4, tab 42). For reasons that are not clear on this record, two checks were issued to Castle for Payment Request No. 7--16 December 1996, in the amount of $150,977.31, and 3 January 1997, in the amount of $150,043.70 (R4, tabs 78, 80, 90).

15. Defense Finance and Accounting Service (DFAS) asked Castle to return $150,043.70 by letter of 24 November 1998 and asked UPI to return the same amount by letter of 10 December 1998 (R4, tabs 90, 91). UPI refused by letter of 23 December 1998 (R4, tab 92).

16. By letter of 8 January 1997, Mr. Ruck reported to Mr. Zauderer on an investigation of Castle. Regarding the contract at issue, Mr. Ruck reported that Castle was 68.95 percent complete, and concluded it was one of two projects warranting immediate attention. (R4, tab 105 at 6, 10) The contracting officer was not informed of this conclusion (tr. 1646-47).

17. By letter to Castle of 6 February 1997, copy to Mr. Ruck, Mr. Zauderer reminded Castle of subcontractor claims and again demanded resolution within 10 days (R4, tab 107). On 5 March 1997, in response to a 26 February 1997 letter from a Castle subcontractor, Mr. Zauderer informed the subcontractor UPI was investigating its claim of nonpayment against Castle (R4, tabs 108, 109). In another 5 March 1997 letter, Mr. Zauderer requested from Castle specific information about various claims (R4, tab 111). By letter of 25 April 1997, Mr. Zauderer provided Castle with a list of outstanding payment claims which showed claims totaling $302,143.38 on the instant contract and asked for an update (R4, tab 114).

18. On or about 30 April 1997, First Community Bank approved a $1,000,000 line of credit for Castle (R4, tab 115).

19. On 21 May 1997 in a letter to Castle, Mr. Zauderer forwarded summonses and complaints filed against Castle in litigation instituted by a Castle subcontractor, and in which UPI was a named defendant. He demanded that Castle resolve the matter immediately. (R4, tab 120) By FAX dated 21 May 1997, Castle forwarded to UPI spreadsheets showing claims in excess of $300,000 on the instant contract (R4, tab 121).

20. On 27 May 1997, Castle wrote to First Community Bank regarding its initial draw of $685,664.90 and the subcontractors to which that sum would be paid:

> As per your conversation with Mr. Fred Zauderer from [UPI], and in accordance with an agreement between our bonding company and [Castle] and Castle Construction & Management Services, Inc., herein we are requesting to disburse as an initial draw down from our Line of Credit, the following payments . . . .

(R4, tab 123). At or about this time Mr. Zauderer informed the contracting officer of the loan and the disbursements. Both the Air Force and UPI were trying to work with Castle and continue the contract. (Tr. 458)

21. On 30 May 1997 Castle, as borrower, UPI as subordinator, and First Community Bank, as lender, entered into a Subordination Agreement wherein UPI agreed to subordinate its security interest to the bank's security interest. The agreement was intended to induce the bank to make a lending transaction with Castle. (R4, tab 124)

22. By letter of 17 June 1997, Castle informed UPI that it needed financial assistance from UPI if it was to continue performance of the contract. Castle stated that it would abandon performance if assistance was not forthcoming. (R4, tab 49) On 17 June 1997, UPI and Castle entered into an interim financing agreement whereby UPI agreed to advance $350,000 to Castle (R4, tab 126).

23. Contract Progress Report No. 33, for the period ending 24 June 1997, shows the percent of the total job and each individual task completed as follows:[7]

| Work Elements | % Completed | % of Total Job | % of Task |
|---|---|---|---|
| Bond | .98 | 0.98 | 100 |
| Mobilization | 3.73 | 3.73 | 100 |
| Demolition | 7.10 | 7.56 | 94 |
| Asbestos Abatement | 4.18 | 4.41 | 95 |
| Site | 2.44 | 3.02 | 81 |
| Concrete | 6.14 | 7.68 | 80 |
| Masonry | 9.25 | 9.86 | 94 |
| Metal | 2.97 | 3.27 | 91 |
| Carpentry | 6.55 | 7.36 | 89 |
| Thermal | 0.51 | 0.64 | 80 |
| Doors/Windows | 7.11 | 11.10 | 64 |
| Finishes | 5.34 | 10.59 | 50 |
| Specialties | 0.00 | 0.76 | 0 |
| Furnishings | 0.00 | 0.80 | 0 |
| Mechanical | 13.49 | 14.87 | 91 |
| Electrical | 10.12 | 13.37 | 76 |
| TOTAL | 79.91 | 100.00 | |

(R4, tab 97 at 65) Mr. Jaques approved the report. UPI was aware of the report and the estimate of 79.91 percent completion at or about the time of the report (tr. 93, 99).

24. On 30 June 1997, Castle sent a FAX to Mr. Zauderer thanking him for wiring funds to cover Castle's payroll and seeking $42,227.96 to cover payroll taxes (R4, tab 132). There is no evidence UPI paid Castle's payroll taxes, although UPI's payments under the contract continued into July 1997 (R4, tab 359, admission 11; app. R4 supp. B, tab 15). Mr. Zauderer was motivated to cut-off funding to Castle and trying to rehabilitate Castle when he uncovered what he believed to be evidence that Castle's president was "robbing his own company" (tr. 458).

25. In an 8 July 1997 letter, Mr. Ruck, counsel to UPI, forwarded a copy of Castle's 17 June 1997 letter to Ms. Kathleen DeMito, the contracting officer. He informed Ms. DeMito that UPI did not intend to render further assistance to Castle. (R4, tab 50) In a 15 July 1997 memorandum to Headquarters, Air Force Materiel Command, referencing this information, termination authority was requested on behalf of Ms. DeMito, and a show cause notice was issued to Castle (R4, tabs 51, 52). Thereafter, by letter to its employees of 15 July 1997, received that date by Mr. Ruck, Castle announced that it was abandoning performance (R4, tab 53). Termination authority was received on 17 July 1997 and the contract was terminated for default on 21 July 1997 because of Castle's abandonment of performance (R4, tabs 54, 55). There is no evidence of an appeal or lawsuit filed by Castle

contesting the termination for default. We find Castle did not contest the termination for default.

26. At the time of termination progress payments had been made to Castle as follows:

| Application No. | Amount of Payment |
|---|---|
| 1 | $ 35,022.00 (R4, tab 69) |
| 2 | 454,553.81 (R4, tab 70) |
| 3 | 59,770.00 (R4, tab 71) |
| 4 | 192,283.00 (R4, tab 72) |
| 5 | 660,380.52 (R4, tab 73) |
| 6 | 457,064.70 (R4, tab 74) |
| 7 | 150,977.31 (R4, tab 78) |
| 7 | 150,043.70 (R4, tabs 75-77, 79, 80; finding 14) |
| 8 | 162,021.57 (R4, tab 81) |
| 9 | 346,962.24 (R4, tab 82) |
| 10 | 120,692.73 (R4, tab 83) |
| 11 | 76,392.25 (R4, tab 84) |
| 12 | 116,962.05 (R4, tab 87) |
| Total | $2,983,004.36 |

The contract completion percentage reported by the Air Force was 79.91 percent (finding 23).

The Takeover Agreement and Work Thereunder

27. Mr. Zauderer relied on the Air Force's 79.91 percent completion estimate in entering into the takeover agreement (tr. 93, 99). He testified that he did not make an inspection of the site prior to entering into the takeover agreement (tr. 426). UPI did not obtain a signed contract, bids or a fixed-price from a prospective completion contractor (tr. 427). It obtained the services of Lattimer & Associates, LLP (L & A) (app. R4 supp. B, tab 4; tr. 56-61, 718-20). L & A was to complete the contract work and handle all claims (app. R4 supp. B, tab 4). L & A was formed in July 1997 by Mr. Clyde Lattimer and its purpose was to do work for UPI and other bonding companies (tr. 718-19). C. M. Lattimer & Son Construction Company, Inc. (Lattimer) was a bonded construction company formed some 20 years ago and owned by Clyde Lattimer, his wife and son Scott. Mr. Clyde Lattimer felt it best to keep it separate from L & A. (Tr. 712, 718) The agreement between L & A and UPI is documented by the following 6 August 1997 two-page, unsigned letter from Mr. Clyde Lattimer to Mr. Ruck:

> I think it would be much simpler if the following format and items were to be issued as a contract to us. First of all,

Lattimer and Associates would manage all work on this project and complete the work in accordance with the contract documents and change orders that have been issued by the government, as well as handling and negioating [sic] claims, for all four projects.

Item 2. Employees on the project will be paid by Lattimer and Associates with a markup of 39% on top of raw cost. The 39% will pay for workman's compensation, general liability, FICA, state and federal unemployment insurance and other items necessary to be paid to the state and federal government. All other payments, such as payments to subcontractors, vendors, and suppliers will be paid by Lattimer and Associates with a markup of 1.25% on these items. This 1.25% is to pay cost of the insurance, which I have previously sent copies of a letter to Fred. Subcontractors employed by Clyde N. Lattimer and Son or Lattimer and Associates will either work on a lump sum basis or on a time and material basis as determined by the type of work they are doing. As for payments to the Supervisory people of Lattimer and Associates, they will be billed as follows:

Clyde and Scott Lattimer will be billed at $95 per hour, for each hour worked plus out of pocket expenses, such as automobile expenses, meals and so forth.

Project Managers and accounting personnel will be billed at the rate of $75 per hour which is an all inclusive rate. No additional expenses or charges will be incurred on these numbers.

Secretarial work will be billed at $35 per hour.

Lattimer and Associates will provide and pay all insurance required for this project. Subcontractors are to provide their own insurance in accordance with the contract documents.

Project Superintendents will be paid for at the rate of $68 per hour. This is a fully loaded rate, including insurance, taxes, vehicles, health insurance, and so forth.

> All of the above rates are fully loaded rates with workman's compensation, general liability, pickup trucks, cars, and other expenses related to these employees.
>
> The Bonding Company has agreed to fund this project with payroll and other deposits into Lattimer's account at the time the moneys are being dispersed. If the money is not transferred Lattimer will meet the payroll and will be allowed to charge interest until the money has been received.
>
> Lattimer and Associates will not be responsible for any incorrect work done on the project prior to its coming there or during the completion phase of this work. There are so many records that are missing that no one could be sure as to exactly what has been changed and what has not. We are going to limit our liability, and are not taking responsibility for the accuracy of what we are doing, in terms of change orders, etc. In addition we require that the bonding company would pickup all legal cost should any of these jobs go to litigation, arbitration, etc.
>
> Lattimer will also review phases of work that have not been subbed out and try to find contractors to perform this work. We will review these numbers with Fred Zauderer. If the numbers appear to be too high, it would be our intent to do the work on a time and material basis. The judgment will be discussed with Fred as work consists.
>
> Accounting will be kept by individual jobs and turned over to Fred Zauderer at least on a monthly basis. I believe this is an accurate statement as to what we intend on doing and I would like to see the contract written on this basis. Thank you.

(App. R4 supp. B, tab 4) There is no evidence, and we find, that no formal contract was ever written.

28. Mr. Clyde Lattimer made several site visits, at least one of which was two or three weeks before the termination for default (tr. 724). According to Mr. Clyde Lattimer the site was a "disaster" (tr. 724-25). He had a conversation with a Castle employee, Mr. Peter Chero, within a week after the termination. Mr. Chero informed him that Castle's president had been told to "get rid of everybody because he was terminated." (Tr. 725) Mr. Clyde Lattimer's description of the site as a disaster does not reconcile with the professional videotape of the site he caused to be made in August 1997 (app. R4 supp. C,

tab 214). Mr. Clyde Lattimer also testified Mr. Zauderer was on a pre-takeover agreement site visit and that he pointed things out to Mr. Zauderer during the initial site visit (tr. 720, 791). Ms. DeMito testified that before takeover Mr. Zauderer toured the job site "many times," including a visit with one of the Lattimers (tr. 1618).[8] There is thus a conflict between the testimony of Mr. Clyde Lattimer and Ms. DeMito, and the testimony of Mr. Zauderer as to whether Mr. Zauderer made a site visit prior to the takeover agreement (*cf.* finding 27). In addition to the believability inherent in corroborated testimony, we think it sufficiently improbable that Mr. Zauderer did not visit the site before the takeover agreement that we find the recollections of Ms. DeMito and Mr. Clyde Lattimer to be more probative than Mr. Zauderer's on this point. We find that Mr. Zauderer visited the site before takeover.

29. The takeover agreement, which was drafted *in toto* by UPI's counsel (tr. 1631), was executed on 5 August 1997 as Mod. 8 (R4, tab 56). Castle was not a party. Relevant provisions include the following:

> WHEREAS, the GOVERNMENT desires to effect the completion of the work covered by the CONTRACT in order to expedite completion and to avoid the delay and inconvenience of reletting; and
>
> WHEREAS, SURETY is willing and desires to complete or to procure the completion of the CONTRACT in accordance with the terms of this AGREEMENT, as a measure of cooperation with the GOVERNMENT, and to minimize excess costs, and keep such within the monetary limits of its bonds; and
>
> WHEREAS, under its performance bond, SURETY is willing to cause the CONTRACT to be completed in accordance with the provisions of this AGREEMENT, provided that in so doing it will receive the contract balance as hereinafter set forth;
>
> WHEREAS, the parties acknowledge that as of the date of Contractor's termination the Contractor had been paid through Payment Application No. 12 for work performed through June 15, 1997, the following:
>
> <u>FIXED PRICE PORTION OF CONTRACT</u>
>
> Contract Price $3,057,249.00



25

| | |
|---|---|
| Net Change Orders (P0003,4,5,6) | 394,857.96 |
| Adjusted Contract Price | $3,452,106.96 |
| Amount Paid To Contractor | 2,629,237.67* |
| Unpaid Contract Balance | $ 822,869.29 |

*The amount and quantities are subject to verification and adjustment by the parties at a future date if the amount proves to be incorrect.

ESTIMATED QUANTITY PORTION OF CONTRACT

Building No. 2401

| | |
|---|---|
| Contract Price Estimates<br>(Item Nos. 0002 thru 0005) | $16,772.50 |
| Amount Paid (See Exhibit "A") | 6,840.00 |
| Estimated Contract Balance | 10,132.50 |

Building No. 2403

| | |
|---|---|
| Contract Price Estimate | $21,472.50 |
| (Items Nos. 0007 thru 0010) | |
| Amount Paid (See Exhibit "B") | 9,640.00 |
| Estimated Contract Balance | $11,832.50 |

Building No. 2402

| | |
|---|---|
| Contract Price Estimate<br>(Item Nos. 0012 thru 0015) | $56,680.00 |
| Amount Paid (See Exhibit "C") | 26,100.00 |
| Estimated Contract Balance | $30,580.00 |

("Contract Balance").

NOW, THERFORE, in reliance upon the matters set forth above and in consideration of SURETY'S promise to complete through Lattimer & Associates, 228 North Route 73, Berlin, New Jersey, the work required by said CONTRACT in accordance with the terms and conditions of the CONTRACT,

including all plans and specifications referred to therein, and all change orders issued pursuant thereto, and in consideration of the mutual covenant set out below, the GOVERNMENT and SURETY further agree as follows:

1. SURETY will cause the performance of all the duties and obligations of CONTRACTOR by the Completing Contractor, as contained in said CONTRACT, including all Contract documents as described therein, and all change orders issued pursuant thereto, and will have the work of CONTRACTOR completed in strict accordance with the terms and conditions of said CONTRACT, pursuant to performance bond provisions.

2. The GOVERNMENT agrees that it will pay direct to SURETY, as the same shall become progressively payable in accordance with the payment provisions of the CONTRACT, all sums now due and payable and to become due and payable upon the CONTRACT, including all unearned Contract balances, all earned retainage percentages, all earned but unpaid estimates and any and all money contracted to be paid hereunder, as would be or would have been payable to the original contractor, if there had been no declared default, provided however, that:

a. The costs and expenses incurred in the performance of the work to be paid to SURETY shall include its accountant, attorney, consultant and engineering fees, if any, incurred by SURETY in discharging its obligations under SURETY'S performance bond given in connection with the CONTRACT; and

b. The unpaid earnings of the defaulting contractor, including retained percentages and progress estimates for work accomplished before termination, shall be subject to debts due the government by the contractor, except to the extent that such unpaid earnings may be required to permit payment to SURETY of its actual costs and expenses incurred in the completion of the work, exclusive of its payments and obligations under the payment bond given in connection with the CONTRACT; however, nothing in this AGREEMENT shall prevent payments of the claims consented to be paid in Paragraph 2c.

c. F.A.R. 49.404(e)(3) provides that:
If the contract proceeds have been assigned to a financing institution, the surety may not be paid from unpaid earnings, unless the assignee consents to the payment in writing. For an assignment to have occurred, it must comply with the Assignment of Claims Act 1940 as amended and its implementing regulations found in F.A.R. 32.8. The GOVERNMENT is aware of SURETY'S position that the conditions set forth in F.A.R. 32.8 have not been satisfied by any alleged assignee, and that under applicable case law, no assignment could be effectuated after knowledge by United States Air Force of the Principal's alleged default on the project without the discharge of SURETY'S obligations pro tanto and the SURETY under the present circumstances, has a priority to unpaid earnings over any alleged assignee. The GOVERNMENT is aware of SURETY'S position that the above-quoted language from F.A.R. 49.404 (e)(3) is inapplicable and contrary to law, and no consent to payments from unpaid earnings shall be required by any alleged assignee before payment to SURETY.

d. This AGREEMENT shall not waive or release the GOVERNMENT'S right to claim liquidated damages for delays in completion of the work, except to the extent that such delays, if any, may be excused under the provisions of the CONTRACT; and SURETY is likewise entitled to such extensions of contract time as are provided for under the CONTRACT and is to be relieved of any delays excused under the CONTRACT.

e. In no event shall SURETY be entitled to be paid any amount in excess of its total expenditures necessarily made in completing the work and discharging any liabilities it may have, if any, under the payment bond of the original Contractor.

. . . .

5. Administration and inspection of the project will remain with the GOVERNMENT and its agents/engineers in accordance with the terms of the original CONTRACT.

. . . .

7. The GOVERNMENT acknowledges that SURETY, in entering into this AGREEMENT does not acknowledge the validity of the GOVERNMENT'S assessment of any liquidated damages by the GOVERNMENT or any other action taken by the GOVERNMENT, except as provided herein. Furthermore, in entering into this AGREEMENT, SURETY does not thereby waive prejudice, that in any way adversely affect any claim that it, as SURETY, or the Contractor might have against the GOVERNMENT.

. . . .

9. The GOVERNMENT agrees that SURETY'S right to proceed to complete the CONTRACT shall not be terminated nor SURETY charged additional liquidated damages if further delay in completing the work arises from conditions or events which are excusable under the original CONTRACT and that SURETY shall be entitled to such additional compensation or equitable adjustment and time extensions as are recognizable under the original Contract Documents.

10. SURETY expressly reserves all prior rights including but not limited to the Government's overpayment to the Contractor, equitable liens and rights to subrogation that would be the United States', the laborers' or materialmen's or the contractor's under the CONTRACT or at law or equity, as well as its own rights dating back to the execution of the performance and payment bonds, including, but not limited to those rights and remedies that may accrue during the completion of the CONTRACT. No waiver of such rights is agreed to or implied or intended regardless of any provisions of this TAKEOVER AGREEMENT to the contrary. Any disagreement between the GOVERNMENT and SURETY shall be considered a dispute within the Disputes Clause contained within the CONTRACT and SURETY shall be entitled to exercise such rights as are afforded by the Disputes Clause and the Contract Disputes Act of 1978, as amended.

11. All terms and conditions of the original CONTRACT shall be and remain the same.

> 12. The parties hereto do not intend by any provision of this AGREEMENT to create any third-party beneficiaries nor to confer any benefit upon or enforceable rights or otherwise upon anyone other than the parties hereto.

(R4, tab 56)

30. The arrangement between L & A and UPI was effectively on a time and materials basis (tr. 719-21; finding 27). L & A's arrangements with its subcontractors were predominantly on a basis other than fixed price (tr. 435).

31. Two videotapes (videos) were made of work at the site. One was made at UPI's behest by a professional videographer at the time of L & A's commencement of work (app. R4 supp. C, tab 214). The other was taken by L & A's job superintendent, Mr. Jack Marks, in increments as the job progressed, commencing 21 August 1997 and continuing to October 1997 (app. R4 supp. A, tab 74; tr. 596). We consider the Tab 214 video to best illustrate the jobsite at termination. As such, it is representative of job progress at the time of the takeover agreement, what Mr. Jaques, UPI and L & A would have seen at that time, and how realistic the Air Force's estimate of progress was. We consider the Tab 74 video to best illustrate job progress after takeover. As such, it is representative of Castle work corrected by L & A, difficulties that were not apparent from a site visit and the actual performance of the completion work by L & A.

32. Castle had not complied with contract requirements in certain areas and had taken actions which could only have been motivated by an intent to conceal and deceive (tr. 603-24; app. R4 supp. A, tab 74; R4, tab 331). In assessing the extent to which this occurred we have relied heavily on the testimony of Mr. Marks, L & A's job superintendent (tr. 576-77), as to specific shortcomings. Mr. Marks testified as follows on concealed Castle deficiencies which required corrective work.

(A) Castle had not run all the electrical wiring through studs but had placed some of the wiring on the outside of the studs and then nailed sheetrock over it (tr. 579-80). There were lumps in the walls where this was done (tr. 580).

(B) Castle had installed some electrical boxes with wires that dropped down four or five feet and were not connected to anything. Castle then sheetrocked the walls, concealing this condition. (Tr. 582)

(C) Castle had done similar things with some outlets, switches and thermostats (*id.*).

(D) Pipes were not properly insulated and the walls sheetrocked, thereby concealing the condition (tr. 606, 619).

(E) Joint leakage occurred in domestic water plumbing improperly installed in a janitor's closet and one other place in Building 2401, which had no other domestic water leaks (tr. 657, 661). While the defective work was concealed, there is no direct evidence and we cannot reasonably imply that Castle sheetrocked over the pipes to conceal the defects.

Mr. Jaques was not aware of Castle's deception (Jaques dep. at 92-97, 117-18). None of the foregoing is visible on the Tab 214 video.

33. Mr. Marks was unable to estimate how much of the overall work was corrective, *i.e.*, fixing work done improperly by Castle, and how much work was the completion of contract work left unfinished by Castle (tr. 649-50, 652-53).

34. Mr. Chero was an employee of Castle who went to work for L & A after the takeover (tr. 631). Mr. Chero executed a statement dated 19 May 1998 on L & A letterhead stationery, notarized by an L & A employee (the Chero statement) (tr. 634-35), in which Mr. Chero states in relevant part:

> MEMORANDUM
>
> During the construction of the above referenced project, I worked as a carpenter for Castle Construction and Castle Abatement.
>
> During this period we, including myself, were directed to perform construction work in a bad manner. (i.e.: closing up walls without any inspection being done, any testing being completed on the plumbing system, no pipe insulation or wall insulation being done.)
>
> In addition to myself, being Peter Chero, there were several other employees who were laid off or fired for refusing to do faulty work and/or knowing about it. One other person being, Richard Todd Keen, is currently working for Lattimer & Associates on another project.
>
> When asked by Lattimer & Associates at the time they took over the project, "Is there anything done improperly on the job?" I explained to them what I had previously mentioned and also electrical problems that I knew about. (i.e.: dropping 2 - 3 foot drops off each breaker out of the 2 main panels) This would give the appearance on the surface that the electrical was done in the walls we had previously closed up. This was not the

> case and every wall had to be torn apart in order to install the electrical as well as the previously mentioned items.

(R4, tab 331)

35. Mr. Zauderer, Mr. Clyde Lattimer and Mr. Marks deny that the information in the Chero statement was imparted prior to or at the time of takeover, although Mr. Marks concedes that Mr. Chero told him during his first walk-through that, in effect, Castle was incompetent (tr. 346, 631-34, 799-800). Additionally, Mr. Clyde Lattimer testified that Mr. Chero telephoned him in July 1997 (tr. 725; finding 28), but that he didn't learn of any deception by Castle until after takeover when plumbing problems first were discovered (tr. 799). Mr. Marks' field reports indicate that plumbing problems were first discovered on 14 August 1997 (ex. A-1 at 367). However, the 6 August 1997 letter (finding 27), specifically states that L & A "will not be responsible for any incorrect work done on the project prior to its coming there." We think it is more than coincidence that the disclaimer addresses the substance of Mr. Chero's information. Further, the content of the Chero statement asserts that L & A asked Mr. Chero if there was anything done improperly. Given the timing of Mr. Clyde Lattimer's telephone conversation with Mr. Chero, we find it more probable than not that such information would be sought before, not after, making a commitment. We find that Mr. Chero provided information to L & A prior to takeover.

36. The working relationship between L & A and the contracting officer was very difficult early in performance, but it improved. Her relationship with UPI was always "up front" and "cordial." (Tr. 1635) Shortly after takeover weekly meetings were initiated and carried on throughout the project so as to timely address issues and prioritize actions (tr. 1402-03). In the field the working relationship between Mr. Marks, Mr. Jaques and Mr. Robert Santoro, the McGuire engineer working directly on day-to-day performance issues, was good (tr. 1305, 1398).

37. Beneficial occupancy was taken as follows: Building 2402--June 1998; Building 2401--November 1998; Building 2403--November 1998 (tr. 1651-52).

<u>The Claim</u>

38. On 12 April 2000, UPI filed a properly certified Request for Equitable Adjustment (the claim) (ex. A-1; complaint, ¶ 11). The claim originally included 9 elements. After the Board's decision in *UP 1*, the following elements remained:

| | |
|---|---|
| 1. Overpayment | $1,957,108.00 |
| 2. Delay (198 x $501) | 99,198.00 |
| 3. Excess Superintendence (Delays) | 104,988.00 |
| 4. Improper Contract Payment | 116,962.00 |
| 5. Superintendence (Change Orders) | 40,492.00 |



32