| | | |
|---|---|---|
| 6. | Patently Defective Work | 340,937.00 |
| 7. | Contract Balance | 175,745.00 |
| | Total | $2,835,430.00 |

(Ex. A-6) In addition, UPI included an alternative claim theory, asserting that the contract was an illegal contract, and now seeking recovery of $3,525,757.25 (app. br. at 12-13).

Overpayment

39. The overall completion of the job was 79.91 percent based on Progress Report No. 33 (finding 23). Appellant claimed this was grossly inaccurate and a substantial overpayment was made to Castle (ex. A-1).

40. Appellant presented testimony that the job was 20-30 percent complete (tr. 761, 847-48). The Air Force presented evidence the job was 79.91 percent complete (tr. 1263-67; Jaques dep.). We make no finding on the issue in view of our determination as to jurisdiction.

Delay and Excess Superintendence (Delays)

41. L & A never prepared a schedule during performance (tr. 952). There is no evidence that UPI prepared a schedule during performance. We find there was no schedule prepared by appellant at any time relevant to performance. There is no evidence L & A employees were ever in a "standby" status, and we so find. We also find that UPI's superintendent and project managers were salaried (tr. 629, 955).

42. UPI's claim contains a chart entitled "Delay Claims - Chronological Summary," with all periods of delay shown in red. The chart lists five causes: 1) Deletion of design requirements; 2) Additional asbestos; 3) Incorrect elevations; 4) Patently defective work; and 5) Finish details. (Ex. A-1 at 157) Portions of the original claim were dismissed by *UP 1*. The remaining claim is for L & A's extended overhead. (Ex. A-1 at 159; tr. 872-73) UPI seeks $99,198 representing 198 days of delay at $501 per day (ex. A-1 at 162). UPI explains the excess superintendence claim as follows: "[t]he weekly salary of a superintendent was $520 calculated at $65 per hour times 8 hours per day. Multiplying $520 times 162 days of delays and adding 10 percent for overhead, 10 percent for profit and 3 percent bond costs equals $104,988 in excess superintendence costs" (app. br. at 19). Mr. Zauderer testified in very general terms about the causes of delay (tr. 123-28). He testified that UPI was "forced to pay for extra superintendent time" (tr. 129). Mr. Zauderer's role was as UPI's claims executive (tr. 30-31). There is no evidence of his participation in the management of the work or other role from which he would have gained personal knowledge of the effect of various Government actions on job progress. We find his testimony as to delays unpersuasive.

43. Mr. Scott Lattimer testified that the most significant delay was caused by Air Force tardiness in providing a finish schedule. According to Mr. Lattimer they could not "start finishing a room until February 19, 1998." He also identified paint, defective work (presumably Castle's defective work), and trying to get answers to questions as factors causing delay. (Tr. 873-75) When asked if he had done a critical path analysis to determine whether the alleged delays were on the project's critical path, he testified that any delay was critical (tr. 874). However, he also testified that L & A had never prepared a schedule (tr. 949, 952). Various correspondence was attached as exhibits to the claim to document requests by L & A and Castle to the Air Force to obtain a finish schedule (ex. A-1 at 171-214). The correspondence indicates that L & A received the finish schedule on or about 8 December 1997 (*id.* at 213). The excess superintendence part of the claim is a one-page narrative listing a litany of delay causes with no documentary support attached or referred to (ex. A-1 at 247). Mr. Santoro testified that the Air Force provided timely responses to L & A and that there were no delays. He also testified that the finish schedule did not impact job progress because it addressed the "last thing to really be completed in the project." (Tr. 1405-06, 1426, 1429) The Board takes particular note that UPI did not cite to the testimony of Mr. Marks regarding the length of the delay (app. findings of fact at 8-9; app. br. at 18-19; app. reply br.). Mr. Marks could not estimate how much work was completion work and how much was for correcting Castle's deficient work (tr. 649-53). There is also no probative evidence of additional pay to Mr. Marks because of delays. The Board finds that because of the lack of a schedule, expert testimony, evidence on reasonable times to complete particular tasks, evidence comparing reasonable times with experiences on this job, and personal knowledge testimony as to specific events, combined with the intermingling of evidence of corrective work with completion work, appellant has failed to meet its burden of proof on compensable delay.

<u>Improper Contract Payment</u>

44. By letter of 27 May 1997, Castle requested that the contracting officer, Ms. DeMito, mail all future payments to UPI, attention Mr. Zauderer (app. R4 supp. A, tab 33). Ms. DeMito thereafter called Mr. Zauderer and told him that once the invoice left McGuire that McGuire had no control over it and that she could not guarantee that payment would be sent to UPI. She informed him a novation agreement would be necessary to change the address, and he did not want to sign a novation agreement. Mr. Zauderer did not inform Ms. DeMito that Castle's default was imminent. He did not ask for the payment to be withheld, he wanted the payment processed. She was never asked to modify the contract to change the remittance address, which was Castle Abatement Corp., 60 Heckel St., Belleville, NJ. (R4, tab 1 at 2, blocks 14, 16; tr. 136-37, 1609-11, 1680-83) The contract was not modified to make UPI a party or to make UPI the recipient of future payments until execution of the takeover agreement (R4, tabs 1, 30, 33, 41, 45, 47, 48, 55, 56).

45. Mr. Lefkowitz informed Mr. Zauderer by memorandum of 26 June 1997 that payment no. 12, in the amount of $116,962.05 was being released and "I have requested

payment be mailed to your office" (app. R4 supp. A, tab 34). DFAS nonetheless sent the payment to Castle (tr. 135-36).

Superintendence (Change Orders)

46. During performance under the takeover agreement, the parties entered into Mods. 9-13 and 15. Each provided for changes to the contract work and adjusted the contract price. Each contained a release, as follows:

Mods. 9-12 (Change Proposals 14, 22)

> IN CONSIDERATION OF THE MODIFICATION AGREED HEREIN AS COMPLETE AND EQUITABLE ADJUSTMENT FOR THE CONTRACTOR'S PROPOSAL, INCLUDING SUBCONTRACTORS AND SUPPLIERS, THE CONTRACTOR HEREBY RELEASES THE GOVERNMENT FROM ANY AND ALL LIABILITY UNDER THIS CONTRACT FOR FURTHER EQUITABLE ADJUSTMENT ATTRIBUTABLE TO SUCH FACTS AND CIRCUMSTANCES GIVING RISE TO THIS PROPOSAL, EXCEPT THAT THE CONTRACTOR AND THE GOVERNMENT HEREBY SPECIFICALLY UNDERSTAND AND AGREE THAT:
>
> (1) THE CONTRACTOR DOES NOT RELEASE AND HEREBY RESERVES ITS RIGHT, IF ANY, TO MAKE CLAIM FOR EXTENDED OVERHEAD INCLUDING BUT NOT LIMITED TO SITE SUPERVISION AND PROJECT MANAGEMENT, IN ANY WAY RESULTING FROM THIS MODIFICATION; AND (2) THIS RELEASE RELATES TO AND IS SPECIFICALLY LIMITED TO THE MATTERS CONTAINED IN THIS MODIFICATION AND IS NOT A RELEASE OF ANY OTHER CLAIM THAT THE CONTRACTOR MAY HAVE AGAINST THE GOVERNMENT.

Mod. 13 (Change Proposal 25)

> (C.) THE NEGOTIATED PRICE FOR THIS ACTION INCLUDES THE COSTS FOR PROJECT SUPERINDENTENT AND MANAGER AND EXECUTION OF THIS MODIFICATION RELEASES THE GOVERNMENT FROM FURTHER CLAIMS FOR THESE SPECIFIC COSTS. THEREFORE IN CONSIDERATION OF THE ABOVE MODIFICATION AGREED TO HEREIN AS COMPLETE AND

EQUITABLE ADJUSTMENT FOR THE CONTRACTOR'S PROPOSAL, INCLUDING SUBCONTRACTORS AND SUPPLIERS. THE CONTRACTOR HEREBY RELEASES THE GOVERNMENT FROM ANY AND ALL LIABILITY UNDER THIS CONTRACT FOR FURTHER EQUITABLE ADJUSTMENT ATTRIBUTABLE TO SUCH FACTS AND CIRCUMSTANCES GIVING RISE TO THIS PROPOSAL.

Mod. 15 (Change Proposal Addendum 3A)

IT IS THE INTENT OF BOTH PARTIES THAT THIS AGREEMENT SETTLES ALL REVISIONS/ADDITIONS OF THE SAME TYPE UP TO THE EFFECTIVE DATE OF THIS AGREEMENT AND FURTHER SETTLES ALL TYPE REVISIONS/ADDITIONS TO BE ACHIEVED BY THE CONTRACTOR THROUGH THE END OF THE CONTRACT. EXECUTION CONSTITUTES A RELEASE OF THE GOVERNMENT BY THE CONTRACTOR OF CLAIMS RELATED TO THE AFORESAID ISSUE(S). IT IS FURTHER UNDERSTOOD AND AGREED THAT THE PRICE ADJUSTMENTS, IF APPLICABLE, PROVIDED HEREIN CONSTITUTES COMPENSATION IN FULL ON BEHALF OF THE CONTRACTOR AND ITS SUBCONTRACTORS AND SUPPLIERS FOR ALL COSTS AND MARKUPS DIRECTLY OR INDIRECTLY ATTRIBUTABLE TO THE CHANGE(S) DESCRIBED HEREIN, INCLUDING ALL EXTENDED OVERHEAD, IMPACT ON OTHER WORK AND TIME ADJUSTMENTS, AND FOR ALL DELAYS RELATED THERETO AND FOR PERFORMANCE OF THE WORK WITHIN THE STATED TIME.

(R4, tabs 57-63) None of the modifications extends the time of performance.

47. According to Mr. Scott Lattimer, L & A incurred additional expense of $40,492 for the cost of project manager's and superintendent's time under the modifications which the Air Force would not allow. The calculation is based on a summary of hours spent on various tasks. Scott Lattimer testified that L & A was directed instead to file a claim. (Tr. 877-79; ex. A-1 at 277) Ms. DeMito testified that had she known the employees were salaried, she would have considered the costs part of L & A's overhead (tr. 1640-41).

48. The claim identifies Exhibit B as support for the costs for a project manager and superintendent. That exhibit does not identify them by name. (Ex. A-1 at 272-73) Exhibit B, included as Appendix A to this opinion, is a chart showing project manager time for 25

change proposals commencing 17 October 1997 and concluding 10 September 1998 (ex. A-1 at 277). The chart shows 181 project manager hours at $75 per hour and 291 superintendent hours at $65 per hour, plus 10 percent overhead, 10 percent profit and 3 percent for bonds. L & A was not bonded (tr. 981). As the period is from 17 October 1997 to 10 September 1998, we find Mr. Marks was the superintendent and that he was the onsite supervisor throughout the job (tr. 576-77). He was a salaried employee (tr. 629). There is no evidence that Mr. Marks was paid additional amounts attributable to changes. His salary was paid by L & A (ex. A-12) and L & A billed UPI for superintendent costs (exs. A-5, -12; tr. 1556). We find Mr. Scott Lattimer was the project manager (tr. 827, 954-55). Scott Lattimer was salaried and his salary was paid by Lattimer, not by L & A (tr. 955). He visited the site intermittently (tr. 827). His time was not identified with a particular project and the 6 August 1997 letter states his time was to be billed at $95 per hour (tr. 1464-65). There was generally inadequate support for billings to L & A (tr. 1557). UPI has presented no credible evidence, such as billings from Lattimer to L & A, of additional payments for work done by Scott Lattimer arising from the change proposals during the relevant periods. Moreover, Scott Lattimer's total testimony on his involvement with this part of the claim was as follows:

> Ours were the costs as broken down, starting with Exhibit B . . . which shows, basically, calculations for the superintendent and the project manager. Those two times--they really weren't days, but they are hours involved with these change orders for this project.

(Tr. 878) The DCAA audit did not verify incurrence of costs by L & A for either the superintendent or project manager attributable to change orders (tr. 1470).

49. A review of the change proposals listed in Exhibit B reveals the following relevant points:

Change Proposal No. 1 (light switches) (Mod. 9) - no indication of total hours; 35 percent labor burden; 15 percent home office overhead; no subontractor costs; no reservation of claims (R4, tabs 268, 280);

Change Proposal No. 2 (no Mod.) - for Addendum 26 which was not performed by UPI/L & A (R4, tabs 270, 273);

Change Proposal No. 3 (doors) (Mod. 10) - no indication of total hours; 35 percent labor burden; 15 percent home office overhead; no subontractor costs; no reservation of claims (R4, tab 285);

Change Proposal No. 4 (finish schedule, ceiling tiles) (Mod. 10) - no indication of total hours; 35 percent labor burden; 15 percent home office overhead; 10 percent



37

general conditions; 10 percent profit; no subcontractor costs; no reservation of claims (ex. A-1 at 285-86);

Change Proposal No. 4 (ceiling tiles) (Mod. 10) - 75 hours superintendent time @ $68; 45 hours project manager time @ $75; 35 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no subcontractor costs; no reservation of claims (ex. A-1 at 295-96);

Change Proposal No. 4 (ceiling tiles) (Mod. 10) - 0 project manager and superintendent hours, claim for same reserved (ex. A-1 at 299, 302);

Change Proposal No. 5 (roof changes) (Mod. 9) - nothing identifiable as Change Proposal No. 5 in record;

Change Proposal No. 6 (store fronts) (Mod. 10) - 8 hours superintendent time @ $68; 5 hours project manager time @ $75; 35 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no subcontractor costs; no reservation of claims (ex. A-1 at 295, 297).

Change Proposal No. 7 (ceramic tiles) (Mod. 10) - 8 hours superintendent time @ $68; 2 hours project manager time @ $75; 35 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no subcontractor costs; no reservation of claims (ex. A-1 at 293-94);

Change Proposal No. 8 (electric) (Mod. 11) - 0 hours superintendent and project manager time (exhibit B shows 4 hours for both); 35 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no subcontractor costs; claim for project manager and superintendent reserved (ex. A-1 at 277, 298-99);

Change Proposal No. 9 (power plan) (Mod. 11) - 0 hours superintendent and project manager time (Exhibit B shows 8 hours for both project manager and superintendent); 35 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no subcontractor costs; claim for project manager and superintendent reserved (R4, tab 313);

Change Proposal No. 10 (wall paper) (Mod. 9) - 0 hours superintendent and project manager time (Exhibit B shows Change Proposal No. 10 with 32 hours for project manager, 56 hours for superintendent); 35 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no subcontractor costs; claim for project manager and superintendent reserved (ex. A-1 at 277, 298-99);

Change Proposal No. 11 (west vestibule) (Mod. 10) - 0 hours superintendent and project manager time (exhibit B shows 2 hours for project manager, 4 hours for

superintendent); 35 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no subcontractor costs; claim for project manager and superintendent reserved (ex. A-1 at 277, 311-12);

Change Proposal No. 12 - no cost (ex. A-1 at 277);

Change Proposal No. 13 (basement finishes) - nothing identifiable as Change Proposal No. 13 in record; no correlation with a modification; exhibit B claims 8 project manager hours @ $75 (*id.*);

Change Proposal No. 14 (electrical floor plan changes) (Mod. 11) - proposes a credit; exhibit B claims 8 hours project manager time @ $75 (R4, tab 316; ex. A-1 at 277);

Change Proposal No. 15 (wallpaper painting areas) - nothing identifiable as Change Proposal No. 15 in record; no correlation with a modification; exhibit B claims 2 project manager hours @ $75 (ex. A-1 at 277);

Change Proposal No. 16 (planter deletion) - no cost;

Change Proposal No. 17 (platform deletion) (Mod. 11) - credit proposal; exhibit B claims 8 hours for both superintendent and project manager (ex. A-1 at 277, 313-14);

Change Proposal No. 18 (porcelain pavers) (Mod. 11) - claims 1 hour for superintendent and 2 hours for project manager, but no labor cost; claim for project manager and superintendent reserved (ex. A-1 at 277, 316-17);

Change Proposal No. 19 (exhaust fan) (Mod. 12) - claims 1 hour for both superintendent and project manager; 35 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no subcontractor costs; claim for project manager and superintendent reserved (ex. A-1 at 277, 318-19); Mod. 12 states that the exhaust fan was provided at no cost per 14 June 1998 Lattimer letter (R4, tab 60);

Change Proposal No. 20 (cabinets and handrail) - credit proposal; cannot correlate to a modification; exhibit B claims16 project manager hours and 2 superintendent hours (ex. A-1 at 277);

Change Proposal No. 21 (fire alarm control panel) - cannot correlate to a modification; exhibit B seeks 3 project manager hours and 1 superintendent hour (*id.*);

Change Proposal No. 22 (fire protection devices) (Mod. 12) - 10 superintendent hours and 4 project manager hours claimed; 15 percent overhead; 10 percent profit; 3 percent bonds; reservation of claims (ex. A-1 at 322-23);

Change Proposal No. 23 (courtyard deletion) - nothing identifiable as Change Order Proposal No. 23 in the record; cannot correlate to a modification; exhibit B claims 4 project manager hours (ex. A-1 at 277);

Change Proposal No. 24 (Unicor installers) - no cost (*id.*);

Change Proposal No. 25 (extra's letter) (Mod. 13) - 96 hours superintendent time @ $68; 8 hours project manager time @ $75; 39 percent insurance and taxes; 15 percent overhead; 10 percent profit; 3 percent bonds; no reservation of claims (ex. A-1 at 277; R4, tabs 61, 340).

None of the change proposals show Lattimer as a subcontractor.

<u>Patently Defective Work</u>

50. Some Castle work requiring correction was not concealed by Castle. Specifically, almost all of the chilled water valves were installed upside down, causing leakage (tr. 607-09). Other work was not completed. For example, chairs were not installed for handicapped sinks, requiring L & A to cut into existing walls (tr. 606-08). Vents had to be cut in masonry at some places, although Mr. Marks could not estimate how many (tr. 618, 651). Some ducts did not have fire dampers (tr. 617). An airhandling unit was damaged due to freezing (tr. 650). The foregoing are visible on the Tab 74 video. Additionally, although concealment appeared to have been attempted, Mr. Zauderer observed bulges where sheetrock was installed directly over electrical wires (tr. 145).

51. Regarding improperly sized pipe insulation, it was agreed that where improperly sized insulation could be removed and replaced in the ceiling where there was no demolition involved, the correction was to be made. However, if there was improperly sized plumbing insulation (as contrasted with no insulation at all) in the walls requiring demolition and replacement of existing sheetrock, the Air Force waived correction. (Tr. 691-92)

52. Shortly after Mr. Marks' arrival at the site, domestic water tests were done in Buildings 2402 (14 August 1997) and 2403 (13 August 1997). Both buildings passed the tests. (Tr. 656) Field reports prior to the tests do not show any work on domestic water by L & A (ex. A-1 at 364-67).

53. Mr. Jaques testified that he was unaware of the following elements of Castle's work which are identified in UPI's claim as patently defective, with the reasons set out in parentheses: incomplete wiring inside a wall (not visible, testing only done for final inspection); wires not placed through studs and sheetrocked over (he did not see it); thermostat wiring buried behind walls (did not see, testing only done for final inspection); different sized pipe insulation (did not see); uninsulated pipes and gaps in insulation

sheetrocked over (did not see); frozen coils for window unit or other coils requiring replacement (not aware); and damaged MC cable (not aware). (Jaques dep. at 91-98)

54. Mr. Jaques' approach to inspection was to check for the proper materials (*e.g.*, no metal studs where wooden studs were required); inspect where work was actually in progress; and to determine the status of work (Jaques dep. at 111-13). He did not inspect before walls were sheetrocked because inspection on systems behind walls was, in his view, to be done only for final inspection. His technical surveillance did not include quality control, which is the contractor's responsibility. His surveillance included workmanship and he would only observe at tests during performance when requested. In order for electrical to be tested it was necessary for the system to be energized, and it generally is not energized until it is complete. (*Id.* at 111-24) He was never present for field tests (Jaques dep. at 192-93). He was not aware that Lattimer had spent "a considerable amount of time" correcting upside-down valves, although he "had heard that some valves had to be turned" (*id.* at 195).

Contract Balance

55. UPI submitted an undated, unsigned voucher asserting the right to a contract balance of $175,745.62 (ex. A-1 at 750).

56. According to the contracting officer, issues remain between the Air Force and UPI with regard to a credit for BC cable, delivery of "as-built" drawings, and a release, which UPI has not provided (tr. 1641-42). She also maintains that a double payment was made to Castle (findings 14, 26) that should be included in determining the contract balance (tr. 1706-07, 1710).

57. UPI has admitted that it has not provided a release as set out at FAR 52.232-5(h)(3) (R4, tab 359 at 3).

Contracting Officer's Decision and Appeal

58. On 12 September 2000 the contracting officer issued her decision denying UPI's claim. The decision only raises the lack of a release as the reason for denying UPI the contract balance. (R4, tab 66)

59. UPI filed its timely Notice of Appeal on or about 18 September 2000 (R4, tab 67).

DECISION

UPI seeks recovery for seven claim elements alleging that its cost of performance was increased because of delays, changes, overpayment to Castle, and improper inspection.

In the alternative, UPI seeks quantum meruit recovery based on an illegal contract theory. UPI asserts that it has standing to bring and we have jurisdiction to resolve this appeal in its entirety. The Air Force asserts that we have been divested of jurisdiction over certain portions of this appeal by *Fireman's Fund Insurance Co. v. England*, 313 F.3d 1344 (Fed. Cir. 2002) (*Fireman's Fund*). The Air Force further argues that UPI's claim lacks factual and legal merit. We address jurisdiction, the illegal contract theory, and the individual claim elements in that order.

<u>Jurisdiction and the Overpayment Claim</u>

Except for appeals arising directly from work under a takeover agreement where the surety is a contractor, our assumption of jurisdiction in appeals from performance bond sureties has generally been based on the principles of equitable subrogation:

> The right of subrogation is not founded on contract. It is a creature of equity; is enforced solely for the purpose of accomplishing the ends of substantial justice; and is independent of any contractual relations between the parties.

*Memphis & Little Rock Railroad v. Dow,* 120 U.S. 287, 301-02 (1887). A surety completing or financing to completion under a Miller Act performance bond may be subrogated to the rights of both the contractor and the Government which may entitle it to the retained funds and unpaid progress payments, *i.e.*, the contract balance. *Security Insurance Company of Hartford v. United States,* 428 F.2d 838 (Ct. Cl. 1970). This Board has long accorded standing to sureties under the right of subrogation. *See, e.g., Peerless Insurance Co.*, ASBCA No. 28887, 88-2 BCA ¶ 20,730. However, the United States Supreme Court in *Department of the Army v. Blue Fox, Inc.,* 525 U.S. 255 (1999), cast doubt on our jurisdiction by noting that none of its earlier decisions in which sureties had been granted standing based on equitable subrogation involved waiver of sovereign immunity. The Court affirmed the long-standing principle that sovereign immunity, unless waived by Congress, is a bar to lawsuits against the Government, and asserted that its earlier decisions do not disturb that principle.

In *Insurance Company of the West v. United States,* 243 F.3d 1367 (Fed. Cir. 2001), a case arising in the Court of Federal Claims under the Tucker Act, the United States Court of Appeals for the Federal Circuit was called upon to interpret *Blue Fox*. The Federal Circuit concluded that the Tucker Act waived sovereign immunity and therefore the Tucker Act jurisdiction of the Court of Federal Claims was not altered by *Blue Fox.* Relying on *Insurance Company of the West,* we reasoned in *UP I* that, like the Court of Federal Claims, our jurisdiction was unaffected by *Blue Fox*. We must re-examine our earlier decision in light of *Fireman's Fund* and its holding that the waiver of sovereign immunity in the Contract Disputes Act (CDA), 41 U.S.C. §§ 601-613, as amended, is not broad enough to encompass equitable subrogation.



42

The Board requested supplemental briefs on *Fireman's Fund*. We asked the parties to address whether that opinion divested us of equitable subrogation jurisdiction and, if so, whether the Court in *National Surety Corp. v. United States,* 118 F.3d 1542 (Fed. Cir. 1997) (*National Surety II*), held that *pro tanto* discharge is an element of equitable subrogation. UPI has relied heavily on *National Surety II* in its arguments on the overpayment issue: "[h]ad the Government adhered to its duty to the surety as set forth in *National Surety,* the balance left for the surety would have been greater . . . ." (App. br. at 15) We note at the outset that UPI's argument is, effectively, that the Air Force impaired collateral or an underlying obligation in the form of the contract balance. Thus, RESTATEMENT (THIRD) OF SURETYSHIP AND GUARANTY § 42 (1995) (hereinafter "RESTATEMENT"), states:

> Impairment of Collateral
>
> (1) If . . . the obligee impairs the [collateral] the secondary obligation is discharged to the extent that such impairment would increase the difference between the maximum amount recoverable by the secondary obligor pursuant to its subrogation rights . . . and the secondary obligor's interest in the collateral.

UPI argues in its supplemental brief that "it is completely inappropriate as a matter of law to apply *Fireman's Fund* to the facts of this case" (app. supp. br. at 5). At the outset, we reject UPI's argument that the Court's holding in *Insurance Co. of the West* governs where the claims are post-takeover. That argument overlooks the differences between the Tucker Act and the CDA. UPI also argues that the claims presented in this appeal after *UP I* are not pre-takeover and therefore not barred by the Anti-Assignment Act, while *Fireman's Fund* dealt only with pre-takeover claims which are barred by that Act. The Air Force argues that the dissent in *National Surety II,* which reasoned that *pro tanto* discharge is distinct from equitable subrogation, should be followed, while contending that UPI still cannot establish its status as a contractor under the CDA.

In *National Surety Corp. v. United States,* 31 Fed. Cl. 565 (1994) (*National Surety I*), affirmed in part, vacated in part, and remanded by *National Surety II*, the Government had failed to withhold the ten percent retainage required by the contract. After the original contractor was terminated for default, the surety completed the contract under its performance bond and sought recovery of the retainage. The Court of Federal Claims held that the surety was a third party beneficiary and granted recovery for the retainage. In *National Surety II* the Federal Circuit disagreed with respect to whether the surety was a third party beneficiary, stating:



43

> National Surety argued at trial that, based on principles of suretyship and the doctrine of subrogation, it was entitled to the retainage security that was required to have been withheld from the contractor. We agree that this is the appropriate theory of liability.

*Id.* at 1545. The Court then cited with approval *Prairie State National Bank v. United States,* 164 U.S. 227, 233 (1896), where the Supreme Court held that the right of subrogation entitled a surety to be substituted to the rights of the United States with respect to contract retainage: "a stipulation . . . for the retention . . . raises an equity in the surety in the fund to be created . . . ." The Federal Circuit agreed that a surety has the right to subrogation in the security held by the Government and "[t]he subrogation right is equitable, in origin and in implementation." *National Surety II* at 1546. We conclude that the Court held that Government impairment of that security which results in the *pro tanto* discharge of a surety's obligation is an element of a surety's equitable subrogation rights in that the Government's wrongful payment diminished the funds constituting the contract balance to which the surety was subrogated. However, as both parties argue, and as we discuss, *infra*, *pro tanto* discharge may be viewed as a separate defense of the surety which is not dependent on equitable subrogation. In either case the question is whether impairment of the contract balance gives the surety standing under the CDA.

We first address our jurisdiction under equitable subrogation. In *Fireman's Fund* the Court plainly held there was no CDA jurisdiction over the pre-takeover claims of a performance bond surety arising from the doctrine of equitable subrogation. The Court repeated the oft-stated principle that a claim must be brought by a contractor for CDA jurisdiction to arise, and continued:

> Even if Fireman's Fund were equitably subrogated to any claim that Summit [the original contractor] may have had against the government, that did not make Fireman's Fund a party.

*Fireman's Fund,* 313 F.3d at 1351.

The Court then went on to remove any doubt as to whether the surety had standing, and the Board jurisdiction:

> To the extent [the surety] relies upon equitable subrogation and to the extent that doctrine works by operation of law (cf. *Ins. Co. of the West, 243 F.3d 1367*), the Anti-Assignment Act would not bar its claim. That, however, would not entitle Fireman's Fund to prevail, because it still does not satisfy the requirement of the Contract Disputes Act that to proceed under



414

> that Act, a party must have been a "contractor" with the United States, which Fireman's Fund was not with respect to its pre-takeover claims.

*Id.* at 1352. This holding defeats UPI's argument that *Fireman's Fund* is distinguishable because the Anti-Assignment Act does not come into play with post-takeover claims. The Court, as we understand its opinion, rested its conclusion solely on waiver of sovereign immunity, which would bar a surety's standing even where the Anti-Assignment Act did not.

UPI also argues that the overpayment claim does not fall into the category of the original contractor's pre-takeover claims, but arises from the Air Force's failure to exercise reasonable discretion. UPI cites *Balboa Insurance Co. v. United States,* 775 F.2d 1158 (Fed. Cir. 1985). As we understand that case, which was appealed from the United States Claims Court, predecessor to the Court of Federal Claims, the Court addressed the "reasonable discretion" issue within the context of the surety's equitable subrogation rights. If we do not have equitable subrogation jurisdiction, we cannot address that issue. Further, as noted, the Court in *Fireman's Fund* did not base its holding on lack of an assignment of the original contractor's claims as we did in *UP I* in dismissing the pre-takeover claims. Rather, it stresses the CDA requirements for standing and, as we understand the Court's holding, concludes that equitable subrogation rights do not equate to standing under the CDA.

*Fireman's Fund* does not close the door entirely here, because of another factual difference--the equitable subrogation overpayment claim of UPI arises not from UPI being subrogated to the rights of Castle, but from UPI being subrogated to the rights of the Government. However, under the facts at issue it is the reduction of the amount available for recovery under the doctrine of equitable subrogation that is disputed. We cannot conclude UPI is somehow a CDA party for this purpose. The CDA recognizes two parties to Government contracts--the contractor and the Government, 41 U.S.C. § 601(4)--and only contractors are expressly given the right to bring appeals to boards of contract appeals. 41 U.S.C. §§ 605(a), 606. The pre-takeover contracting parties in *Fireman's Fund* were the original contractor and the Government. If the surety there did not stand in the CDA shoes of the party with whom it had an express contractual obligation (the performance bond) and to whom the CDA has given the express right of appeal, we are not persuaded that the surety here should have greater claim to the right to file an appeal where equitable subrogation has it standing in the shoes of the Government, with which it had no express pre-takeover contractual relationship. Thus, we can find no rational basis to treat the filing of an appeal arising from denial of a claim based on subrogation to a Government right differently than a claim based on subrogation to a contractor's right, given that a performance bond was involved here and in *Fireman's Fund*.[9] We hold that we do not have CDA jurisdiction over equitable subrogation claims of sureties. Accordingly, we conclude we have no jurisdiction over the *pro tanto* discharge overpayment claim of UPI insofar as it may be presented under that doctrine.

UPI argues that *Fireman's Fund* is distinguishable because UPI is pursuing its own claim for overpayment, not that of Castle. Thus, both parties argue, in effect, that *pro tanto* discharge may be viewed as a suretyship defense with a life of its own, separate and apart from equitable subrogation. It is clear from the dissent in *National Surety II* that the argument was not presented by the parties in that case. *Id.* at 1552. That may explain why the majority did not address it and chose instead to resolve the matter under equitable subrogation principles. The two doctrines may be seen as separate branches of the suretyship tree, with one requiring notice while the other does not. *Security Insurance Corporation of Hartford,* ASBCA No. 51759, 00-2 BCA ¶ 31,021; 01-2 BCA ¶ 31,519. Indeed, the RESTATEMENT § 42, quoted *supra*, leaves some doubt as to whether subrogation rights are involved, or whether the decrease in the collateral (here, contract balance) available under subrogation rights serves merely as the measure of relief available. Further, there are a variety of suretyship defenses which may, if the surety has performed or made payment, give rise to a claim. *See* RESTATEMENT, §§ 37-49; *Security Insurance Corporation of Hartford,* ASBCA No. 51759, *supra*. However one views discharge as it applies to suretyship rights in other forums, the overriding issue here is whether the CDA waives sovereign immunity and provides jurisdiction to consider those rights.

We can find no basis to treat *pro tanto* discharge, and therefore the overpayment claim, any differently than equitable subrogation with respect to the waiver of sovereign immunity as articulated in *Fireman's Fund*. UPI contends that the Takeover Agreement (finding 29) provides it with a contractual right to pursue the overpayment claim. If UPI's argument is accepted, it would establish jurisdiction regardless of which doctrine one applied. Specifically, paragraph 10 states "SURETY expressly reserves all prior rights including but not limited to the Government's overpayment to the Contractor . . . ." According to UPI, this bridges the privity gap and gives it standing. The difficulty with UPI's argument is that it reserved *prior* rights, and it had no prior rights. It was not a party to the original contract, had no rights arising from the bonded contract between the Air Force and Castle, no third-party beneficiary rights, and there was no implied-in-fact contract that arose from the bonds. *National Surety II; Fireman's Fund Insurance Co. v. United States,* 909 F.2d 495, 499-500 (Fed. Cir. 1990); *UP I.*

The most fundamental reason for UPI's lack of standing and our lack of jurisdiction is that UPI's position effectively seeks discharge from its responsibilities under the performance bond, which was between it and Castle, not between UPI and the Air Force. The Government was expressly a third-party beneficiary for the penal sum of the bond for purposes of the contract, and this bound UPI to the Air Force. There was, however, no similar relationship flowing to UPI as the Government was not a party to the bond. (Finding 7) Payment and performance bonds create no contractual obligations for the Government unless an obligation is specifically undertaken. *Fireman's Fund Insurance Co. v. United States,* 909 F.2d at 499-500. Without such a contractual agreement there is no waiver of sovereign immunity under the CDA. We have previously rejected UPI's arguments

involving a contractual relationship with the Air Force under the indemnity agreement. *UP I.* Because of this, we have no jurisdiction and UPI has no standing.[10] The overpayment portion of the appeal is dismissed. Other claim items have similar standing issues, as we discuss, *infra*.

The Illegal Contract Claim

UPI contends that the contract was illegal and that an implied-in-fact contract between it and the Air Force arose from its ashes. UPI asserts that it should recover on a *quantum meruit* basis. The Air Force argues that the contract was not illegal. It also contends that UPI has no standing to pursue an illegal contract claim because it cannot show an implied-in-fact contract between it and the Air Force.

UPI's claim is premised on its argument that the contract involved only one building because the connectors made Buildings 2401, 2402 and 2403 interrelated to such a degree that their individual character was lost. If, as UPI believes, only one building was involved, the statutory limit on O&M funds was violated and the contract was illegal. It also argues that the $3,000 price for the connectors was a sham. UPI relies heavily on *United States v. Amdahl Corp.*, 786 F.2d 387 (Fed. Cir. 1986), and the Court's statement that where the Government benefits from receiving goods or services under an invalid contract the contractor is entitled to recover on a *quantum valebant* or *quantum meruit* basis under an implied-in-fact contract theory. *Id.* at 393.[11]

Assuming, *arguendo*, that UPI's arguments on the facts regarding illegality are persuasive, it cannot establish the existence of an implied-in-fact contract between it and the Air Force. The real essence of UPI's contention is that it would not have entered into the bonding agreement with Castle if it had known that the underlying Air Force contract was illegal:

> Clearly no surety would have ever bonded an illegal Contract being improperly funded by the Government which was engaging in project-splitting and acceptance of an obvious unbalanced bid. The Government had a legal obligation to the Surety to ensure that the Contract on which it required a bond was a legal contract and the Surety which relied on the Government's entry into a legal contract must have the right to pursue its illegal Contract claim.

(App. reply br. at 5)

Following UPI's argument to what we believe is its logical conclusion, any obligation of the Government was implied-in-law, not implied-in-fact. We do not have

jurisdiction over quasi-contractual, implied-in-law agreements. *Eaton Corp.,* ASBCA No. 38386, 91-1 BCA ¶ 23,398. Nonetheless, we consider UPI's argument that there was an implied-in-fact contract between it and the Air Force.

The burden of proof to show compliance with the jurisdictional statute--here, the CDA--is on UPI. *Trauma Service Group v. United States,* 104 F.3d 1321 (Fed. Cir. 1997) (party invoking jurisdiction of the Court of Federal Claims has to show Tucker Act compliance). This means that UPI must establish the existence of an implied-in-fact contract:

> An implied-in-fact contract is one "founded upon a meeting of the minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of the surrounding circumstances, their tacit understanding." *Baltimore & Ohio R.R. Co. v. United States*, 261 U.S. 592, 597, 67 L. Ed. 816, 43 S. Ct. 425 (1923); see also *Hercules, Inc. v. United States*, 516 U.S. 417, 424, 134 L. Ed. 2d 47, 116 S. Ct. 981 (1996). Like an express contract, an implied-in-fact contract requires "1) mutuality of intent to contract; 2) consideration; and, 3) lack of ambiguity in offer and acceptance." *City of El Centro v. United States*, 922 F.2d 816, 820 (Fed. Cir. 1990); see also *H.F. Allen Orchards v. United States,* 749 F.2d 1571, 1575 (Fed. Cir. 1984); *Russell Corp. v. United States*, 210 Ct. Cl. 596, 537 F.2d 474, 482 (Ct. Cl. 1976). When the United States is a party, a fourth requirement is added: The government representative whose conduct is relied upon must have actual authority to bind the government in contract. See *City of El Centro*, 922 F.2d at 820. In short, an implied-in-fact contract arises when an express offer and acceptance are missing but the parties' conduct indicates mutual assent. See *Chavez v. United States*, 18 Cl. Ct. 540, 544 (1989). Implied-in-fact contracts, which are within the jurisdiction of the Court of Federal Claims, differ significantly from implied-in-law contracts, which impose duties that are deemed to arise by operation of law and are outside the jurisdiction of the Court of Federal Claims. See *Hercules, Inc.* 516 U.S. at 423; *Merritt v. United States*, 267 U.S. 338, 340-41, 69 L. Ed. 643, 45 S. Ct. 278 (1925); *Russell Corp.*, 537 F.2d at 482.

*City of Cincinnati v. United States,* 153 F.3d 1375, 1377 (Fed. Cir. 1998).

According to UPI, the facts which create the requisite elements -- meeting of the minds, offer, acceptance, mutuality of intent, consideration, authority -- are to be found in the contract between Castle and the Air Force: "Castle and United Pacific clearly performed work pursuant to the written Contract. Therefore, the Contract was a contract implied-in-fact as a matter of law" (app. br. at 21). The first flaw in UPI's argument is that the contract referred to is the contract between Castle and the Air Force. There is no evidence that UPI participated in negotiations with the Air Force or otherwise placed itself in a position through which a contract could have been formed by "conduct of the parties showing . . . their tacit understanding." *City of Cincinnati, supra*. (Finding 7) The parties to the implied-in-fact contract alleged here by UPI are UPI and the Air Force. If there were funding irregularities and an illegal unbalanced bid, they related to a contract to which UPI was not a party. The performance bond, under which the Government is a third-party beneficiary, did not create contractual privity, express or implied-in-fact, between UPI and the Air Force. *United States v. Seaboard Surety Company,* 817 F.2d 956, 961 (2d Cir. 1987), *cert. denied,* 484 U.S. 855 (1987). Nor are the surety's rights and obligations derived from a third-party beneficiary relationship which might conceivably give rise to some form of agreement between UPI and the Air Force. *National Surety II* at 1545 ("The surety's rights and obligations are not based on third-party beneficiary concepts . . . ."). Thus, the contractual elements necessary to a contract implied-in-fact that UPI would have us find as inherent in the contract between Castle and the Air Force and the bond are not established through Contract No. F28609-95-C-0036. Moreover, an express contract on the same matter is a bar to, not proof of, an implied-in-fact contract. *Trauma Service Group,* 104 F.3d at 1326.

UPI correctly represents that Castle and it did work under the terms of the contract, which was incorporated into the takeover agreement. The problem with this argument is that the work done by UPI was pursuant to the takeover agreement, about which UPI raises no issue as to legality, and "an implied-in-fact contract cannot exist if an express contract already covers the same subject matter." *Id.*

We conclude that, even if Contract No. F28609-95-C-0036 was illegal, and we have not so found, no implied-in-fact contract came into being between the Air Force and UPI. Accordingly, we hold we have no jurisdiction over UPI's illegal contract claim. That portion of the appeal is dismissed.

<u>Delay and Excess Superintendence (Delays)</u>

The first of UPI's delay claims seeks $99,198 for extended overhead of 198 days at $501 per day (finding 42). The excess superintendence claim is for 162 days of delay at $520 per day (*id.*). Viewed as a suspension of work, these elements of UPI's claim share as a predicate the need to prove the length of the delay, that the length of the delay was unreasonable, and that the delay was caused by the Government. *Wunderlich Contracting Co. v. United States,* 351 F.2d 956, 967 (Ct. Cl. 1965). We have found that UPI has not

met its burden of proof with respect to compensable delay (finding 43). For one thing, there never was a schedule with which to compare performance (finding 41). We cannot, for example, evaluate the effect of UPI's receipt of the finish schedule on 8 December 1997 (finding 43), except to say that Mr. Scott Lattimer's testimony that finish work could not begin until 19 February 1998 (*id.*) indicates a two month, unexplained lag. UPI has left us with a record like that in *Wunderlich Contracting Co*., 351 F.2d at 969, where the Court observed:

> Although we do not doubt that plaintiffs and their subcontractors encountered delays and difficulties in proceeding with the plans provided by defendant, all that plaintiffs have attempted to prove with respect to any of the major claims is the total amount of costs and the total delay experienced on the project. No satisfactory evidence has been presented to differentiate between reasonable and unreasonable government delays, or between delays attributable to defendant and delays unavoidably caused by extraneous circumstances. It is incumbent upon plaintiffs to show the nature and extent of the various delays for which damages are claimed and to connect them to some act of commission or omission on defendant's part.

We think the Court's rationale for denying the appellant's claim also applies here. Our holding *infra* that UPI is responsible under the performance bond for correcting Castle's work means that UPI is responsible for attendant delays. UPI was unable to provide a probative estimate of the amount of corrective work (finding 43). UPI has argued its case from the general testimony of Mr. Lattimer and Mr. Zauderer and the claim (app. br. at 18-19). This is, in our view, insufficiently probative to be persuasive. UPI's delay claims fail for a lack of proof.

Viewed as a claim under the Changes clause, UPI's claim also fails for lack of proof. There is no proof that Latimer paid Mr. Marks, the superintendent and a salaried employee, any additional money due to delays. The only specific cause of post-takeover delay claimed which is discernible from the record is for the finish schedule. UPI has failed to prove this delayed completion. Finally, there is no proof of a delay. (Finding 43)

Additionally, UPI's claim seeks extended overhead costs of $99,198. Such costs are only recoverable by resort to the Eichleay formula. *Wickham Contracting Co. v. Fischer,* 12 F.3d 1574, 1580-81 (Fed. Cir. 1994). Before recovery can be had, a contractor must show that its forces were on standby. *West v. All State Boiler, Inc.,* 146 F.3d 1368 (Fed. Cir. 1998). UPI's forces were never on standby (finding 41). This portion of the claim is denied for this reason as well.

Improper Contract Payment

The facts here are that Castle asked that future payments be sent to UPI. Ms. DeMito called Mr. Zauderer and told him that the only way to assure that was through a novation agreement, which he declined. He did not want the payment withheld, and the payment was sent to DFAS with a request from the contracting office that payment be sent to UPI. DFAS, however, sent the payment to Castle. (Findings 44, 45) UPI argues that the Air Force became a stakeholder and violated its duty to UPI when it did not ensure that the payment was not sent to Castle. The Air Force argues that UPI does not have standing for this part of its claim because the matter arose prior to the takeover agreement.

UPI cites four cases in support of its position. One is a case filed in the Court of Claims--*American Fidelity Fire Insurance Co. v. United States,* 513 F.2d 1375 (Cl. Ct. 1975). The other three are cases filed in the Court of Federal Claims or its predecessor -- *Transamerica Premier Insurance Co. v. United States,* 32 Fed. Cl. 308 (1994); *International Fidelity Insurance Co. v. United States*, 25 Cl. Ct. 469 (1992); and *International Fidelity Insurance Co. v. United States* 41 Fed. Cl. 706 (1998). The cases do not, therefore, establish the jurisdiction of the Board to resolve "stakeholder" disputes under the CDA.

In *Balboa Insurance Co. v. United States,* 775 F.2d 1158 (Fed. Cir. 1985), the surety brought suit to recover progress payments which it alleged were improperly made to the principal, a defaulted general contractor. There, the Court stated that a surety's "traditional means" of asserting such a claim was under the doctrine of equitable subrogation. *Id.* at 1161. UPI has not established and we are not aware of any other basis for UPI's recovery of an improperly made progress payment. As we are shorn of jurisdiction over the surety's equitable subrogation claims by *Fireman's Fund*, we must dismiss this part of the claim for lack of jurisdiction.

Superintendence (Change Orders)

UPI seeks $40,492 for additional costs for L & A's superintendent and project manager arising from changes to the takeover agreement (Mods. 9-13 and 15). The releases for Mods. 13 and 15 are total and do not reserve a claim for the time of a superintendent or project manager (finding 46). Both were salaried (finding 41). UPI cites to the claim and testimony of Scott Lattimer as support. To say that the testimony is lacking in specifics would be a kindness. Mr. Lattimer's sparse and unspecific testimony is not enough to carry UPI's burden of proof. However, many of the change proposals are in the record and can be traced to one of the modifications to the takeover agreement (finding 49).



51

None of the change proposals show costs going to Lattimer, the company which employed Scott Lattimer (findings 48, 49). Mr. Clyde Lattimer testified it was his intention to keep the two entities separate (finding 27). Scott Lattimer testified that he was the project manager (finding 48). He visited the site intermittently (*id.*). However, UPI and L & A have produced no subcontract other than the 6 August 1997 letter. In that document, Scott Lattimer's time is to be paid at the rate of $95 per hour. However, project manager billings were made at the rate of $75 per hour. (Finding 48) Project manager's time, pursuant to the letter, is to be paid at the rate of $75 per hour (finding 27). UPI seeks recompense for project manager time billed by L & A at $75 per hour. We have found there is no probative evidence of payments resulting from Scott Lattimer's work on the change proposals (finding 48). As an employee of Lattimer, we would have expected billings to UPI for his time as project manager to be supported by bills to L & A from Lattimer. We cannot identify any such bills (*id.*). Between the lack of evidence as to Scott Lattimer's involvement with the changes and the discrepancies as to his employer and the rate he is to be paid, we find there is a lack of proof as to UPI's entitlement to the project manager hours claimed. Accordingly, we deny the claim as to project manager's hours.[12]

Mr. Marks was the site supervisor for L & A (finding 48). From this we think it reasonable to infer that he supervised the work resulting from the changes to the takeover agreement. The 6 August 1997 letter calls for superintendent time to be compensated at $68 per hour and, unlike Scott Lattimer, he is not named in the letter (finding 27). The record does contain proof that he was paid by L & A and that UPI was billed by L & A for superintendent's time (finding 48).

In addition to considering the sparse record citations argued by appellant, we have also reviewed the change proposals. We conclude from our review that 135 superintendent hours are not recoverable. The reasons are set out below.

1. The release for Mod. 13 is complete and without any reservation and there is no reservation of claims in the change proposal. Thus, the 96 superintendent hours in change proposal 25 are not reserved. The hours are not recoverable because a complete release bars additional compensation. *Northwest Marine, Inc.,* ASBCA No. 40505, 94-3 BCA ¶ 27,036.

2. The releases for Mods. 9-12 reserve "extended overhead including but not limited to site supervision and project management." However, the costs sought are direct costs, and change proposals 1-3, 6 and 7 contain no reservation for the 21 superintendent hours claimed through those change proposals. We think the reservations in the modifications are inadequate, standing alone, to reserve a request for direct costs. Accordingly, without claims reservations in the change proposals clarifying the "extended overhead" reservation, we hold the direct costs have not been reserved. The costs are barred by the release in the modifications. (Finding 46) *Northwest Marine, Inc., supra.*



52

3. There are no modifications resulting from change proposals 20 (2 superintendent hours) and 21 (1 superintendent hour). UPI seeks a total of 3 superintendent hours based on these proposals. As there is no modification or other evidence of changed work performed, we hold that UPI has not carried its burden of proof and is not entitled to recover.

4. There are no change proposals in the record supporting the claim for change proposal 5 (4 superintendent hours). Without the change proposal to show that L & A was actually proposing superintendent direct costs, we hold there is inadequate evidence to support UPI's claim. UPI has failed to carry its burden of proof for those claimed direct hours.

5. Change proposals 14, 17, 20, and 23 are either deletions of work or "no cost" proposals. Yet UPI claims a total of 10 superintendent hours for those change proposals. UPI does not attempt to explain how it can be that deletions of work and "no cost" proposals give rise to increased supervisory hours. We hold that UPI has failed to carry its burden of proof.

6. Change proposal 19 is noted as for no cost in Mod. 12, yet UPI claims 1 hour for the superintendent. We hold that the "no cost" description in the modification, combined with the general release language in the modification (finding 46), merge to constitute a failure to reserve the claim for superintendent and project manager hours. As such, the costs are barred by the release. *Northwest Marine, Inc., supra.* UPI has failed to carry its burden of proof.

Regardless of the fact that our review of the change proposals does not totally eliminate all of the claimed hours, there are overriding reasons to deny this portion of the claim. As noted earlier, UPI has not proved there was compensable delay. Thus, no costs for superintendence over a period longer than anticipated were incurred as a result of delay. Moreover, UPI was required by the contract to have a full-time superintendent, and Mr. Marks was salaried, not hourly (findings 2, 48). Thus, the fact that Mr. Marks supervised the work does not, *ipso facto*, establish the incurrence of additional cost as a result. There is no proof that additional salary was paid (finding 48). We note also that, as L & A was not bonded, the bonding costs of 3 percent were not incurred (*id.*). UPI has not met its burden of proof on the portion of its claim for costs of superintendence attributable to changes.

<u>Patently Defective Work</u>

UPI seeks recovery for patently defective work, which it appears to define as work to correct the work performed defectively by Castle. The Air Force argues that the defects complained of were latent and fraudulent. With one exception, we agree with the Air Force.

As noted *supra*, even UPI concedes that the site looks 80 percent complete in the Tab 214 video. As we have stated, we consider that video to best represent the site as Mr. Jaques would have seen it. We are unable to detect any patent defects. Moreover, the relevant contract provisions did not require Castle to test water and electric in the presence of the inspector until the systems were complete (finding 3). We do not think the record supports a finding that the defects were evident, except for the bulges in the wall where wiring had been placed over, instead of through, wall studs. Although not visible on the Tab 214 video, there is testimony to support this deficiency as patent. (Finding 50) However, there is nothing to support the extent of this condition or how expensive it was to repair.

Moreover, we have found that Mr. Zauderer toured the site before termination, and before entering into the takeover agreement. After its principal is default terminated a surety always has the option of refusing to perform and letting the Government sue it. *Seaboard Surety Co.,* 817 F.2d at 959. We think there is inconsistency between Mr. Zauderer's actions in agreeing to the takeover agreement here, which UPI drafted and under which it agreed to complete the contract without any exceptions for defective work (finding 29), and the magnitude of patent defects complained of in the claim. It seems unlikely that a surety that had observed "numerous items of patently defective work" (app. br. at 19) would propose and execute the takeover agreement here and then arrange for the work on a time and materials basis where L & A was not responsible for "incorrect work" (finding 27).

UPI's greatest obstacle is that it issued the performance bond to insure that the contract would be performed satisfactorily. That contract and the takeover agreement included the Warranty of Construction clause which, in paragraph (c), obligates the contractor to "remedy at the Contractor's expense any failure to conform, or any defect." Castle abandoned performance. Castle's termination for default was, therefore, performance-based and has not been contested. (Finding 25) Under these facts, the contracting officer's decision is final and conclusive and the propriety of the default is established. *Combined Arms Training Systems, Inc.,* ASBCA Nos. 44822, 47454, 96-2 BCA ¶ 28,617 at 142,891. Where, as here, a performance-based termination for default has been established, the surety becomes liable and stands in the place of the principal. *Seaboard Surety Co.,* 817 F.2d at 962. It seems antithetical to UPI's status as a Miller Act surety to argue that defective performance by its defaulted principal is a basis for recovery of damages from the obligee (here, Air Force). Indeed, we note that UPI cites no cases in support of its position. We deny this portion of the appeal.

<u>Contract Balance</u>

UPI asserts it completed the contract and is entitled to the contract balance. However, the Air Force argues, and we have found, UPI has not submitted the release required by FAR 52.232-5(h)(3) (finding 57).[13] That clause provides:



54

(h) Final payment. The Government shall pay the amount due the Contractor under this contract after—

. . . .

(3) Presentation of release of all claims against the Government arising by virtue of this contract, other than claims, in stated amounts, that the Contractor has specifically excepted from the operation of the release.

Payment of the contract balance would constitute final payment. Accordingly, we must deny UPI's claim for the contract balance.[14]

SUMMARY

The following claim items are dismissed for lack of jurisdiction:

1. The Illegal Contract Alternative Claim
2. Overpayment
3. Improper Contract Payment

The following claim items are denied:

1. Delay
2. Excess Superintendence (Delays)
3. Superintendence (Change Orders)
4. Patently Defective Work
5. Contract Balance

The appeal is dismissed in part and denied in part in accordance with the foregoing.

Dated: 4 June 2003

CARROLL C. DICUS, JR.
Administrative Judge
Armed Services Board
of Contract Appeals

I concur

MARK N. STEMPLER
Administrative Judge
Acting Chairman
Armed Services Board
of Contract Appeals

I concur

EUNICE W. THOMAS
Administrative Judge
Vice Chairman
Armed Services Board
of Contract Appeals

NOTES

1 Appellant's claim asserted an alternative basis for recovery based on an illegal contract and termination for convenience theory under which it sought $3,194,490.59.

2 The Reliance Group was the parent of Reliance Holding Company, a publicly traded corporation that owned a group of insurance companies, which included UPI. Reliance National was the underwriting division of the Reliance Group. UPI was one of the companies authorized to write Federal surety bonds under Reliance Holding Company. (Tr. 31)

3 UPI's appeal to the Federal Circuit was voluntarily dismissed. *United Pacific Insurance Company v. Roche,* No. 01-1596 (Fed. Cir. November 22, 2002).

4 That building was the only one of the three to receive a new peaked roof (tr. 1352).

5 Conditioned space is space built to house people. The connectors were walkways between the buildings not meant to house people. (Tr. 1346-47)

6 Except to refer to his testimony regarding his function, we have found the testimony of Mr. Lefkowitz (tr. 1058-1193) to be lacking in probative value.

7 We have extrapolated the percentage of completion for each individual task from Contract Progress Report No. 33.

8 Ms. DeMito was not specific as to whether it was Clyde or Scott Lattimer.

9 We recognize that *National Surety I* was an appeal taken from a deemed denial under 41 U.S.C. § 605(c)(5) and therefore at least nominally a CDA claim. However, there was no jurisdictional issue raised or argued in *National Surety II,* where equitable subrogation based on a Government right was involved on appeal. We note that the Tucker Act, 28 U.S.C. § 1491, gives the Court of Federal Claims "jurisdiction to render judgment upon any claim . . . founded upon . . . any Act of Congress . . ." and in *Insurance Company of the West, supra*, the Court interpreted the Tucker Act as waiving sovereign immunity.

10 Except as specific findings may be necessary to resolve issues before us, we express no opinion as to the substance of UPI's rights under the doctrines of equitable subrogation and *pro tanto* discharge. We are rather persuaded that we are the wrong forum in which to address those rights.

11 Our reading of *Amdahl* does not lead us to conclude that the Court found an implied-in-fact contract, so we treat the statement as *obiter dictum.* Moreover, it is unclear that a contract implied-in-law can be formed if the Government agent did not have actual authority, as would be the case here if the contract was illegally funded. *See Chavez v. United States,* 18 Cl. Ct. 540 (1989); Willard L. Boyd III & Robert K. Huffman, *The Treatment of Implied-in-Law and Implied-in-Fact Contracts and Promissory Estoppel in the United States Claims Court,* 40 Cath. U.L. Rev. 605 (1991). In any case, UPI cannot establish other elements of an implied-in-law contract.

12 As there are costs sought for proposals for which there is no modification, it may be that Scott Lattimer's time is for preparing proposals. That is ordinarily recovered through overhead costs. *Bridgewater Construction Corp.*, VABCA No. 2935, 91-3 BCA ¶ 24,274. UPI has produced no evidence that its overhead costs were increased by preparation costs for change proposals.

13 The final voucher was also unsigned (finding 55).

14 We offer no opinion as to whether UPI could recover after satisfying FAR 52.232-5(h)(3).

## APPENDIX A

| Change Proposal | Date | Description | Project Manager | Project Superintendent | | | |
|---|---|---|---|---|---|---|---|
| 1 | 17-Oct-97 | Raise light switches in bathrooms 2402 & 2403 | 1 | 1 75 65 | $75 | $65 | $140 |
| 2 | 20-Oct-97 | Adden 26 power 2401 | 8 | 0 | $600 | $0 | $600 |
| 3 | 26-Nov-97 | Adden 25 replace wood doors | 6 | 4 | $450 | $260 | $710 |
| 4 | 26-Nov-98 | Ceiling tile revision | 45 | 75 | $3,375 | $4,875 | $8,250 |
| 5 | 19-Dec-97 | roof changes | 4 | 4 | $300 | $260 | $560 |
| 6 | 17-Dec-97 | Modify store fronts | 5 | 8 | $375 | $520 | $895 |
| 7 | 17-Dec-97 | Ceramic tile revision in restrooms | 2 | 8 | $150 | $520 | $670 |
| 8 | 08-Jan-98 | Modify Electrical Service building 2401 | 4 | 4 | $300 | $260 | $560 |
| 9 | 08-Jan-98 | Modify power plan 2401 | 8 | 8 | $600 | $520 | $1,120 |
| 10 | 15-Jan-97 | Revise wall paper | 32 | 56 | $2,400 | $3,640 | $6,040 |
| 11 | 16-Jan-98 | Modify west vestibule | 2 | 4 | $150 | $260 | $410 |
| 12 | | Double credit mod 4 | 0 | 0 | $0 | $0 | $0 |
| 13 | 11-Feb-98 | 2401 basement finish | 8 | 0 | $600 | $0 | $600 |
| 14 | 06-Mar-98 | Electrical changes - RF1 memo #7 30 Jan 98 | 8 | 0 | $600 | $0 | $600 |
| 15 | 17-Feb-98 | Wallpaper painting areas | 2 | 0 | $150 | $0 | $150 |
| 16 | | Planter deletion | | | $0 | $0 | $0 |
| 17 | 24-Apr-98 | Platform deletion | 8 | 8 | $600 | $520 | $1,120 |
| 18 | 11-May-98 | Porcelain Pavers in lieu of quarry tile | 2 | 1 | $150 | $65 | $215 |
| 19 | 12-May-98 | Exhaust fan basement 2403 | 1 | 1 | $75 | $65 | $140 |
| 20 | 19-May-98 | Revise custom cabinets & handrail | 16 | 2 | $1,200 | $130 | $1,330 |
| 21 | 14-Jun-98 | Fire alarm control panel | 3 | 1 | $225 | $65 | $290 |
| 22 | 30-Jun-98 | Additional Fire protection devises [sic] | 4 | 10 | $300 | $650 | $950 |
| 23 | 24-Jul-98 | Courtyard deletion | 4 | 0 | $300 | $0 | $300 |
| 24 | | Unicor installers | 0 | 0 | $0 | $0 | $0 |
| 25 | 10-Sep-98 | Extra's letter dated 18 Aug 98 | 8 | 96 | $600 | $6,240 | $6,840 |
| | | | | | $0 | $0 | $0 |
| | | | | | $0 | $0 | $0 |
| | | | | | $0 | $0 | $0 |
| | | | 181 | 291 | $13,575 | $18,915 | $32,490 |
| | | | | | | 10.00% | $3,249 |
| | | | | | | | $35,739 |
| | | | | | | 10.00% | $3,574 |
| | | | | | | | $39,313 |
| | | | | | | 3.00% | $1,179 |
| | | | | | | | $40,492 |

I certify that the foregoing is a true copy of the Opinion and Decision of the Armed Services Board of Contract Appeals in ASBCA No. 53051, Appeal of United Pacific Insurance Company, rendered in conformance with the Board's Charter.

Dated:



58

EDWARD S. ADAMKEWICZ
Recorder, Armed Services
Board of Contract Appeals

**H**

**Briefs and Other Related Documents**

United States Court of Appeals,
Federal Circuit.
UNITED PACIFIC INSURANCE COMPANY,
Appellant,
v.
James G. ROCHE, Secretary of the Air Force,
Appellee.
**No. 03-1622.**

DECIDED: Aug. 18, 2004.
Rehearing Denied Dec. 1, 2004.

**Background:** Surety that completed performance of defaulting government contractor sought equitable adjustment. The Armed Services Board of Contract Appeals ruled that it had no jurisdiction over most of surety's claims, and rejected remaining claims on the merits. Surety appealed.

**Holdings:** The Court of Appeals, Friedman, Senior Circuit Judge, held that:
(1) Board lacked jurisdiction over surety's claims to the extent that claims related to and depended upon events which occurred before surety's takeover agreement with government was executed;
(2) provision in takeover agreement reserving surety's prior rights did not give Board jurisdiction over surety's pre-agreement claims;
(3) provision of takeover agreement entitling surety to exercise such rights as were afforded by Contract Disputes Act did not establish Board's jurisdiction over surety's pre-agreement claim;
(4) contract illegality claim was barred by invalidation of assignment by Anti-Assignment Act; and
(5) surety was not entitled to balance due under construction contract until it provided required release.
Affirmed.

West Headnotes

**[1] United States ⚷73(15)**
393k73(15) Most Cited Cases
For Armed Services Board of Contract Appeals to have jurisdiction pursuant to Contract Disputes Act over a claim by a surety that entered into a takeover agreement with the United States, claim must arise under a contract which surety had with the government prior to such agreement, and for a claim to "arise under" pre-takeover contract, the operative facts upon which claim is based must have occurred after the pre-takeover contract was executed. Contract Disputes Act of 1978, § 2 et seq., 41 U.S.C.A. § 601 et seq.

**[2] United States ⚷73(15)**
393k73(15) Most Cited Cases
Armed Services Board of Contract Appeals lacked jurisdiction over claims for equitable adjustment asserted by surety that completed performance of defaulting contractor, pursuant to surety's takeover agreement with government, to the extent that claims related to and depended upon events which occurred before takeover agreement was executed, such that surety was not "contractor" under Contract Disputes Act when claims arose. Contract Disputes Act of 1978, § 2 et seq., 41 U.S.C.A. § 601 et seq.

**[3] United States ⚷73(15)**
393k73(15) Most Cited Cases
Provision in takeover agreement between government and surety for defaulting contractor by which surety expressly reserved all prior rights, including those respecting alleged overpayments made to contractor, did not give Armed Services Board of Contract Appeals jurisdiction over surety's claim for equitable adjustment based on alleged overpayments, over which Board never had jurisdiction.

**[4] United States ⚷73(15)**
393k73(15) Most Cited Cases
Jurisdiction of Armed Services Board of Contract Appeals is defined by the Contract Disputes Act. Contract Disputes Act of 1978, § 2 et seq., 41 U.S.C.A. § 601 et seq.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

**[5] Federal Courts ⚿31**
170Bk31 Most Cited Cases
Parties cannot, by agreement, confer upon a tribunal jurisdiction that it otherwise would not have.

**[6] United States ⚿73(15)**
393k73(15) Most Cited Cases
Provision of takeover agreement between government and defaulting contractor's surety that entitled surety to exercise such rights as were afforded by Contract Disputes Act merely recognized that surety retained whatever rights it otherwise had under Act, and did not establish jurisdiction of Armed Services Board of Contract Appeals over claims asserted by surety based on events preceding takeover agreement, as to which, under Act, surety had no right to maintain claim before Board. Contract Disputes Act of 1978, § 2 et seq., 41 U.S.C.A. § 601 et seq.

**[7] United States ⚿111(4)**
393k111(4) Most Cited Cases
Nothing in takeover agreement between government and surety for defaulting contractor showed government's recognition of contractor's assignment to surety, under their indemnity agreement, of claims arising under construction contract between contractor and government in the event of default, and therefore claim of contract illegality that surety sought to assert did not come within exception under Anti-Assignment Act for situations in which government chose to recognize assignment, and claim was barred by Act's invalidation of assignment. 31 U.S.C.A. § 3727(a)(1), (b); 41 U.S.C.A. § 15(a).

**[8] United States ⚿73(15)**
393k73(15) Most Cited Cases
Armed Services Board of Contract Appeals had jurisdiction over claim for balance due on construction contract asserted by surety that completed contract following contractor's default, given that claim, while stemming from construction contract, arose after surety entered into takeover agreement with government.

**[9] United States ⚿74.1**
393k74.1 Most Cited Cases
Pursuant to regulation incorporated by construction contract, surety that completed performance under contract following contractor's default was not entitled to receive balance due under contract until it provided required release of all claims against government except those specifically excepted from operation of release, notwithstanding surety's contention that it would be unable to pursue other claims against government if it provided release. 48 C.F.R. § 52.232-5(h).

***1354** Gary A. Wilson, Duane Morris LLP, of Philadelphia, PA, argued for appellant. With him on the brief was Salil P. Patel.

Michael N. O'Connell, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for appellee. With him on the brief were Peter D. Keisler, Assistant Attorney General; David M. Cohen, Director; and James M. Kinsella, Deputy Director. Of counsel on the brief was Major Graeme Henderson, Chief, Surety Litigation Branch, Air Force Legal Services Agency, of Arlington, Virginia. Also of counsel was William M. Lackermann, Jr., Attorney, Air Force Materiel Command Law Office, Wright-Patterson Air Force Base, of Dayton, OH.

Edward G. Gallagher, Wickwire Gavin, P.C., of Vienna, VA, for amicus curiae The Surety Association of America.

Before LOURIE, Circuit Judge, FRIEDMAN, Senior Circuit Judge, and CLEVENGER, Circuit Judge.

FRIEDMAN, Senior Circuit Judge.

A surety who completed performance of a defaulting government contractor seeks an equitable adjustment on various theories. The Armed Services Board of Contract Appeals ("Board") held that it had no jurisdiction over most of these claims under our recent decision in *Fireman's Fund Insurance Co. v. England,* 313 F.3d 1344 (Fed.Cir.2002) ("*Fireman's Fund*"), and rejected the remaining claims on the merits. *In re United Pac. Ins. Co.,* 03-2 B.C.A.(CCH) ¶ 32,267 at 159,604, 2003 WL 21350374 (A.S.B.C.A.2003). We affirm.

I

This case grows out of a 1995 Air Force contract with Castle Abatement Corporation ("Castle") for

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.



61

the renovation of three buildings. The appellant, United Pacific Insurance Company ("United"), was the surety for the project and "issued performance and payment bonds to Castle." *Id.* at 159,606. Castle and United also executed an indemnity agreement in which Castle assigned to United, in case of Castle's default, all of its "rights ... [and] claims ... arising from or out of" the construction contract, including "all moneys due" thereunder. The government was not a party to the surety or indemnity agreements, and except for its participation as a surety, United was not "part of the contracting process." *Id.* at 159,606.

Castle had performance and financial problems. *Id.* at 159,607. In May 1997, Castle asked the contracting officer to make all future progress payments to United. *Id.* at 159,616. After the contracting officer told United that a novation would be required to make that change, United refused to do that. *Id.* Thereafter, the Air Force made an additional payment of $116,000 to Castle. *Id.*

In July 1997, Castle abandoned performance, and the government terminated the contract for default. *Id.* at 159,609. The following month, United and the government entered into a takeover agreement under which United agreed to complete performance of the contract and the government ***1355** agreed to pay United the remaining amounts due under the construction contract, which the takeover agreement incorporated. *Id.* at 159,611-13. At that time, the government estimated, and United agreed, that 79.91 percent of the contract work had been completed. *Id.* at 159,610. Contract performance was completed in 1998. *Id.* at 159,615.

United sought an equitable adjustment from the contracting officer on a number of grounds; it also requested the balance due under the construction contract. *Id.* at 159,615; 159,620. After the contracting officer denied the claims, United appealed to the Board, which held that under *Fireman's Fund,* it lacked jurisdiction to consider United's claims based on events that occurred before the takeover agreement, including its equitable subrogation claims. *Id.* at 159,614. The Board also held that it lacked jurisdiction over United's claim that the original construction contract was illegal. *Id.* at 159,622-23. The Board denied United's claim for the balance due under the contract because United had not given the release that the contract required. *Id.* at 159,627-28.

II

A. Our recent decision in *Fireman's Fund* involved an almost identical situation. There, following a contractor's default on a government building construction contract, the surety (Fireman's Fund) and the government entered into a takeover agreement. 313 F.3d at 1346. The contractor (Summit) and the surety had entered into a "General Indemnity Agreement," to which the government was not a party, under which, in case of a breach of the construction contract, the contractor assigned to the surety all of its rights under that contract. *Id.*

The Armed Services Board of Contract Appeals dismissed the surety's claims that arose before the takeover agreement for lack of jurisdiction. *Id.* at 1347. It held that the surety was not a "contractor" under the Contract Disputes Act with respect to those claims, that the contractor's assignment of its claims to the surety in case of default was barred by the Anti-Assignment Act, and it rejected the surety's equitable subrogation claim because the surety was not a "contractor" under the Disputes Act. *Id.*

We affirmed. Noting that Fireman's Fund's "claims involved in th[e] appeal all relate[d] to its pre-takeover agreement activities," we held that the surety was not a " 'contractor' with the United States ... with respect to its pre-takeover claims," *id.* at 1352, because "[i]t was not a party to any contract with the government prior to the takeover agreement it had with the government, and its pre-takeover claims did not arise under such a contract," *id.* at 1351. We ruled that "[e]ven if Fireman's Fund were equitably subrogated to any claim that Summit may have had against the government, that did not make Fireman's Fund a party to the contract between Summit and the United States for purposes of the Disputes Act." *Id.* We further held that the Anti-Assignment Act covered and invalidated the assignment of the contractor's rights under the construction contract, and that the exception to that Act "for 'an assignment to a financing institution of money due or to become due under a contract' " was inapplicable because the surety was not a "financing

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

institution." *Id.* at 1350.

[1] *Fireman's Fund* thus stands for the proposition that for the Board to have jurisdiction under the Contract Disputes Act over a claim by a surety that entered into a takeover agreement with the United States, the claim must "arise under" a contract the surety had with the government prior to that agreement. For a claim to "arise under" such a contract, the ***1356** operative facts upon which the claim is based must have occurred after the pre-takeover contract was executed.

In this case, the only contract between United and the government was the takeover agreement. Prior to that agreement, there was no contract between United and the government, and United's present claims cannot have arisen under such a contract. Stated differently, the Board had no jurisdiction over United's claims that were based upon events that occurred prior to the takeover agreement.

[2] B. Except for one claim we discuss in Part III below, the remainder of United's claims suffer from the same infirmity that made the claims in *Fireman's Fund* not subject to the Board's jurisdiction: they relate to and depend upon events that occurred before the takeover agreement and with respect to which United was not a "contractor" under the Contract Disputes Act when the claims arose.

1. United seeks an equitable adjustment because the government "paid Castle approximately 80 percent of the contract price when only 34 percent of the work was complete." Appellant's Br. at 13. Its theory apparently is that if the government had not thus overpaid Castle, United would have known that it had more work to do than it had anticipated and would have received more under the takeover contract for the work it did. It also seeks recovery of the $116,000 payment the Air Force made to Castle before the takeover agreement, which United alleges the Air Force agreed to send to it.

All of these alleged overpayments to Castle, however, were made prior to the takeover agreement, at a time when United was not yet a "contractor" with the United States. The Board therefore correctly concluded that it lacked jurisdiction over the claims.

United relies on *National Surety Corp. v. United States,* 118 F.3d 1542, 1544 (Fed.Cir.1997), which involved a surety's suit in the Court of Federal Claims for "funds that were required to have been retained by the government from the progress payments to" the original contractor. We ruled that the surety could assert such a claim but that the "appropriate theory of liability" was the "doctrine of subrogation." *Id.* at 1545; *see also id.* at 1546 ("The subrogation right is equitable ... and is established when the surety bonds are given." (citation omitted)). We expressly rejected the surety's contention that such a claim could be based on a third-party beneficiary theory. *Id.* at 1544.

*National Surety* involved a suit in the Court of Federal Claims under the Tucker Act and did not involve the question in *Fireman's Fund* whether the Board had jurisdiction over such a claim that arose before the takeover agreement. *Fireman's Fund* indicated that the Board could not entertain such a claim. It stated: "To the extent [the surety] relie[d] upon equitable subrogation[,] ... it still d[id] not satisfy the requirement of the Contracts Disputes Act that to proceed under that Act, a party must have been a 'contractor' with the United States, which [the surety] was not with respect to its pre-takeover claims." 313 F.3d at 1352 (citation omitted).

[3][4][5] United contends that it has a "contractual right" to assert its overpayment claim before the Board because the takeover agreement states that the "SURETY expressly reserves all prior rights including but not limited to the Government's overpayment to" Castle. *United Pac. Ins. Co.,* 03-2 B.C.A. (CCH) ¶ 32,267 at 159,613. Contrary to United's argument, however, this provision did not give the Board jurisdiction over the claim. The Board's jurisdiction is defined by the Contract Disputes Act. Parties cannot, by agreement, confer upon a tribunal jurisdiction that it otherwise would not have. ***1357** *See Fla. Power & Light Co. v. United States,* 307 F.3d 1364, 1370 (Fed.Cir.2002) ("Contractual language ... cannot confer jurisdiction" under the Contract Disputes Act.) Thus, a "reference to the [Contract Disputes Act] in the contract" could not vest the Board with "jurisdiction over the ... claim[ ] if it was not otherwise authorized" to adjudicate it. *Id.* at 1371. The provision of the takeover agreement upon

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

which United relies reserves only its "prior" rights, *i.e.,* those that existed before the takeover agreement. Under *Fireman's Fund,* the Board had no jurisdiction over claims based upon those rights.

[6] United also cites the following language of the takeover agreement as a basis for Board jurisdiction: the "SURETY shall be entitled to exercise such rights as are afforded by the ... Contract Disputes Act." *United Pac. Ins. Co.,* 03-2 B.C.A. (CCH) ¶ 32,267 at 159,613. That contractual provision merely recognized that United retained whatever rights it otherwise had under the Contract Disputes Act. As we have explained, United had no right under that Act to maintain before the Board a claim based on pre-takeover agreement events.

[7] 2. United contends that the original construction contract was illegal because under governing statutes and regulations, the Air Force was required to obtain prior congressional authorization before entering into it, which the Air Force concededly did not do. Such prior authorization was required for certain construction contracts whose cost exceeded $300,000. The legality issue turns largely upon whether the contract involved three buildings or a single building.

United contends that because the contract was illegal, it is entitled to recover under a theory of *quantum meruit. See United States v. Amdahl Corp.,* 786 F.2d 387, 393 (Fed.Cir.1986). It also argues that there was an implied-in-fact contract (presumably between Castle and the government) under which it may recover.

United's illegality claims all involve events that occurred long before the takeover agreement and relate to a contract to which United was not a party. Assuming without deciding that a surety has standing to challenge the validity of a completed contract, on its face United's claim appears covered by *Fireman's Fund* and therefore beyond the Board's jurisdiction.

United argues, however, that Castle's assignment in the indemnity agreement of all claims arising under the construction contract in case of default included the claim of contract illegality it now asserts. *Fireman's Fund* held that the Anti-Assignment Act covered and invalidated such assignment of claims to a surety. 313 F.3d at 1349-50. United invokes an exception to that Act for situations where the "Government ... chooses to ... recognize an assignment." *Tuftco Corp. v. United States,* 222 Ct.Cl. 277, 614 F.2d 740, 745 (1980) (internal quotation marks omitted). It asserts that the government recognized the assignment when it entered into the takeover agreement with United. Without discussing the issue in detail, it suffices to say that we discern nothing in the takeover agreement that shows a government recognition of the assignment in the earlier indemnity agreement between Castle and United, to which the government was not a party.

III

[8][9] Finally, United asserts that it is entitled to the balance due on the construction contract (approximately $175,000) now that it has satisfied its obligations under the takeover agreement. The Board had jurisdiction over this claim because, although it stemmed from the construction contract, it arose after the takeover agreement.

***1358** Under Federal Acquisition Regulation 52.232-5(h), *see* 48 C.F.R. § 52.232-5(h) (1994), which the contract incorporated, the government's obligation to make final payment under the contract is conditioned on the contractor's "[p]resentation of release of all claims against the Government arising by virtue of th[e] contract, other than claims, in stated amounts, that the Contractor has specifically excepted from the operation of the release." As United admits in its brief, it has not provided such a release. Appellant's Br. at 43. Although United argues that it would be unable to pursue its other claims if it provided the release, that is beside the point. As the regulations and contract state, without the release United is not entitled to receive the balance due under the contract.

In these circumstances, the Board properly denied the claim. Like the Board, however, "[w]e offer no opinion as to whether [United] could recover after satisfying" the release requirement, since apparently issues remain regarding the amount of United's claim. *United Pac. Ins. Co.,* 03-2 B.C.A. (CCH) ¶ 32,267 at 159,620; 159,631 n. 14.

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.

CONCLUSION

The decision of the Armed Services Board of Contract Appeals is

*AFFIRMED.*

380 F.3d 1352

**Briefs and Other Related Documents (Back to top)**

. 03-1622 (Docket) (Sep. 08, 2003)

END OF DOCUMENT

© 2005 Thomson/West. No Claim to Orig. U.S. Govt. Works.