Q Based on the contract value and the price of the repair work?

A No. Absolutely not. And I think there's a document in the Rule 4 file which shows my programmer's work on 2402, which was the most expensive unit. So he did that estimate on the most expensive unit, found that it was below 70 percent, and so we met that criteria.

JUDGE DICUS: Mr. Wilson, when you say most expensive unit, are you referring to the replacement costs of the building or the repair work that was being programmed for the building?

THE WITNESS: The total cost of everything we're doing on that building, the minor construction and the repair, that total cost he checked against an estimated cost to replace the whole building. That cost was below 70 percent, so in his estimation and in mine, we met that criteria and the project was valid to continue being programmed as it was.

JUDGE DICUS: Yes, but my question is when you -- it may be just semantics here, but I want the record to be clear. You said it was the most expensive. Would the new building to replace it have been the most expensive of the three or are you referring to the contract work that was being done here and is at issue, that of the three buildings that work was the most expensive for 2402?

THE WITNESS: I understand. We had three buildings, three projects. 2402 and 3, the work was very similar except that 2402 also got a new peaked roof, so it was more expensive than 2403 for similar square footage.

2401 had in his estimation much less cost per square foot, so the real project that he needed to check against the 70 percent rule was 2402. So that was the most expensive unit per square foot, as far as those three buildings.

JUDGE DICUS: Right.

THE WITNESS: Now, obviously the most expensive option is to tear the whole building down and replace it with totally new construction, which is what you would do in the MILCON program. So the government guides us to say if you can bring this building up to standards for under 70 percent of what it would cost us to build new, then that's a wise economic decision, but once you go over about 70 percent, we really need to be thinking about junking that building and building a new one. So it's an economic criteria.

BY MR. GARY WILSON:

Q And you said this is in the Rule 4 file, you believe?

A Yes.

Q Okay. I'd like to be able to determine what

you're referring to.

JUDGE DICUS: Have you seen the document today?

THE WITNESS: Yes. When we were talking about work classification.

JUDGE DICUS: So it's probably Rule 4 File Tab 7?

MR. LACKERMANN: No, Your Honor. It's United Pacific Rule 4 File Tab -- Supplement C, Tab 212.

MR. GARY WILSON: 212.

JUDGE DICUS: Okay.

MR. LACKERMANN: I'll provide the witness with a copy.

JUDGE DICUS: I see. Yes.

MR. LACKERMANN: I believe this is what the witness was referring to.

BY MR. GARY WILSON:

Q Is that correct, Mr. Wilson?

A Let me see if I can find it in here. Yes. It's --

JUDGE DICUS: There's a page marked with a fax number 19 at the top, it's about halfway through, it says "An economic analysis has been prepared comparing the alternatives to new construction."

THE WITNESS: But if you go -- I think it's the eighth page in, there's a handwritten --

BY MR. GARY WILSON:

Q The handwritten page?

A Right. And this is his estimate for the cost to build new for Building 2402.

MR. LACKERMANN: For the record, Your Honor, I believe at the top it has a fax number of 04/25/2002 10:30, the number 609-724-6866 and then in the right-hand corner the number page 2.

JUDGE DICUS: Yes. That comports with what I've got, Mr. Lackermann. Thank you.

BY MR. GARY WILSON:

Q Now, how was this calculation made? It appears to end up at 66 percent.

A What you see there is the programmer is costing out a new facility, a replacement facility, in accordance with MILCON programming guidance. There's separate guidance provided by the Air Force on exactly how to program a new facility. They build so many facilities that they have collected all the data on different types of facilities, developed square footage costs depending on type of facility, what they call supporting facilities costs as a percentage of the facility cost, and then ancillary costs such as parking and utilities and they also have an area cost factor which you then apply. So that's why you see a series of costs running down, the last item is 1.19, which is the McGuire area cost factor.



69

He comes to a total replacement cost for new construction of 2,292,977. He compared that with his program cost and came up to 66 percent.

Q So just to replace one building was 2.2 million or almost 2.3 million?

A That was his estimate based on MILCON cost estimating guidance. Now, our actual final cost came in less than that.

Q Well, substantially less.

A That's correct.

Q Approximately the entire contract for all three buildings is 3.5 million.

A That's correct.

Q How could it possibly be 2.3 million for just one building?

A That's new construction. That's starting over from scratch, new parking, new utility runs from the central system, new foundation, new everything.

Q But in this project, almost everything is being replaced either arguably as a repair or as new construction. There wasn't very much left of the original construction on these buildings. Isn't that correct?

A Not from my perspective.

Q Well, you had foundations, you had some structural members and the roofs remained, with the exception of the

one that was replaced. And other than that almost everything is new in these buildings. Isn't that correct?

A All of the parking remained. All of the central utility system feeds to those buildings remained. The structure for the entire building remained, the sheathing remained. The roofing remained. That's a significant cost item. But irregardless, the point is that there's clear guidance to us that if the cost is expected to exceed 70 percent then we should stop programming it as repair and we should be looking at demolishing the buildings and building new.

Our programming estimate was admittedly conservative. The final cost of the project came in fairly significantly below our programming estimate. So my guys did a good job of fairly assessing the cost of the project.

Q All right. So in summary, if we go back, we've got the 70 percent criteria, your position is that you met that under this calculation, and then there's a separate calculation as to the $300,000 threshold. Your position there is that there are three projects within this contract based on there being connectors that did not contain conditioning. Is that correct?

A That's correct.

Q And if you would refer to 1021 again, page 25 -- do you have page 25?

testify. So, as a result, Your Honor, we believe that we will be able to show, we will be able to prove, you know, our claims as summarized on that board and that it will be clear and convincing evidence. Thank you.

JUDGE DICUS: Thank you, Mr. Wilson. I do have to caution you that I hope somebody at your firm put quantum meruit through Lexus or Westlaw because it's my understanding that we've never taken jurisdiction on a quantum meruit basis and that whenever an illegal contract has been found before the Board because there is no contract at that point, that we are without jurisdiction. So, I caution you to make sure you want to present that evidence on that aspect of the claim because it seems to me it could backfire but having said that, you know, it's your call obviously and the nature of Board practice is such that it takes three judges to make a dispositive decision so, I'm not in a position at this point to deny you the opportunity to do that. Mr. Lackermann do you want to make your opening statement now or do you prefer to hold off until before your case in chief?

MR. LACKERMANN: Your Honor, obviously I want to see if Appellant can prove it's case first, so I'm going to reserve my statement. There are three or four quick points if I could. I didn't make any objections during Mr. Wilson's opening so not to disrupt his opening



71A

adjustments, and although sufficient supporting documentation has been provided to the Government, the Government has failed to compensate United Pacific for its additional costs and damages as required by the terms of the Original Contract and Takeover Agreement.

WHEREFORE, United Pacific Insurance Company respectfully requests that this Honorable Board award United Pacific Insurance Company an equitable adjustment in the amount of $3,591,362.62 plus interest, and such other and further relief as in law and in justice it may be entitled to receive.

**COUNT II - ILLEGAL CONTRACT**
**(In the Alternative)**

68. United Pacific incorporates by reference the allegations of paragraphs 1 through 67 of the Complaint as if set forth at length herein.

69. The Government's Solicitation and Offer of Award for the Original Contract defined the work to be performed as a project for "Construction, Alteration or Repair," specifically a contract to "Renovate Bldgs 2401, 2402 & 2403."

70. Applicable law defines "military construction" as " ...any construction, development, conversion, or extension of any kind carried out with respect to a military installation." 10 U.S.C. § 2801 (a). A "military construction project" is defined as " ...all military construction work, or any contribution authorized by this chapter [10 U.S.C. §§ 2801, et seq.], necessary to produce a complete and usable facility or a complete or usable improvement to an existing facility (or to produce such portion of a complete and usable facility or improvement as is specifically authorized by law)." 10 U.S.C. § 2801(b).

71. Further, the Federal Acquisition Regulations in place at the time of the Original



72

Contract define "construction" as " ...construction, alteration, or repair (including dredging, excavating and painting) of buildings, structures or other real property... " 48 C.F.R. § 36.102.

72. Under the foregoing definitions, the work to be performed under the Original Contract was clearly "military construction," which under Air Force rules and regulations must be funded under Requisition and Accounting Classification 3300, Military Construction.

73. In this instance, however, the Government funded the work under Classification 3400, Operations and Maintenance.

74. This misclassification was improper and rendered the Contract illegal.

75. Expenditure of operations and maintenance funds for construction work is expressly limited to minor military construction projects costing not more than $500,000. 10 U.S.C. § 2805(c)(1)(B); DOD Dir. 4270.36 As the Original Contract price in this case exceeded $3 million, it was clearly beyond the Government's authority to fund the work using operations and maintenance appropriations. The Federal Acquisition Regulations expressly bar such contract awards in excess of statutory cost limitations. 48 C.F.R. § 36.205(a)(1).

76. Additionally, military construction on projects costing over $1.5 million requires Congressional authorization, which the Government failed to obtain with regard to the Original Contract. 41 U.S.C. § 12.

77. A contract which is illegal is deemed to be voidable, entitling the contractor to have the contract terminated for convenience, particularly where the contractor did not contribute to the illegality and was unaware that the contract was illegal when it was awarded.

78. Such a termination entitles the contractor to recover the cost of performance plus a reasonable profit on those costs whether or not benefit accrued to the government.

79. Neither the Original Contractor nor United Pacific contributed to the illegality of the Original Contract, nor was either the Original Contractor or United Pacific aware of the illegality at the time of award. Accordingly, United Pacific is entitled to have the Contract terminated for convenience under FAR Section 52.249-2 (APR 1984), which is specified in the Original Contract, and to recover its costs plus a reasonable profit on a quantum meruit basis.

80. United Pacific incurred a total of $3,505,457.18 in costs in completing the Original Contract work under the Takeover Agreement. A reasonable markup for profit is ten per cent (10%) or $350,545.72, the same profit percentage allowed by the Government on change orders issued under the Original Contract. To date, the Government has made payments of $661,512.31. Therefore, United Pacific is entitled to recover the sum of $3,194,490.59 from the Government.

**Reliance National**
A Reliance Group Holdings Company

Robert Haberle
Executive Vice President

April 7, 2000

**VIA FEDERAL EXPRESS**

Kathleen DeMito
Contracting Officer
305 CONS/LGCK
3563 Lancaster Avenue
McGuire AFB, NJ 08641-1712

**Re: Alternative "A": Request for Equitable Adjustment**
**Alternative "B": Request for Termination for Convenience of Illegal Contract and Award of Quantum Meruit Recovery**

**Contract No.: F28609-95-C-0036**
**Project: Renovation of Buildings 2401, 2402 and 2403, McGuire AFB, New Jersey**
**Claims: Various**
**Bond No.: NSU-2512441**

Dear Ms. DeMito

United Pacific Insurance Company (hereinafter "United Pacific" or "Surety") previously entered into a Takeover Agreement with the United States of America, United States Air Force, acting by and through yourself as the Contracting Officer (hereinafter the "Government") on August 5, 1997 (hereinafter the "Takeover Agreement"). Pursuant to clause 10 of the Takeover Agreement, United Pacific reserved all prior rights, including but not limited to overpayment by the Government to Castle Abatement Corporation (hereinafter the "Contractor"), including equitable liens and rights of subrogation by the United States, the laborers or materialmen or the Contractor under the subject Contract Number F28609-95-C-0036 (hereinafter "the Contract"). Further, United Pacific reserved its rights to pursue any disputes or claims under the Disputes Clause of the Contract and the Contract Disputes Act of 1978, as amended. Accordingly, pursuant to the Contract Disputes Act of 1978 and particularly, in accordance with clause 52.233-1, Disputes Clause of the Code of Federal Regulations, which is incorporated within and referenced in the Contract documents, United Pacific is seeking additional compensation for various claims set forth herein with a total sum certain of $3,591,362.62. The claims as described herein address the contractual aspects of the request for additional compensation. Accordingly, United Pacific requests a Final Decision of the Contracting Officer with respect to the attached documentation, which includes ten (10) claims comprising the total claim value of **$3,591,362.62** ("Alternative 'A', Request for Equitable Adjustment").



77 Water Street, New York, NY 10005 ▪ Tel: 212-858-3556 Fax: 212-858-5050 ▪ E-Mail: Robert.Haberle@RelianceNational.com

Alternatively, as set forth in this Request, and based upon the Contract being illegal and voidable, United Pacific asserts an alternative remedy based upon termination for convenience. Pursuant thereto, United Pacific is entitled to payment of all of its costs and expenses in completing the Project, as Surety, net of Contract funds received, equal to **$3,194,490.59** ("Alternative 'B', Request for Termination for Convenience of Illegal Contract and Award of Quantum Meruit Recovery").

United Pacific requests your decision regarding these claims within sixty (60) days pursuant to the applicable provisions of the Code of Federal Regulations, incorporated by reference in the Contract.

Respectfully submitted,

Robert Haberle, Executive Vice President

cc: Frederick M. Zauderer, Esquire
Gary A. Wilson, Esquire

CERTIFICATION

I certify that the attached claim is made in good faith; that the supporting data are accurate and complete to the best of my knowledge and belief; that the amount requested accurately reflects the contract adjustment for which the United Pacific Insurance Company believes the Government is liable; and that I am duly authorized to certify the claim on behalf of United Pacific Insurance Company.

Robert Haberle, Executive Vice President
United Pacific Insurance Company

PH2\324241.1

ALTERNATIVE "A": REQUEST FOR EQUITABLE ADJUSTMENT

ALTERNATIVE "B": REQUEST FOR TERMINATION OF ILLEGAL CONTRACT AND AWARD OF QUANTUM MERUIT RECOVERY

CONTRACT NUMBER F28609-95-C0036
RENOVATION OF BUILDINGS 2401, 2402 AND 2403
MCGUIRE AFB, NEW JERSEY

Volume I of I

PREPARED FOR

Kathleen DeMito
Contracting Officer
**DEPARTMENT OF THE AIR FORCE**
Three Hundred and Fifth Air Mobility Wing (AMC)
McGuire Air Force Base, New Jersey

Robert Haberle
Executive Vice President
United Pacific Insurance Company
77 Water Street, 25th Floor
New York, NY 10005
(212) 858-3788

PH2\276133.1

# OVERVIEW

On August 5, 1997, The United States of America, United States Air Force, acting by and through its Contracting Officer (hereinafter referred to as the "Government"), and United Pacific Insurance Company (hereinafter referred to as "United Pacific" or as the "Surety") entered into a Takeover Agreement for the completion of Contract No. F28609-95-C-0036 (hereinafter referred to as "Takeover Agreement"). Prior thereto, the Government had entered into Contract No. F28609-95-C-0036 with Castle Abatement Corporation (hereinafter referred to as "Contractor") in the amount of $3,152,174.00, for the construction of a project described as the renovation of Buildings 2401, 2402 and 2403, located at McGuire Air Force Base, New Jersey (hereinafter referred to as "Contract"). United Pacific Insurance Company as Surety for the Contractor, executed a Performance Bond and Payment Bond Number NSU-2512441, as required by the Government in connection with said Contract, the Performance Bond being in the sum of $3,152,174.00 and the Payment Bond being in the sum of $1,576,087.00 (hereinafter referred to as the "Bonds" (Exhibit A). Subsequent to the Contract being entered into and the issuance of the Bonds by the Surety, the Government, on July 21, 1997, determined that the Contractor was in default, terminated the rights of the Contractor to proceed with the Contract and made demand upon the Surety to arrange for completion of the Contract. Thereafter, the Surety arranged for completion of the Contract through Lattimer & Associates (hereinafter referred to as "Lattimer"). The Surety has completed the Contract through Lattimer and therefore, pursuant to its equitable rights as Surety and pursuant to the Takeover Agreement, the Surety now makes two alternative claims against the Government, as set forth herein: (1) a claim for equitable adjustment under the Contract; and (2) in the alternative, a request that the Contract be terminated for the convenience of the Government and that United Pacific be awarded its actual costs plus a reasonable profit, on the ground that the Contract is illegal and therefore voidable.

**REQUEST FOR EQUITABLE ADJUSTMENT OR, ALTERNATIVELY, TERMINATION FOR CONVENIENCE OF ILLEGAL CONTRACT AND AWARD OF QUANTUM MERUIT RECOVERY**

This Request includes claims on two alternative theories of recovery: a Request for Equitable Adjustment based upon specific, documented claims in the total amount of $3,591,362.62, as set forth below; and a Request for Termination for Convenience, premised upon the fact that this Contract was an illegal contract which was illegally misclassified by the Government as O&M (Operations and Maintenance) rather than Military Construction, as well as the Government's failure to obtain the required Congressional authorization. The Contractor did not contribute to the illegal misclassification and did not receive direct notice of same before the award by the Government. Furthermore, where the Contractor, and subsequently the Surety, has completed the Contract without knowledge of the illegal Contract, the Contract may only be terminated for the convenience of the Government. The governing precedent in the Court of Claims is The United States v. Amdahl Corporation, United States Court of Appeals for the Federal Circuit, 786 F.2d 387 (1986), which stated:

> "We are in agreement with the position of the Court of Claims that "the binding stamp of nullity" should be imposed only when the illegality of an award is "plain," *John Reiner & Co. v. United States, 325 F.2d 438, 440 (163 Ct. Cl. 381)* or "palpable," *Warren Brothers Roads Co. v. United States, 355 F.2d 612, 615 (173 Ct. Cl. 714)*. In determining whether an award is plainly or palpably illegal, we believe that if the award was made contrary to statutory or regulatory requirements because of some action or statement by the contractor *(Prestex, Inc. v. United States, 320 f.2d 367 (162 Ct Cl. 620)*, or if the contractor was on direct notice that the procedures being followed were violative of such requirements *(Schoenbrod v. United States, 410 F.2d 400 (187 Ct. Cl. 627)*, then the award may be canceled without liability to the Government except to the extent recovery may be had on the basis of quantum meruit. On the other hand, if the contractor did not contribute to the mistake resulting in the award and was not on direct notice before award that the procedures being followed were wrong, the award should not be considered plainly or palpably illegal, and the contract may only be terminated for the convenience of the Government. *John Reiner & Co. v. United States, supra; Brown & Son Electric Co. v. United States, 325 F.2d 446 (163 Ct. Cl. 465)* (emphasis added).



80

This holding in the Amdahl Corporation case was reaffirmed in Melrose Associates, L.P. v. United States, United States Court of Federal Claims, 43 Fed. Cl. 124 (1999), at Page 28 of such opinion.

Based upon this alternative theory of recovery, United Pacific seeks recovery of its actual costs on a quantum meruit basis plus a reasonable markup for profit, less sums paid to date, in the sum of $3,194,490.59.

## ALTERNATIVE SUM CERTAIN CLAIMS

This Request seeks alternative remedies. First, as identified above and as documented below, specific claims for equitable adjustment of the Contract sum are asserted in the sum certain amount of $3,591,362,62. Alternatively, based upon the illegal, voidable contract, United Pacific asserts a remedy based upon a termination for convenience, which is required under the case law cited above. Pursuant to this alternative remedy based upon termination for convenience, United Pacific is entitled to the quantum meruit recovery of a sum certain in the amount of $3,194,490.59, which includes all costs and expenses incurred by United Pacific in completing the subject Project and paying subcontractors and suppliers plus a reasonable profit, less contract balances paid through the date of this Request.

In support of United Pacific seeking alternative remedies, for sums certain, the Armed Services Board of Contract Appeals has allowed a contractor to seek sum certain amounts under alternative theories of recovery in Appeals of United Technologies Corporation, Pratt & Whitney Group, Government Engines and Space Propulsion, Armed Services Board of Contract Appeals, 1996 ASBCA LEXIS 43, 96-1 B.C.A. (1996). In particular, this case includes the following discussion about alternative theories of recovery for sums certain:

> "Similarly, [*16] by referring to the amounts stated on the various pages of Attachment 34, the sum certain amount of $385,728,272, claimed under P&W's "Restitution Interest" theory can be determined (finding 21).
>
> In a breach of contract situation, the Court of Claims has permitted a contractor to seek alternative remedies. *Acme Process Equipment Co. v. United States, 171 Ct. Cl. 324, 356-60, 347 F.2d 509, 528-30 (1965).* It follows that, in asserting a breach claim under the CDA before the board,



81

a contractor may seek different sum certain amounts under alternative theories of recovery. See *41 U.S.C. § 607(d)*.

Therefore, this Request includes in the alternative, a sum certain Request for Equitable Adjustment in the amount of $3,591,362.62, based upon specific claims set forth below, and a sum certain claim in the amount of $3,194,490.59, based upon a Request for Declaration of a Termination for Convenience, and the recovery of all costs and expenses incurred by United Pacific plus a reasonable profit, as completing surety for the subject Project.

**MAJOR CONSTRUCTION PROJECT**

The Contract was solicited by the Government as a total renovation/transformation project of three existing World War II barracks buildings, which included new structures to connect the three buildings with covered walkways, into a modern office complex. The intent of the Contract was to convert the three separate units into a single, three section office complex. The Contract required that the existing electrical, mechanical, wall, lighting, ceilings, flooring systems, and exterior asbestos siding be removed so that new, modern, energy efficient offices would result from the scope of work included within the Contract. The Surety has concluded from its independent investigation that the Contract could have been completed for the accepted bid proposal of $3,152,174, subject to certain adjustments for differing site conditions, which are discussed elsewhere in this submittal. This is based upon a comprehensive analysis of the scope of work and associated construction costs. It is also supported by the Government's cost estimate in the total amount of $2,918,000. (Exhibit B)



82

**AS THE CONTRACT IS AN ILLEGAL CONTRACT, UNITED PACIFIC IS ENTITLED TO HAVE A TERMINATION FOR CONVENIENCE DECLARED, AND TO RECOVER ITS ACTUAL COSTS ON A QUANTUM MERUIT BASIS PLUS A REASONABLE PROFIT**

**IMPROPER FUNDING AND FUND LIMITATIONS**

The requisition and accounting classifications for the subject Project reflect a code number 3400, which is a Government accounting classification for Operations and Maintenance (O&M). This appropriation provides funding for the operation and maintenance of Government activities and facilities, and can also include training, the purchase of supplies and equipment. This was an improper classification for the subject Project. It should have been classified under code number 3300, which refers to Military Construction. This would have been consistent with the definition of Construction as set forth in 10 U.S.C. §2801(a) and FAR 36.102, which includes construction, alteration, conversion, renovation, repair or painting of buildings, structures or other real property. Construction is also defined to include erection, installation or assembly of a new facility; or the acquisition, expansion, extension, alteration, conversion or replacement of an existing facility. It also includes site preparation, excavation, filling, landscaping, land improvements, utility connections, and the installation of equipment made part of the facility. With regard to the subject project, the definition of Construction would have incorporated the vast majority of the work and it was improper for the Government to classify such construction as Operations and Maintenance. In fact, attached hereto as Exhibit E is a copy of the "Solicitation Offer and Award", which refers to the Contract as "Construction, Alteration or Repair" and "Renovate Buildings 2401, 2402 & 2403". Clearly, this Contract should have been classified as Military Construction (3300) rather than Operations and Maintenance (3400), as included in Exhibit E under the "Requisition and Accounting Classification" section.

## CONGRESSIONAL AUTHORIZATION NOT OBTAINED

Operations and Maintenance funds could have been used by the Government for unspecified minor military construction. However, the subject Construction was a major renovation project, in excess of project limitations under both the Purpose Statute and the Antideficiency Act. Based upon the subject Construction and the cost thereof, Congressional authorization was required for the funding of the subject Project. Based upon information provided by the Government, such Congressional authorization was not obtained.

Military construction on projects costing over $1.5 Million requires Congressional authorization, which the Government failed to obtain with regard to this Contract, as set forth in 41 U.S.C. §12. In addition, the funding of military construction projects from appropriations for operations and maintenance without express Congressional authorization is limited to $500,000, whereas the Government funded the Contract from operations and maintenance appropriations without Congressional authorization in the sum of $3,152,174 (10 U.S.C. §2805(c)(1)(B); DOD Dir. 4270.36).

In further support of the misclassification and improper funding of the Project, Maintenance is defined as routine recurrent work to prevent deterioration and preserve the facility for its intended purpose. This was definitely not the purpose of the subject Contract. Repair is defined as the restoration of a facility for use as its designated purpose by overhauling, reprocessing, or replacing parts or materials that have deteriorated due to wear and tear while in use and which have not been corrected through maintenance. Again, the Construction under the Contract was definitely not limited to Repair activity. Therefore, the Government clearly misclassified the work as Operations and Maintenance and exceeded the Project limitation prescribed by Congress.

## IMPROPER CLASSIFICATION OF NEW CONSTRUCTION AS MAINTENANCE OR REPAIR

A review of the Contract, Contract drawings and the actual work performed thereunder, clearly established that the Contract work was new construction. The Contract drawings identify such new construction. The Contract did not include maintenance or repair work, as defined above. Accordingly, attached hereto as Exhibit J is a comprehensive list of the new construction performed by the Contractor, and after termination, by Lattimer. As set forth in Exhibit J, none of the work performed constituted maintenance or repair.

## THE CONTRACT IS AN ILLEGAL CONTRACT, IS VOIDABLE AND MUST BE DEEMED TO BE TERMINATED FOR THE CONVENIENCE OF THE GOVERNMENT

As a consequence of the Government's patently illegal misclassification of the Contract as O&M rather than Military Construction and its failure to obtain the required Congressional authorization, the Contract is voidable and must be deemed to have been terminated for the convenience of the Government. Therefore, under the Termination for Convenience provision of the Contract, the Surety is entitled to recover the costs and expenses incurred in connection with completion of the work on a quantum meruit basis, plus a reasonable markup for profit.

Based upon the illegality of the Contract and the Surety's right to a termination for convenience, the Surety is entitled to recover from the Government its losses and expenses in the total sum of $3,194,490.59, (Exhibit I) calculated as follows:

| | |
|---|---|
| Surety's Cost to Complete | $3,505,457.18 |
| plus profit (10%) | 350,545.72 |
| | $3,856,002.90 |
| less payment | 661,512.31 |
| Amount of claim | $3,194,490.59 |

**ALTERNATIVELY, IF THE CONTRACT IS NOT FOUND TO BE AN ILLEGAL CONTRACT, UNITED PACIFIC IS ENTITLED TO AN EQUITABLE ADJUSTMENT OF THE CONTRACT SUM**

In the alternative, should the Contract not be found to be illegal, United Pacific is entitled to an equitable adjustment in the Contract Sum for the reasons set forth below.

**CONNECTOR STRUCTURES GROSSLY UNDER VALUED**

The Construction included connector structures between the three buildings. Only $3,000 is included in the accounting classifications for the cost of constructing the connector facilities. Attached hereto is Exhibit B, which is a summary of the actual cost to construct the connectors, which exceeds $434,000. Attention is directed to the original Solicitation Offer and Award for the subject Contract. The $3,000 attributable to the connectors, is divided between the following Requisition and Accounting Classifications:

1. $750.00 is included under line item FQ4484-5160-0100, which relates to Building 2403 and is in the amount of $298,173.

2. Classification No. FQ4484-5160-0300, includes $750.00 for connector charges, as it relates to Building 2402, and is in the total amount of $298,173.

3. Classification No. FQ4484-5160-0500, includes $1,500 for the connectors, and relates to Building 2401 in the total amount of $298,900.

The Government's estimate dated July 28, 1995 ("Government Estimate") includes the following:

"Construct Connectors - $134,000.00"

(See Exhibit C)

Therefore, based upon the Government Estimate, the Government knew $3,000 was not sufficient for the construction of the connectors. As a result, the Government was on notice of the Contractor's materially unbalanced bid and the obvious under valuation.

## MATERIALLY UNBALANCED CONTRACT BID

The Contract bid was materially unbalanced as to prices for basic bid items and should have been rejected as non-responsive. An unbalanced bid is based upon some of the prices being significantly less than cost and some prices being significantly overstated. Furthermore, the Contract specifications refer to 80 line items but, only 16 line items were identified by the Contractor and the Government failed to object to the lack of requisite detail. As discussed above, the Contractor's bid also included only $3,000 for the construction of the connectors, which was grossly deficient and materially unbalanced.

The Government should have rejected the Contractor's bid as non-responsive since the prices bid were materially unbalanced between line items, particularly as it related to the construction of the connectors. A bid is materially unbalanced when it is based on prices which are significantly less than the actual cost of the work. A bid is also unresponsive if it exceeds a statutory dollar limit, which is identified above.

The Government should have rejected the bid proposal as exceeding statutory limits, based upon the misclassification of the type of work and based upon the bid being materially unbalanced. The Government's failure to reject the subject bid ultimately caused the losses included in this Request for Equitable Adjustment by allowing the Contractor to proceed with a contract that could not be performed pursuant to the statutory and other limitations governing such construction, and by allowing the Contractor to receive payment from the Government for work which had not been performed, to the detriment of the Surety. Accordingly, United Pacific should recover its losses from the Government based upon such modifications materially increasing the risk and the loss sustained by United Pacific.

**BID ESTIMATE**

In order to understand the problems associated with this Contract and the Government mismanagement thereof, it is necessary to acquire an understanding of a Bid Schedule as promulgated in relation to the formulation of a bid proposal. The Bid Schedule is developed by the Government in close relationship to the Government estimate and available funds approved for the project. All bidders are guided by the Statement of Work and then, the developed Bid Schedule is tied to stated Factors for Award. The low bidder is then determined by employing the Factors for Award as the Basis for Award. The Government estimate must include all cost factors comprising the project requirements and special requirements. Understanding the above, we now direct you to commentary on 3 estimates related to this Contract: (1) the Government; (2) Contractor's bid and (3) Lattimer's Estimate.

**GOVERNMENT ESTIMATE**

The official Government estimate is stated as $2,918,000 (Exhibit C). This estimate is seriously flawed as major elements of work are not estimated in detail, such as Demolition, Site Work, Site Concrete, Masonry, Carpentry, Steel and Metal, Electrical, Mechanical. The Government, in lieu of the proper cost details, merely employed a single lump sum, such as: Construction Bldg. 2403-$213,000.00 and Repair Bldg. 2403-$916,000.00. It is not possible to determine what work is included in the items provided. It is known that new construction is included in the Repair prices (see prior discussion). The estimate was incomplete as a tool to verify a proper Schedule of Values since it is not possible to determine the cost of various Specification Division requirements as submitted on a Schedule of Values for payment purposes.

**CONTRACTOR'S BID/LATTIMER ESTIMATE**

In an effort to test the validity and sufficiency of the Contract bid price, Lattimer Associates ("Lattimer") was engaged to produce a detailed estimate for this project (Exhibit D) to compare with Contractor's bid amount (Exhibit E). The purpose was to determine if the project, if properly managed by the Government, could have been successfully and profitably completed. Lattimer produced an extensively detailed estimate covering every facet of work in the amount of $3,507,095. This then reflects a difference of about $350,000, as compared to the Contractor's bid price. This represents a reasonable difference between Lattimer's estimate and Contractor's bid. The Contract amount should have been reasonably close to actual costs to complete. Therefore, the primary causes of the large loss on the Project relate to the other factors and claims set forth in this Request for Equitable Adjustment.

**CONTRACT TERMINATION/46% OVERPAYMENT/IMPROPER PAYMENT**

The Contractor was unable to complete the Contract timely or within budget and the Government terminated the Contractor on July 21, 1997. As set forth above, the Surety entered into the Takeover Agreement with the Government and proceeded to complete the project through a completion contract with Lattimer. Upon the initial investigation of the Contract, it was determined that a substantial overpayment of contract funds had been made by the Government to the Contractor, which was specifically reserved by the Surety in the Takeover Agreement. In fact, the Surety's analysis supports the conclusion that the work in place as of July 21, 1997 constituted 34% of the Contract requirements but, the Government had paid 80% of the Contract funds to the Contractor.

After the termination, the Surety became aware of the severe problems with the management of the Contract by the Government. The most important discovery related to the Contract funds paid to the Contractor greatly in excess of actual completed work. The Government's mismanagement allowed payment of numerous invoices without proper support, and allowed the Contract to continue without an approved project schedule. During certain other

periods of time, the Government allowed the Contractor to prosecute the work without insurance, there were extreme delays in finalizing change orders, dilatory funding of change orders, delays in providing revised drawings covering change orders, extremely slow technical responses to field problems, authorization for payment of work not performed, and the authorizing and issuing of payment for patently and obviously defective work. Finally, as previously noted, the Government's wrongful acceptance of the Contractor's materially unbalanced bid also contributed to the overpayment, by permitting the contractor to receive payment for work not performed through the "front end loading" of the Project. All of these management problems contributed to a 46% overpayment of Contract funds, all to the detriment of the Surety when it arrived on the site to fulfill its responsibilities under the Bonds issued for this project.

Indeed, the Government's administration of the work, most notably its overpayment of the Contractor for work not performed, its payment of the Contractor for defective work, its failure to properly inspect the work before authorizing payment, and its payment of the Contractor without first requiring the submission of a project schedule, constituted a gross deviation from the responsibilities placed upon the Government by the terms of the Contract itself. For example, the payment provision of the Contract entitled the Contractor to receipt of progress payments, only upon approval by the Contracting Officer, based upon the Government's determination that the work invoiced by the Contractor was actually performed, and that it met the standards and criteria established under the Contract. FAR Section 52.232-5. Likewise, the Government materially deviated from the Contract when it elected to approve progress payments to the Contractor without first requiring the submission and approval of a progress schedule -- in and of itself a material breach of the Contract which would have been grounds for declaration of a termination of default FAR Section 52.236-15. These deviations by the Government substantially prejudiced the interest of United Pacific by allowing the Contractor to receive significant sums of money for work which was not performed.

## STANDARD OF INSPECTION

It is important to the analysis of the following claims to understand the standard of inspection required by the Government. In this regard, please refer to the attached October 16, 1995 correspondence forwarded by Contracting Officer, Kathleen DeMito, to the Contractor (Exhibit F). This correspondence references the subject Contract and identifies the person who would be the designated Contract Construction Inspector (hereinafter referred to as the "CCI"). This correspondence specifically refers to the responsibilities of the CCI which include performing technical surveillance of the work, maintaining records to support that the project was completed, issue deficiency notices and reports of failures by the Contractor to furnish the contract requirements, recommend corrective action for such deficiencies, conduct final inspections and acceptance of the work performed, and coordinate and approve minor, no-cost changes in the work. Further, the CCI was instructed to review and approve/disapprove materials submittals with regard to the Contract. The Surety has concluded that the standard of care to be exercised by the Government in inspecting the work, both as to the acceptability of such work and whether or not such work was in fact completed, was abysmal. In addition to making the Contract payments for 80% of Contract value when the work was only 34% complete, other grossly deficient and openly and patently unacceptable work was allowed to proceed on the subject Contract, all to the detriment of the Surety. In fact, an analysis of almost every major facet of the Contract, reflects the poor management and inspection of the Contract by the Government.

## VIDEOTAPE RECORD OF OVERPAYMENTS/MISMANAGEMENT

Attached hereto as Exhibit G is a videotape of the extremely poor project conditions when Lattimer arrived at the job site in August 1997. It is patently obvious to anyone viewing the videotape that the Contract work was substantially uncompleted. The videotape also documents the poor quality of work by the Contractor prior to termination. Without any doubt, the Government severely mismanaged the Contract by allowing substandard work by the

Contractor to continue for months and at the same time, the Government overpaid Contractor without justification.

## SPREADSHEET ANALYSIS OF OVERPAYMENTS/MISMANAGEMENT

Attached hereto as Exhibit H is a comprehensive spreadsheet analysis and comparison of Contractor's estimate, Lattimer's estimate, the approved schedule of values, a revised schedule of values, and various other related costs and analysis of same. This spreadsheet analysis is a critical part of the overall Request for Equitable Adjustment. It includes a detailed calculation of the overpayments on the Contract. This includes a summary in Column 11 of the percentages of completion for each of the sixteen items comprising each pay application submitted by the Contractor, the total of which was paid prior to termination i.e., 80% of the Contract funds. In Column 12, the Actual Percentages of Completion are calculated, based upon a formula i.e., Lattimer's Cost to Complete (Column 8) less Lattimer Approved Contract Modifications (Column 9), divided by the Modified Schedule of Values (Column 5), which was never approved but served as the basis for the payments made under the Contract.

The spreadsheet analysis, based upon the specific calculations contained therein, and fully documented within this Request for Equitable Adjustment, concludes that the overpayments, at the time of termination of the Contractor, totaled $1,957,108 . These overpayments are more fully discussed under Tab 2 below.

As noted above, the Contractor's bid amount (Column 3) clearly supports a viable bid i.e., a sufficient bid to support a successful prosecution of the work under the Contract without a loss. Furthermore, as noted in a footnote to the spreadsheet analysis, the Government Estimate of $2,918,000 compares favorably to the Contractor's bid. If a 5% markup is added to the Government's Estimate for this Project, the total would be $3,063,900. Lattimer's Estimate (Column 2) is approximately $350,000 higher than the Contractor's bid but, this amount of differentiation was not materially detrimental and the Contractor bid sufficient funds for completion of the Contract.



92

Another important part of the spreadsheet analysis is to review the Lattimer Cost to Complete (Column 8), in the total amount of $2,442,477 and compare it to the Contract Balance (Column 7) in the amount of $712,599. This comparison dramatically supports the huge and unjustified overpayment by the Government to the Contractor prior to termination.

Another comparison to be made from the spreadsheet analysis is based upon a review of the Approved Schedule of Values (Column 4) and the Modified Schedule of Values (Column 5), which was never approved by the Government. As noted from a review of these two columns, there were substantial adjustments made between the Approved Schedule of Values and the Modified Schedule of Values.

## EXAMPLES OF MISMANAGEMENT, DELAYS AND OVERPAYMENT

An example of poor management by the Government on the subject Contract regards its payment for the "finishes" portion of the schedule of values. The value assigned to the finishing work was in the amount of $346,739.00. Such work is necessarily not possible until the Contractor would reach the last 20% of contract work, as the project is nearing completion. For whatever reason, the Government proceeded to pay $186,219.00 to the Contractor for "finishing" work. In actuality, the Surety determined that only 10% of the "finishing" work had been completed prior to July 21, 1997.

Another area regarding substantial mismanagement by the Government concerns the electrical work performed on the Contract. The Contract required the Government to have inspectors on the site throughout the construction process. When the Surety investigated the status of the electrical work, it was determined that numerous electrical outlets were installed but, only two to three feet of wiring would be connected to such outlets and then, left hanging in the wall cavity. Prior to sheetrock being installed in such wall areas, such an unacceptable condition would have been patently obvious to the Government's inspector. For whatever reason, this condition was prevalent throughout the project and substantial payments were made to the Contractor for incomplete and clearly unacceptable work.

Another example of the Government's failure to manage the Contract properly, was the mechanical work required under the Contract. For this line item, similar to other line items, it appears that the Government failed to review the work in place to determine what payment would be properly justified. With respect to the mechanical work, substantial payments were made to the Contractor even though the Government knew, at the time of such payments, that mechanical work was not possible. Such work was not possible due to the discovery of additional asbestos and incorrect building elevations, which delayed the mechanical and other work upon the project for several months. Nevertheless, the Government, without reasonable explanation, paid substantial dollars for mechanical work and other work on the project.

During the substantial delays on the project resulting from the discovery of additional asbestos and incorrect building elevations, the Government continued to make payments not fully supported by the work completed. In fact, by June 23, 1996, the Government payments to the Contractor totaled $743,913.00 or 23.6% of the Contract value, which included substantial payments for mechanical work and other work that was obviously not completed. The Surety's analysis shows that at the time of these payments, no more than 11.4% of the Contract value was completed, relating to mobilization, demolition, asbestos abatement and minimal site work, all of which should have had a value of $359,347.00.

As set forth below, the Surety has calculated its overpayment claims to total $1,957,108, which is calculated in detail and relates in part to the problems discussed above. The Government's failure to properly manage the Contract also resulted in substantial delay claims, claims resulting from the discovery of additional asbestos within the buildings, damages resulting directly from the failure of the Government to require insurance by the Contractor, an improper Contract payment to the Contractor and various other claims resulting from change orders and the failure of the Government to properly inspect the work.

## SUMMARY OF UNITED PACIFIC'S ALTERNATIVE CLAIMS

United Pacific's alternative claims, as documented in other sections of this submittal, are itemized as follows:

**Alternative "A" - Request for Equitable Adjustment**

| | |
|---|---|
| Overpayment Claims | $1,957,108.00 |
| Delay Claims | 325,302.00 |
| Extended Superintendence Claim (Delays) | 321,171.00 |
| Asbestos-Underpayment Claim | 245,608.00 |
| Improper Contract Payment to Contractor | 116,962.00 |
| Superintendence Claim (Change Orders) | 62,110.00 |
| Patent Defective Work | 340,937.00 |
| Construction Deletions | 46,419.00 |
| *Contract Balance | $ 175,745.62 |
| **Total** | **$3,591,362.62** |

* A separate requisition for the Contract Balance was previously forwarded to the Government. If United Pacific receives payment, then, this amount shall be subtracted from this Request for Equitable Adjustment.

**Alternative "B" - Request for Declaration of Termination for Convenience Of Illegal Contract and Quantum Meruit Recovery**

As set forth above, this Contract was an illegal contract, is voidable and must be deemed to have been terminated for convenience. Based upon the illegality of the Contract and the Surety's right to a termination for convenience, as supported above, the Surety is entitled to recover alternatively from the Government all of its losses and expenses in completing the Project plus a reasonable profit, less sums already paid, in the total amount of $3,194,490.59.

Accordingly, this Request seeks recovery under two different alternative legal theories. First, it seeks a sum certain equitable adjustment in the amount of $3,591,362.62, as described above and as documented below. Alternatively, it seeks the declaration of a termination for convenience and an award of the Surety's sum certain total of losses and expenses it has incurred in completing the Project in the amount of $3,505,457.18 plus a reasonable ten percent (10%) profit in the amount of $350,545.72, less contract funds of $661,512.31 paid by the Government, for a net claim of $3,194,490.59 (Exhibit I).

PH2\303489.5