**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

| | | |
|---|---|---|
| UNITED PACIFIC INSURANCE COMPANY,<br>RELIANCE INSURANCE COMPANY, and<br>RELIANCE NATIONAL,<br>Plaintiffs | : | No. 1:05–CV-00107 |
| | : | Judge Firestone |
| v. | : | |
| THE UNITED STATES,<br>Defendant | : | |

**BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Respectfully Submitted,

**POST & SCHELL, P.C.**

Dated: April 26, 2005

______________________________

Gary A. Wilson
PA Attorney I.D. #39995
John W. Dornberger
PA Attorney I.D. #69293
Steven K. Bainbridge, Esquire
PA Attorney I.D. # 91018
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103-2808
(215) 587-1000
(215) 587-1444 (fax)
gwilson@postschell.com
jdornberger@postschell.com
sbainbridge@postschell.com

Attorneys for
United Pacific Insurance Company,
Reliance Insurance Company, and
Reliance National,
Plaintiffs.

**TABLE OF CONTENTS**


**Page**

TABLE OF AUTHORITIES ........ ii

I. STATEMENT OF THE ISSUES ........ 1

II. STATEMENT OF THE CASE ........ 1

A. NATURE OF CASE ........ 1

B. STATEMENT OF FACTS AND PROCEDURAL HISTORY ........ 2

C. SUMMARY OF UNITED'S CLAIM ........ 3

III. ARGUMENT ........ 4

A. STANDARD OF REVIEW ........ 4

B. UNITED'S CLAIMS ARE NOT TIME BARRED ........ 5

C. UNITED DID NOT WAIVE ITS CLAIMS ........ 9

1. UNITED COULD NOT WAIVE ITS CLAIMS UNTIL AFTER IT DISCOVERED THE ILLEGALITY IN THE SUBJECT CONTRACT [*I.E.*, ACCRUAL], WHICH OCCURRED AFTER THE TAKEOVER CONTRACT WAS FORMED ........ 9

2. UNITED'S CLAIMS ARE NOT BARRED BY THE ELECTION DOCTRINE BECAUSE THE ASBCA WAS FOUND NOT TO HAVE JURISDICTION OVER CLAIMS BASED UPON EVENTS OCCURRING PRIOR TO THE TAKEOVER AGREEMENT ........ 11

D. UNITED HAS A CLAIM AGAINST THE GOVERNMENT ........ 13

1. THE PERRI AND CONTEL CASES CITED BY THE GOVERNMENT ARE CLEARLY DISTINGUISHABLE FROM THE PRESENT CASE ........ 17

E. COLLATERAL ESTOPPEL IS NOT APPLICABLE ........ 20

IV. CONCLUSION ........ 23

**TABLE OF AUTHORITIES**

**Page**

**Cases:**

Admiralty Constr., Inc. v. Dalton, Sec'y of the Navy, 156 F.3d 1217 (Fed. Cir. 1998) ....................12

Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478 (Fed. Cir. 1994) ....................7

American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) ....................16

American Telephone & Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) ....................15, 16

Ammex, Inc. v. United States, 384 F.3d 1368 (Fed. Cir. 2004) ....................20

Arkla, Inc. v. United States, 37 F.3d 621 (Fed. Cir. 1994) ....................20

Balboa Ins. Co. v. United States, 775 F.2d 1158 (Fed. Cir. 1985) ....................2

Barrett v. United States, 689 F.2d 324 (2d Cir. 1982) ....................7

Boise Cascade Corp. v. United States, 296 F.3d 1339 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003) ....................5

Bonneville Assocs. v. United States, 43 F.3d 649 (Fed. Cir. 1994) ....................12

Catawba Indian Tribe v. United States, 982 F.2d 1564 (Fed. Cir. 1993) ....................7

Chris Berg, Inc. v. United States, 426 F.2d 314 (Ct. Cl. 1970) ....................10

Conley v. Gibson, 355 U.S. 41 (1957) ....................4

Contel of California v. United States, 37 Fed. Cl. 68 (1996) ....................17, 18, 19

Dana v. E.S. Originals, 342 F.3d 1320 (Fed. Cir. 2003) ....................22

Fireman's Fund Insurance Co. v. England, 313 F.3d 1344 (Fed. Cir. 2002) ....................11, 12, 21

First Fed. Sav. Bank of Hegewisch v. United States, 52 Fed. Cl. 774 (2002) ....................13

Godley v. United States, 5 F.3d 1473 (Fed. Cir. 1993) ....................13, 14

Gould v. United States, 935 F.2d 1271 (Fed. Cir. 1991) ....................5, 14

**Page**

**<u>Cases (con't)</u>:**

Holmberg v. Armbrecht, 327 U.S. 392 (1946) ....................6, 7

Hopland Band of Pomo Indians v. United States, 855 F.2d 1573 (Fed. Cir. 1988) ....................6, 7

Insurance Company of the West v. United States, 243 F.3d 1367 (Fed. Cir. 2001) ....................2, 12

Johnson v. Zerbst, 304 U.S. 458 (1938) ....................9

Kinne v. United States, 12 Cl. Ct. 104 (1987) ....................5

Kinsey v. United States, 852 F.2d 556 (Fed. Cir. 1988)....................7

LaBarge Prods., Inc. v. West, 46 F.3d 1547 (Fed. Cir. 1995) ....................10

Martinez v. United States, 333 F.3d 1295 (Fed. Cir. 2003)....................6, 7, 8

Mother's Restaurant v. Mama's Pizza, 723 F.2d 1566 (Fed. Cir. 1983)....................20

Ontario Power Generation, Inc. v. United States, 54 Fed. Cl. 630 (2002) ....................4, 8, 10

Perri v. United States, 340 F.3d 1337 (Fed. Cir. 2003) ....................17, 18

Pixton v B & B Plastics, Inc., 291 F.3d 1324 (Fed. Cir. 2002) ....................5

Scheuer v. Rhodes, 416 U.S. 232 (1974)....................4, 5, 8, 10

Tesoro Hawaii Corp. v. United States, 58 Fed. Cl. 65 (2003)....................10

Transfair Int'l v. United States, 54 Fed. Cl. 78 (2002) ....................13, 14

United Pacific Insurance Company v. Roche, 380 F.3d 1352 (Fed. Cir. 2004) ....................11, 21

United States v. Amdahl, 786 F.2d 387 (Fed. Cir. 1986) ....................14, 15, 16, 20

Welcker v. United States, 752 F.2d 1577 (Fed. Cir. 1985)....................6, 7

Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997)....................9, 10

**Statutes:**

10 U.S.C. §2805 .......... 5, 15

10 U.S.C. §2811 .......... 5

28 U.S.C. §1491 .......... 2, 11

28 U.S.C. §2501 .......... 8

Contract Dispute Act, 41 U.S.C. §601, *et seq* .......... 5, 6

**PLAINTIFFS' BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

Pursuant to Rule 12 of the Rules of the United States Court of Federal Claims (RCFC), Plaintiffs United Pacific Insurance Company, Reliance Insurance Company and Reliance National (collectively "United" or "Plaintiff"), hereby submit this Brief in Opposition to the Motion to Dismiss of Defendant as follows:

## I. STATEMENT OF THE ISSUES

1. Whether United's claims are timely under the Tucker Act.

2. Whether United waived its claims.

3. Whether United, as surety, is equitably subrogated to the terminated contractor and therefore can bring claims of contractual illegality pursuant to the Tucker Act.

4. Whether Collateral Estoppel is applicable to findings of fact made by the Armed Services Board of Contract Appeals ("ASBCA") regarding facts which the ASBCA did not have jurisdiction.

## II. STATEMENT OF THE CASE

### A. NATURE OF THE CASE

Under principles of equitable subrogation, United asserts that the Air Force violated 10 U.S.C. §2805 (which required the Air Force to seek Congressional approval for military construction projects exceeding $300,000) when the Air Force intentionally and illegally divided a large construction project into artificially smaller projects and intentionally and illegally funded over $2 Million of the Project as O&M (Operations and Maintenance), when the vast majority of

the work constituted new construction requiring Congressional approval. United asserts these claims pursuant to the Tucker Act, 28 U.S.C. §1491[1].

## B. STATEMENT OF FACTS AND PROCEDURAL HISTORY

By written agreement dated October 5, 1995, by and between the Government and Castle Abatement Corporation ("Castle" or "Original Contractor"), Castle agreed to furnish all labor, material and equipment required for Project PTFL 92-1044 and PTFL 92-1046, Renovation of Buildings 2401, 2402, and 2403, McGuire Air Force Base, New Jersey, (the "Project"), in accordance with certain contract documents (the "Contract" or "Subject Contract") issued by the Government. *See* United Compl., ¶7. (Contract attached to United Compl. as Exhibit "A"). United issued a performance bond (the "Performance Bond") for the Contract, with the Government as obligee. *See* United Compl., ¶8. (Bond attached to United Compl. as Exhibit "B").

Almost two years later, on July 21, 1997, the Government declared the Original Contractor in default and terminated the Contract for default, and then made a demand upon United under the Performance Bond. *See* United Compl. ¶9. Thereafter, on August 5, 1997, the Government and United entered into a written takeover agreement (the "Takeover Agreement"), whereby, *inter alia*, United agreed to complete the work remaining to be completed under the Contract. *See* United Compl. ¶10 (Takeover Agreement attached to United Compl. as Exhibit

[1] *See* Ins. Co. of the West v. United States, 243 F.3d 1367, 1375 (Fed. Cir. 2001) ("[W]e conclude that a subrogee, after stepping into the shoes of a government contractor, may rely on the waiver of sovereign immunity in the Tucker Act and bring suit against the United States."; Balboa Ins. Co. v. United States, 775 F.2d 1158, 1161-63 (Fed. Cir. 1985).

"C"). United then completed the Contract, through its completion contractor, Lattimer & Associates ("Lattimer"). *See* United Compl. ¶ 11.

On April 12, 2000, United served a "Request for Equitable Adjustment" on the Government, including, *inter alia*, a claim that the Contract, as awarded, was illegal. *See* United Compl. ¶ 12. The Government denied the illegal contract claim, and United filed an appeal to the Armed Services Board of Contract Appeals ("ASBCA" or "Board") on or about September 21, 2000. *See* United Compl. ¶ 13.

On or about June 4, 2003, the ASBCA denied United's illegal contract claim on the grounds that it did not have jurisdiction over the claim. *See* United Compl. ¶14. (Opinion reported at 2003 ASBCA Lexis 57 (A.S.B.C.A. June 4, 2003)). Following an appeal to the United States Court of Appeals for the Federal Circuit, the Federal Circuit also ruled that the ASBCA did not have jurisdiction over United's illegal contract claim. *See* United Compl. ¶ 15. (Opinion reported at 380 F.3d 1352 (Fed. Cir. 2004)).

On January 11, 2005, United filed the Complaint giving rise to the present action. On March 28, 2005, the Government filed a Motion to Dismiss. This brief is in opposition to the Government's Motion to Dismiss.

## C. SUMMARY OF UNITED'S CLAIM

It is United's position that, as a matter of law, the Contract was clearly illegal, and that the Government had ample motivation for its actions, which was to avoid having to obtain the Congressional approval required by federal statutes for military construction projects over $300,000, a process that can take years. The Government classified this office complex Project as three separate Projects, each with a construction portion cleverly manipulated to fall just

below $300,000. If this Project had been properly classified as a single office complex, the total construction costs of $892,246 would well exceed the $300,000 cost limitation. *See* United Compl., ¶21.

United alleges that the Government illegally ignored statutory law and Air Force Regulations in three ways: 1) By accepting an unjustified bid of $3,000 for constructing the connectors for the buildings when its own estimate was $134,000 and the next two lowest bids were $290,000 and $344,000, respectively, and thereby the Government was able to keep each building under $300,000; 2) By engaging in contract splitting by claiming that the Project was three separate buildings when the facts show that there was one Project involving interrelated buildings; and 3) Characterizing over $2 million of the Project as O & M (Operations and Maintenance) work because the O & M funding has no limit, when the vast majority of the work constituted new construction as defined by Air Force Regulations as the buildings were gutted for a complete conversion from military barracks to a modern office complex. *See* United Compl., ¶¶ 21-35.

## III. ARGUMENT

### A. STANDARD OF REVIEW

In reviewing the sufficiency of the Compliant pursuant to a Motion to Dismiss, this Court must presume that the factual allegations included in the Complaint are true. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Ontario Power Generation, Inc. v. United States, 54 Fed. Cl. 630, 631 n.1 (2002). "A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). When the Court decides a motion to dismiss for failure to state a claim, "[t]he issue is not whether a plaintiff will ultimately

prevail but whether the claimant is entitled to offer evidence to support the claims." Kinne v. United States, 12 Cl. Ct. 104, 107 (1987) (*quoting* Scheuer, 416 U.S. at 236). When deciding a motion to dismiss based on lack of subject matter jurisdiction, this court must assume that all undisputed facts alleged in the complaint are true and must draw all reasonable inferences in the non-movant's favor. *See* Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Boise Cascade Corp. v. United States, 296 F.3d 1339, 1343 (Fed. Cir. 2002), cert. denied, 538 U.S. 906 (2003); Pixton v. B & B Plastics, Inc., 291 F.3d 1324, 1326 (Fed. Cir. 2002). The Court "must . . . indulge in all reasonable inferences in favor of the non-movant." Gould v United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991).

### B. UNITED'S CLAIMS ARE NOT TIME BARRED

The Government's statute of limitations arguments are based on incorrect presumptions and fallacies of the law, a thorough and proper examination of which permits the unmistakable conclusion that United's claims are not time barred. In order to invoke a shorter limitation period, the Government unilaterally characterizes United's claims as arising under the Contract Dispute Act, 41 U.S.C. §601, *et seq.*, stating "[t]o the extent that United Seeks recovery pursuant to the Contract Dispute Act ("CDA") United was required to file an action in this Court within one year…" *See* Government Motion to Dismiss, p. 13. To the contrary, as plainly set forth in its Complaint, the relief sought by United on all claims arises not under the CDA, but under the Tucker Act seeking relief for harm resulting from an illegal contract. Counts I, II and III set forth allegations of illegal contract funding, classification and project splitting which United contends were violative of 10 U.S.C. §§2805(c)(1), 2811(c) and 2805(b)(1) for which it seeks relief under the Tucker Act. *See* Compl., Counts I, II and III. Counts IV, V and VI set forth

claims of subrogation, breach of a takeover contract arising from the subject illegal contract and misrepresentation respectively, all of which are necessarily pendent to the illegal contract claims. As such, in these latter claims, United is also seeking relief under the Tucker Act. The Government incorrectly presumes that United seeks relief under the CDA, however nowhere in the Complaint is there a demand for relief for these claims under 41 U.S.C. §601 *et seq*.

The timeliness of United's claims are properly analyzed under the provisions of the Tucker Act. A plenary recitation of the law on accrual of an action thereunder reveals that United's claims do not accrue until it knew or should have known its claims existed. Ignoring the complete standard for accrual, the Government would have this Court accept that "[a]n action 'first accrues' when all the events have occurred which fix liability of the defendant and entitle the plaintiff to institute an action." *See* Government Motion to Dismiss, p. 14, *citing* Hopland Band of Pomo Indians v. United States, 855 F.2d 1573, 1577 (Fed. Cir. 1988). A thorough statement of the standard for determining accrual of a claim under the Tucker Act is found in Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir., 2003), which provides:

> The accrual of a claim against the United States is suspended, for purposes of 28 U.S.C. §2501, **until the claimant knew or should have known that the claim existed**. … The "accrual suspension" rule is "**strictly and narrowly applied**: … [The plaintiff] must either show that **defendant has concealed its acts** with the result that plaintiff was unaware of their existence **or** it must show that **its injury was 'inherently unknowable'** at the accrual date." (*Citing* Welcker, 752 F.2d at 1580).

Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003). (Emphasis added).

Indeed, the Hopland decision cited by the Government recognizes that "…despite the apparent unavailability of waiver or estoppel, the statute of limitations can be tolled in proper circumstances, even in suits against the government." Id. at 1577, *citing* Holmberg v.

Armbrecht, 327 U.S. 392, 397 (1946); Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985); Barrett v. United States, 689 F.2d 324, 329-30 (2d Cir. 1982). The Court of Appeals for the Federal Circuit has deemed the legal principle of accrual suspension as "well settled" for purposes of 28 U.S.C. §2501. Martinez 333 F.3d at 1319, (*citing* Alliance of Descendants of Tex. Land Grants v. United States, 37 F.3d 1478, 1482 (Fed. Cir. 1994)); Catawba Indian Tribe v. United States, 982 F.2d 1564, 1571-72 (Fed. Cir. 1993); Hopland, 855 F.2d 1573, 1577 (Fed. Cir. 1988); Kinsey v. United States, 852 F.2d 556, 557 n.* (Fed. Cir. 1988); Welcker, 752 F.2d 1577, 1580 (Fed. Cir. 1985).

Under Welcker and its progeny, United's claims under the Tucker Act did not accrue in 1995 when the subject contract was let, but rather when United discovered information sufficient to become aware of the illegality of the contract. The determination by United of the illegality was necessarily dependent on its receipt of funding, contract and other documentation in the possession of the Government. In its Complaint, United alleges that it did not discover or possess information from which to determine that the subject contract was illegal until approximately January, 2000. *See* United Compl., ¶17. In support thereof, United's Complaint includes affidavits of Frederick M. Zauderer, Scott Lattimer and Irvine A. Cornine, its employees and representatives responsible for investigating and preparing its claims under the subject contract. *See* United Compl., Exhibit "D." The affiants state that funding, contract and other documents relative to the subject contract were not produced to United by the Government until its response to United's Freedom of Information Act request which occurred in January 2000. Review of these documents in January of 2000 permitted United to verify and support its illegal contract claim. Immediately thereafter, in April of 2000, United added an illegal contract

claim to be filed with the Request for Equitable Adjustment ("REA"). According to the affiants, United's drafts of its REA filing did not include claims of an illegal contract until October of 1999, following a review of limited documentation.

In reviewing the sufficiency of a complaint pursuant to a motion to dismiss, the Court must presume that the factual allegations included in the Complaint are true. Scheuer v. Rhodes, 416 U.S. 232, 236 (1974); Ontario Power Generation, Inc. v. United States, 54 Fed. Cl. 630, 631 n.1 (2002). On the face of United's Complaint and the supporting affidavits, the well-pleaded facts that United did not discover the illegality of the subject contract until January of 2000 (or until October of 1999 at the earliest) must be accepted as true for the determining the date of accrual of United's claims under the Tucker Act. As such, the six-year statute of limitation provided for under the Tucker Act did not accrue until October of 1999 at the earliest and, therefore, would not expire until October 2005. 28 U.S.C. §2501.[2] United therefore commenced this action in a timely manner on January 11, 2005.

[2] The Government incorrectly presumes in its Motion that United is invoking the doctrine of equitable tolling to save as timely its Tucker Act claims. As set forth *supra*, United contends that its claims as pled are timely by application of the "accrual suspension" rule. Thus, this Court need not look to equitable tolling for determining the sufficiency of the timeliness of United's claims. United notes, however, that despite the Government's assertion otherwise, the Federal Court of Claims has indeed held that claims against the government may be equitably tolled in Martinez stating:

> "We therefore hold that the same rebuttable presumption of equitable tolling applicable to suits against private defendants should also apply to suits against the United States. Congress, of course, may provide otherwise if it wishes to do so. Id. At 95-96. *See also* Young v. United States, 535 U.S. 43, 49-50 (2002)."

Martinez, 333 F.3d at 1316.

## C. UNITED DID NOT WAIVE ITS CLAIMS

### 1. UNITED COULD NOT WAIVE ITS CLAIMS UNTIL AFTER IT DISCOVERED THE ILLEGALITY IN THE SUBJECT CONTRACT [I.E., ACCRUAL], WHICH OCCURRED AFTER THE TAKEOVER CONTRACT WAS FORMED

United's inability to discover the predicate facts of the illegality of the subject contract until October 1999, at the earliest, also necessarily precludes the Government's argument of waiver. The Government contends that United waived its illegal contract claims by electing to first pursue them under the CDA before the Board of Appeals and, alternatively, by entering into the takeover contract and completing work without objecting to the illegality. *See* Government Motion p. 24, *citing* Whittaker Electronic Systems v. Dalton, 124 F.3d 1443, 1446 (Fed. Cir. 1997) for the latter proposition.

Taking these arguments out of turn, it is axiomatic that parties to a contract must know or have reason to know of an illegality therein in order to lodge an objection or waive such a right. *See* Johnson v. Zerbst, 304 U.S. 458 (1938) (holding that there must be a demonstration of an *intentional* relinquishment of a right or privilege to permit waiver). However, the Government would have this Court conclude, based upon Whittaker, that a party who performs contract work without knowledge of an illegality waives its rights to claim damages therefrom. Such was not the case in Whittaker, plainly distinguishing it from the facts before this Court.

In Whittaker, the parties were aware during the procurement process of technical problems which caused the contract price to exceed the scope of the contracting officer's authority to negotiate, to the extent that the claimant's predecessor issued a report identifying the problems as "a major risk in undertaking the contract." Whittaker, 124 F.3d at 1444, n. 3. The Whittaker Court was therefore presented with markedly different facts from which to hold that

the claimant had *intentionally* waived its rights by its failure to object to a *known* illegality at the time of its takeover from the original contracting party. Id. United did not possess documentation from which to determine that the subject contract was illegal until approximately January, 2000 when the Government produced funding, contract and other records. *See* United Compl., ¶17; Affidavits, Exhibit "D." For purposes of determining the sufficiency of United's Complaint, it is incumbent on the Court to presume the factual allegations set forth in the Affidavits as true. Scheuer, 416 U.S. at 236; Ontario Power, 54 Fed. Cl. at 631 n.1. Should the assertions set forth in United's Complaint be presumed true, United could not have waived claims under the Tucker Act by failing to object to an illegality of which it was not aware at the time the contract was let in 1995, let alone when the takeover contract was formed in 1997.

Moreover, any confusion concerning the application of Whittaker to this matter may be laid to rest by other decisions of this Court and the Court of Appeals for the Federal Circuit, none of which were cited by the Government, holding that a contractor is not bound by estoppel or waiver when a contract contains a provision the government is not authorized to make. *See* LaBarge Prods., Inc. v. West, 46 F.3d 1547, 1552 (Fed. Cir. 1995); Chris Berg, Inc. v. United States, 426 F.2d 314, 317 (Ct. Cl. 1970); Tesoro Hawaii Corp. v. United States, 58 Fed. Cl. 65 (2003). Dismissing Whittaker as inapplicable, this Court in Tesoro found that the contractor did not waive its rights because it was challenging the "inherent legality" of the contract itself. Id., at 73. The alleged breach of the procurement regulations in Whittaker, as the Tesoro Court noted, occurred *after* the contract award, thus was not inherent in the contract itself. Id. Accordingly, the Court found that the contractor's right to challenge the legality of the award of the contract itself implicated "institutional concerns of the United States," which may not be

waived. Id. Similarly, United's claims herein challenge the inherent legality of the award of the subject contract itself as violative of 10 U.S.C. §§2805(c)(1), 2811(c) and 2805(b)(1). As such, United's claims implicate institutional concerns of the United States and these rights may not be waived.

**2. UNITED'S CLAIMS ARE NOT BARRED BY THE ELECTION DOCTRINE BECAUSE THE ASBCA WAS FOUND NOT TO HAVE JURISDICTION OVER CLAIMS BASED UPON EVENTS OCCURRING PRIOR TO THE TAKEOVER AGREEMENT**

The Government further argues in the alternative that United waived its rights to pursue a claim before this Court by electing to first pursue a claim under the CDA through an appeal to the ASBCA ("Board"). First, as set forth *supra*, it must be noted that United is not seeking from this Court relief under the CDA, but rather relief under the Tucker Act for harm resulting from an illegal contract with the United States. *See* 28 U.S.C. §1491(a)(1). Yet, United's initial claims under the subject contract which were appealed to the ASBCA sought relief under the CDA, not the Tucker Act. As conceded by the Government, United filed its appeal with the ASBCA in a timely manner. Further, the claims under the CDA were properly before the Board which, at the time of filing, had jurisdiction. However, due to a subsequent change in the law regarding the Board's jurisdiction, it was determined that the claims were never properly before the Board. *See* Fireman's Fund Insurance Co. v. England, 313 F.3d 1344, 1350-51 (Fed. Cir. 2002). Fireman's Fund abdicated the ASBCA's jurisdiction over a surety's claims based upon events occurring prior to a takeover agreement. Id. Thus, following Fireman's Fund, United's illegal contract claims, among others, under the CDA were dismissed as the ASBCA no longer had jurisdiction over any claims based upon pre-takeover contract events, including claims arising from the underlying subject contract. United Pacific Insurance Company v. Roche, 380

F.3d 1352, 1356-1357 (Fed. Cir. 2004), *citing* Fireman's Fund, 313 F.3d 1344. In order for the election doctrine to be applicable, the original forum selected must have subject matter jurisdiction over the appeal initially filed. Bonneville Assocs. v. United States, 43 F.3d 649, 653 (Fed. Cir. 1994). The doctrine cannot apply in the instant matter because the forum originally selected, the ASBCA, was found to lack jurisdiction over United's appeal. Moreover, as discussed more fully in Section E of this brief, *infra*, since the board did not have jurisdiction over these matters, collateral estoppel cannot apply to any findings of fact made by the ASBCA concerning these claims.

There can be no question that United, as a surety, is entitled to pursue a suit for damages against the United States in the Court of Federal Claims under the doctrine of equitable subrogation. Fireman's Fund, 313 F.3d at 1351. Equitable subrogation entitles a surety that "takes over contract performance" or "finances completion of the defaulted contract" to "succeed to the contractual rights of a contractor against the government." Id. (*quoting* Ins. Co. of the West v. United States, 243 F.3d 1367, 1370 (Fed. Cir. 2001)). The Fireman's Fund Court further recognized that "our case law has long established that a surety can sue the Government in the Court of Federal Claims under the non-contractual doctrine of equitable subrogation." Id. (*quoting* Admiralty Constr., Inc. v. Dalton, Sec'y of the Navy, 156 F.3d 1217, 1221 (Fed. Cir. 1998)). Like United, Fireman's Fund had entered into a takeover agreement and was asserting claims relating to pre-takeover agreement activities. Id. However, unlike United, Fireman's Fund was pursuing its equitable subrogation claims under *the CDA*, as opposed to *the Tucker Act*. Since the CDA requires the claiming party to be a "contractor" with the United States, Fireman's Fund could not proceed under that Act. Id. By contrast, United's claims before this

Court have no such restriction. Because it is proceeding under the Tucker Act and not the CDA, United as a surety may pursue claims relating to pre-takeover activities by operation of law, namely equitable subrogation. Id.

### D. UNITED HAS A CLAIM AGAINST THE GOVERNMENT

Private parties such as Castle (and therefore United, pursuant to principles of equitable subrogation) clearly have a right to assert a cause of action against the government based upon the illegality of the contract caused by violation of statute. In Godley v. United States, 5 F.3d 1473, 1474 (Fed. Cir. 1993),[3] the government sought to avoid an illegal contract, and the contractor was granted summary judgment in the Court of Federal Claims that the contract could not be avoided because the government was not timely in asserting its position. The appeals court overturned the contractor's summary judgment, holding that a government contract tainted by fraud or wrongdoing is void *ab initio*, if there is a causal link between the illegality and the contract provisions. Id., at 1475-1476. Particularly relevant in the present procedural posture where the court is ruling on a Motion to Dismiss, the Godley court, in dismissing the grant of summary judgment, held: "Determining whether illegality taints a contract involves questions of fact." Id., at 1476. The Godley court went on to clarify its holding:

> The trial court erred in determining on summary judgment that Mr. Godley' contract was voidable, rather than void ab initio. The trial court incorrectly concluded that the government's acceptance of the building and entry of the contract with knowledge of Mr. Paramore's conduct made the contract voidable. These factors, however, are relevant to whether the Government exercised its option to void a voidable contract if, in fact, the contract was voidable. These factors do not show that Mr. Godley's contract

[3] Godley has been followed in Transfair Int'l v. United States, 54 Fed. Cl. 78, 86 (2002), and First Fed. Sav. Bank of Hegewisch v. United States, 52 Fed. Cl. 774, 798 (2002).

> was voidable, rather than void ab initio. On remand, the trial court will have the opportunity to make findings on whether Mr. Godley's contract was void ab initio.

Godley, 5 F.3d at 1476.

In the instant case, United asserts in its complaint that the Air Force fraudulently violated the requirements of 10 U.S.C. §§2805 and 2811 which resulted in harm to United, in that United would not otherwise have provided bonds to Castle. (*See* Complaint, where each count specifies illegality and resultant harm to United). Determination of whether there is a causal link between the illegality and the contract, and thus whether the contract is void *ab initio*, will involve a factual determination. Of course, part and parcel to such a determination is the fact that the government and private parties may assert that a contract is void *ab initio* due to illegality.

The principles set forth in Godley permitting United's claims against the Government are further buttressed by the decision of the U.S. Court of Appeals for the Federal Circuit in United States v. Amdahl, 786 F.2d 387, 392 (Fed. Cir. 1986),[4] which held that a private party may recover on *quantum meruit* basis for the value of goods or services received by the government prior to the rescission of an illegal contract (referring to contracts that are void *ab initio*). The Amdahl court discussed the distinction between voidable contracts and contracts that are void *ab initio*:

> We start with the proposition that the failure of a contracting officer to comply with statutory requirements in making an award renders the contract a nullity. The government has the power to

[4] Amdahl has been recently cited in Transfair Int'l v. United States, 54 Fed. Cl. 78, 87 n. 12 (2002): "[O]n multiple occasions, the Federal Circuit has held that, in appropriate circumstances, a contractor may recover under these implied-in-fact contract theories, even where a contract is declared illegal. *See, e.g.*, Gould, Inc. v. United States, 935 F.2d 1271, 1275 (Fed. Cir. 1991) ("A court may grant equitable relief under an illegal contract if the government received a benefit from the contractor's performance"); Amdahl Corp., 786 F.2d at 393 (same)."

> act only through its agents whose authority and manner of exercise thereof is rigidly prescribed and limited by statute, regulation, and judicial and administrative determinations. Failure to follow the applicable rules negates the agent's authority to enter into a contract binding on the government. To permit otherwise would be to nullify those very statutes, regulations, and determinations – a result clearly contrary to the public interest.

Amdahl, 786 F.2d at 392.

As in Godley, intrinsic to the holding and supporting analysis in Amdahl is that private parties may assert claims against the government for violation of statutory provisions causing contracts to be void *ab initio*.

The Amdahl and Godley cases hold that a cause of action is available on a *quantum meruit* basis when a government contract is wholly or partially invalidated. The Court therefore need not consider the Government's attempt in section III of its Motion to Dismiss to analogize a wholly unrelated statute to the statute violated in the present case, 10 U.S.C. §2805. In any event, 10 U.S.C. §2805 is clearly distinguishable from the statute at issue in the AT&T cases. In American Telephone and Telegraph Co. v. United States, 307 F.3d 1374 (Fed. Cir. 2002) ("AT&T V") (and collectively the AT&T I-V cases), the government's violation of an unrelated statute (hereafter referred to as "section 8118") was held not to provide a private cause of action to the contractor. Section 8118, however, is clearly distinguishable from 10 U.S.C. §2805 (section 2805), the statute in the present case. The AT&T courts held that Section 8118 (which requires the Secretary of Defense to assert in writing that program risks had been reduced to the extent to allow realistic pricing, as well as that the program risk had been equitably allocated between the contracting parties) operated pursuant to a explicit statement in its legislative history that Section 8118 did not provide a basis for litigating the propriety of an otherwise valid contract. The AT&T courts gave "significant weight" to a statement in the legislative history of

section 8118 that "this section not be used as the basis for litigating the propriety of an otherwise valid contract." American Telephone & Telegraph v. United States, 177 F.3d 1368, 1375 (Fed. Cir. 1999) ("AT&T III"); AT&T V 307 F.3d at 1378. The AT&T courts explained their reasoning: "This explicit statement of intent weighs heavily against judicial invalidation of 'an otherwise valid contract,' for the clearly stated congressional purpose is contrary." AT&T III 177 F.3d at 1375, AT&T V 307 F.3d at 1378-79. United is unaware of any statement in the legislative history of Section 2805 which explicitly denies claims to private parties against the government for government violations of 10 U.S.C. § 2805; any analogy to the AT&T cases and the present case clearly fails.

Notwithstanding the government's references to AT&T, parties are presumed to be able to seek redress for violation of statutes with the courts. For statutes providing for "legislative oversight and enforcement," Congress should not be required to state in the statute or in the legislative history that the Congress intends to create a cause of action for private parties against the government. The purposeful misclassification of the project unequivocally renders the Contract illegal. A contract which is illegal is deemed to be voidable, entitling the contractor to have the contract terminated for convenience, particularly where the contractor did not contribute to the illegality and was unaware that the contract was illegal when it was awarded. Amdahl, 786 F.2d at 393-95. Such a termination entitles the contractor to recover "… the cost of performance plus a reasonable profit on those costs whether or not benefit accrued to the government." Amdahl, 786 F.2d at 394. Neither the original contractor nor United contributed to the illegality of the Contract, nor was either the original contractor or United aware of the illegality at the time of award. Accordingly, United is entitled to have the Contract terminated

for convenience under FAR Section 52.249-2 (APR 1984), which is specified in the Contract, and to recover its costs plus a reasonable profit on a quantum meruit basis.

### 1. THE PERRI AND CONTEL CASES CITED BY THE GOVERNMENT ARE CLEARLY DISTINGUISHABLE FROM THE PRESENT CASE

In Section V of the Government's Motion to Dismiss, the Government asserts that this Court does not have jurisdiction over the present case because United's claims seek *quantum meruit* recovery. *See* Government Motion to Dismiss p. 24, section V. In essence, the Government asserts that since *quantum meruit* is the measure of recovery for a contract implied-in-law, and United is seeking an amount equal to a *quantum meruit* measure of recovery in all its claims, then United must be asserting the creation of an implied-in-law contract as the basis for all its claims. Carrying the Government's argument further, since this Court does not have jurisdiction for implied-in-law contracts under the Tucker Act, it would follow that the Court does not have jurisdiction over United's claims. To support its contentions, the Government selectively cites Contel of California v. United States, 37 Fed. Cl. 68 (1996), and Perri v. United States, 340 F.3d 1337 (Fed. Cir. 2003). The Contel and Perri cases, however, are clearly distinguishable from the present case.

In Perri, a government informant sought enforcement of an implied contract with agents of the Federal Bureau of Investigation ("FBI"). The FBI agents allegedly promised the informant, in return for his assistance in convicting a criminal, that the informant would receive twenty-five percent of the monies forfeited by the criminal. Perri, 340 F.3d at 1339. The lower court in Perri, however, ruled that there was no contract between Perri and the government. Id., at 1344. In disposing of Perri's claim, the Perri court stated: "we know of no case, however, and Perri has not cited any, in which either we, the Court of Claims, or the Court of Federal Claims

has permitted quantum meruit recovery in the absence of some contractual arrangement between the parties." Id., at 1344. In particular, the Perri court specifically distinguished the situation in Perri's from the situation in the present case:

> Perri relies upon cases in which this court, the Court of Claims, and the Court of Federal Claims recognized quantum meruit recovery. [citations omitted]. Those cases, however, involved situations in which the plaintiff provided goods or services to the government pursuant to an express contract, but the government refused to pay for them because of defects in the contract that rendered it invalid or unenforceable.

Perri, 340 F.3d at 1344. (Emphasis added).

Castle had an express contract with the government, which United (under principles of equitable subrogation) now asserts was illegal. *See* United Compl. ¶ 7 and 12, and the Contract itself attached as Exhibit A to the Complaint. The Perri court clearly distinguishes the present situation from the situation in Perri, and thus Perri is inapplicable to the present case.

Similarly, the Contel case is not applicable to the present case. In Contel, in the absence of an any express contract or evidence that the government's representative had the authority to bind the government, the Contel court did not have jurisdiction (pursuant to the Tucker Act) over an alleged implied-in-fact contract. Contel, 37 Fed. Cl. at 74. The Contel court clearly distinguished the situation in Contel from the situation in the present case:

> [R]ecovery against the United States, premised upon an implied contract is confined to those situations where the existence of an implied-in-fact contract can be established. This can occur in circumstances where, under a purported express contract, goods or services are provided to the United States, but the purported contract lacks validity. Absent a valid express contract, circumstances can support the existence of an implied-in-fact contract covering provided goods or services. This is the case precedent discussed by the Federal Circuit in *Amdahl*. In the instant case, however, no purported express contract under which any goods or services were delivered has been identified.

Contel, 37 Fed. Cl. at 74. (Emphasis added).

The Contel court also provided a cogent standard to distinguish implied-in-fact contracts from those implied-in-law, whose application further distinguishes Perri and Contel from the present case:

> An implied-in-fact contract is one founded upon a meeting of minds, which, although not embodied in an express contract, is inferred, as a fact, from conduct of the parties showing, in the light of surrounding circumstances, their tacit understanding. An implied-in-fact contract requires proof of the same elements necessary to evidence an express contract: mutuality of intent, consideration, and lack of ambiguity in offer and acceptance. When the United States is a party to such an agreement, the contractor must also show that the official(s) whose conduct it relied upon had the authority to bind the government in contract. By contrast, a contract implied-in-law is one in which no actual agreement between the parties occurred but where a duty is imposed by equity to prevent injustice.

Contel, 37 Fed. Cl. at 72. (Citations omitted).

As Castle had an express contract (attached to United's Complaint as Exhibit "A"), the Contel case is clearly inapplicable to the present case. The Contract cannot be a contract implied-in-law because that requires that no agreement was reached between the parties. Rather, the parties were operating under an actual contract that happened to be illegal as United later discovered. Applying the Contel standard to find an implied-in-fact contract, it is clear that all of the necessary contractual elements of mutuality of intent, offer, acceptance, consideration, a meeting of the minds and contractor officer authority existed to establish an implied-in-fact contract in the present case, based upon the (illegal) express contract. Such an implied-in-fact contract is precisely the kind for which the Amdahl case provides a remedy and which this Court has jurisdiction:

> [W]here conforming goods or services have been delivered by a contractor and accepted by the government, the contractor has been held entitled to payment, either on a *quantum valebant* or *quantum meruit* basis if the contract is void *ab initio* or to a possibly larger amount if the contract is voidable, that is, deemed valid and terminated for convenience in accordance with the contract.

Amdahl, 786 F.2d at 395.

### E. COLLATERAL ESTOPPEL IS NOT APPLICABLE

The Government cannot apply the principles of collateral estoppel in this matter to bind United to the findings of fact made in the earlier ASBCA decision, because these findings of fact all arise from areas over which the ASBCA did not have jurisdiction. "Under the doctrine of issue preclusion, traditionally called 'collateral estoppel,' issues which are actually and necessarily determined by a court of competent jurisdiction are conclusive in a subsequent suit involving the parties to the prior litigation." Mother's Restaurant v. Mama's Pizza, 723 F.2d 1566, 1570 (Fed. Cir. 1983) (emphasis added).[5] In order for collateral estoppel to apply to a finding of fact, the court making the determination (here the ASBCA) must have had jurisdiction over the finding of fact. The ASBCA did not have jurisdiction over any of the claims presently before the Court (including the facts necessary to make a determination of those claims).

The earlier ASBCA opinion which the Government asserts contains binding findings of fact is reported at 2003 ASBCA Lexis 57 (A.S.B.C.A. June 4, 2003). This decision was appealed to the United States Court of Appeals for the Federal Circuit, and the Appeals Court

---

[5] Mother's Restaurant was followed by Arkla, Inc. v. United States, 37 F.3d 621, 624 (Fed. Cir. 1994). The government cites Ammex, Inc. v. United States, 384 F.3d 1368, 1371 (Fed. Cir. 2004) for the collateral estoppel standard. Notably, Ammex cites Arkla to provide the collateral estoppel standard.

clearly held that the ASBCA did not have jurisdiction over United's claims that were based upon events that occurred prior to the takeover agreement, in a further clarification of the holding of the Firemen's Fund decision. United Pacific Insurance Company v. Roche, 380 F.3d 1352, 1356-1357 (Fed. Cir. 2004). As it is important to understand the areas over which the ASBCA did not have jurisdiction in order to apply collateral estoppel, a discussion of Firemen's Fund is in order.

In Firemen's Fund Insurance Co. v. England, 313 F.3d 1344, 1346 (Fed. Cir. 2002) a contractor defaulted and its surety was required to complete the project. The surety first entered into a takeover agreement with the government, and thereafter brought claims to the ASBCA arising from events that took place before the takeover agreement (under principles of equitable subrogation, as the surety stood in the shoes of the original contractor, because the original contractor assigned all its rights under the original contract to the surety). Id., at 1346. The ASBCA held that since the surety was not a "contractor" (as defined in the Contract Disputes Act) prior to the takeover agreement, the ASBCA lacked jurisdiction over the equitable subrogation claims, as the claims related to a time period prior to the surety's eligibility to bring a claim before the ASBCA. Id., at 1346.

United Pacific Insurance Company further clarified Firemen's Fund by clearly defining the meaning of "claims arising before the takeover agreement." United Pacific Insurance Company holds that claims that "relate to and depend upon events that occurred before the takeover agreement" are not subject to ASBCA's jurisdiction. United Pacific, 380 F.3d at 1356. Applying this principle, if the ASBCA did not have jurisdiction for claims that relate to and depend upon events that occurred before the takeover agreement, it follows that findings of fact

for events that occurred before the takeover agreement are also outside the jurisdiction of the ASBCA. The claims presently before the court are based upon the illegality of the original contract, which clearly is based on events that occurred before the takeover agreement (the illegality of the contract itself). Since the ASBCA did not have jurisdiction over the present claims, collateral estoppel as well cannot apply to any findings of fact made by the ASBCA concerning events which occurred before the takeover agreement. United cannot be bound to findings of fact made by a court which did not have jurisdiction over the subject matter of such facts.

The only findings of fact to which collateral estoppel could arguably apply would be facts necessary to the ASBCA's determination of its own jurisdiction. Application of collateral estoppel requires that "(1) the issue at stake is identical to the one involved in the prior proceeding; (2) the issue was actually litigated in the prior proceeding; (3) the determination of the issue in the prior litigation must have been 'a critical and necessary part' of the judgment in the first action; and (4) the party against whom collateral estoppel is asserted must have had a full and fair opportunity to litigate the issue in the prior proceeding." Dana v. E.S. Originals, 342 F.3d 1320, 1323 (Fed. Cir. 2003) (emphasis added). Pursuant to Firemen's Fund and United Pacific Insurance Company, the only "critical and necessary" issue to the ASBCA's determination of its own jurisdiction was that the claims related to and depended upon events which occurred before the takeover agreement between United and the government. Any other determinations by the ASBCA, particularly the factual finding referred to by the government in its motion that there was no implied-in-fact contract between United and the government before the takeover agreement, were not "critical and necessary" to determining whether the events

occurred before the takeover agreement. Collateral estoppel is therefore not applicable to any facts at issue in this case.

## IV. CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendant's Motion to Dismiss.

Respectfully Submitted,

**POST & SCHELL, P.C.**

Dated: April 26, 2005

/s/ Gary A. Wilson

Gary A. Wilson
PA Attorney I.D. #39995
John W. Dornberger
PA Attorney I.D. #69293
Steven K. Bainbridge, Esquire
PA Attorney I.D. # 91018
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103-2808
(215) 587-1000
(215) 587-1444 (fax)
gwilson@postschell.com
jdornberger@postschell.com
sbainbridge@postschell.com

Attorneys for
United Pacific Insurance Company,
Reliance Insurance Company, and
Reliance National,
Plaintiffs.

**CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of April 2005, a copy of the foregoing Brief in Opposition to the Motion to Dismiss was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Michael N. O'Connell, Esquire
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
ATTN: Classification Unit
1100 L Street, N.W.
Washington, DC 20530

/s/ Gary A. Wilson, Esquire