NO. 05-107C
(Judge Firestone)

---

IN THE UNITED STATES COURT OF THE FEDERAL CLAIMS

---

UNITED PACIFIC INSURANCE
COMPANY, RELIANCE INSURANCE
COMPANY, and RELIANCE NATIONAL,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

# DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

---

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

JAMES M. KINSELLA
Deputy Director

MICHAEL O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Attn: Classification Unit
8th Floor
1100 L Street N.W.
Washington, DC 20530
Tele: (202) 307-0282
Fax: (202) 514-8624

OF COUNSEL:
WILLIAM M. LACKERMANN, JR.
Air Force Materiel Command Law Office
Wright Patterson Air Force Base
Dayton, OH

May 13, 2005 Attorneys for Defendant

## TABLE OF CONTENTS

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I. The Statutes At Issue Provide No Remedy For United . . . . . . . . . . . . . . . . . 1

II. United Has Waived Its Illegal Contract Claim . . . . . . . . . . . . . . . . . . . . . . . . 5

III. United's Claims Are Not Saved By Accrual Suspension . . . . . . . . . . . . . . . . 9

IV. Collateral Estoppel Bars United's Claims . . . . . . . . . . . . . . . . . . . . . . . . . . 13

V. United Cannot Rely Upon The Doctrine Of Equitable Subrogation . . . . . . . 15

VI. To The Extent United's Claims Are Implied-In-Fact, They Are Barred By The CDA Statute Of Limitations And The Election Doctrine . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

## TABLE OF AUTHORITIES

## CASES

American Ins. Co. v. United States,
62 Fed. Cl. 151 (2004) . . . . . . . . . . 17

American Telecom Corp. v. United States,
59 Fed. Cl. 467 (2004) . . . . . . . . . . 15, 19

American Telephone & Telegraph Co. v. United States,
177 F.3d 1368 (Fed. Cir. 1999) . . . . . . . . . . 2, 4

American Telephone & Telegraph Co. v. United States,
307 F. 3d 1374 (2002) . . . . . . . . . . 3

Beta Systems, Inc. v. United States,
838 F.2d 1179 (Fed. Cir. 1988) . . . . . . . . . . 7

Central Pines Land Co. v. United States,
61 Fed. Cl. 527 (2004) . . . . . . . . . . 10

Chris Berg, Inc. v. United States,
426 F.2d 314 (Ct. Cl. 1970) . . . . . . . . . . 7, 8

City of El Centro v. United States,
922 F.2d 816 (Fed. Cir. 1990) . . . . . . . . . . 14

Colon v. United States,
35 Fed. Cl. 337 (1996) . . . . . . . . . . 18

Computervision Corp. v. United States,
62 Fed. Cl. 299 (2004) . . . . . . . . . . 11

Entines v. United States,
39 Fed. Cl. 673 (1997) . . . . . . . . . . 10, 11

Fisher v. United States,
402 F.3d 1473 (Fed. Cir. 2005) . . . . . . . . . . 2

Godley v. United States,
5 F.3d 1473 (Fed. Cir. 1993) . . . . . . . . . . 3, 4

Hermes Consol., Inc. v. United States,
58 Fed. Cl. 3 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4, 6, 7, 8

Ins. Co. of the West v. United States,
243 F.3d 1367 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 16

Japanese War Notes Claimants Assoc. v. United States,
178 Ct. Cl. 630, 634, 373 F.2d 356, 358-59 (1967) . . . . . . . . . . . . . . . . . . . . . . . . . . 10

LaBarge Products, Inc. v. United States,
46 F.3d 1547 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

Laidlaw Environmental Services (GS), Inc. v. United States,
43 Fed. Cl. 44 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

Martinez v. United States,
333 F.3d 1295 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

National Surety Corp. v. United States,
118 F.3d 1542 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

Perri v. United States,
340 F.3d 1337 (Fed. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

Tesoro Hawaii Corp. v. United States,
- F.3d -, 2005 WL 949074 (Fed. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

Tesoro Hawaii Corp. v. United States,
58 Fed. Cl. 65 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 7, 8

United States v. Amdahl,
786 F.2d 387 (Fed. Cir. 1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

United States v. Mitchell,
463 U.S. 206, 217 (1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

Welcker v. United States,
752 F.2d at 1579 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Whittaker Electronic Systems v. Dalton,
124 F.3d 1443 (Fed. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5, 6, 7, 8

## STATUTES

**United States Code**

10 U.S.C. § 2805 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2, 7

10 U.S.C. § 2811 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

41 U.S.C. § 602(a) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18

41 U.S.C. § 609(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17, 18, 19

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| UNITED PACIFIC INSURANCE COMPANY, RELIANCE INSURANCE COMPANY, and RELIANCE NATIONAL, | ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 05-107C |
| | ) | (Judge Firestone) |
| THE UNITED STATES, | ) | |
| Defendant. | ) | |

DEFENDANT'S REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Pursuant to Rule 7.1 of the Rules of the Court of Federal Claims, defendant respectfully submits this reply to plaintiffs' opposition to defendant's motion to dismiss.

## ARGUMENT

### I. The Statutes At Issue Provide No Remedy For United

As we established in our initial brief, 10 U.S.C. § 2805 provides no remedy to United Pacific Insurance Company (United) in the event of a Government violation of this statute. Rather, the purpose of the statute is legislative enforcement and oversight, not the creation of a cause of action for private parties. Initial brief at 20-22. Similarly, the purpose of the other statute at issue, 10 U.S.C. § 2811, is also legislative enforcement and oversight. Thus, the conference report to the 1994 amendments to this statute states:

> The conferees are concerned that major repairs to facilities, funded through operation and maintenance accounts, are conducted without the oversight of the service secretaries or the Committees on Armed Services of the Senate and House of Representatives. The conferees believe improved oversight of the major repairs is required, but do not want to impose additional reporting requirements.

House Conf. Rpt. 103-701 at 789. Similar to § 2805, this statute provides no remedy for private parties in the event that the Government violates it.

As we also established in our initial brief, because these statutes create no remedy in the event of a violation, as a matter of law United has no claim against the Government. American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) (AT&T III). Nonetheless, United argues, without citation to any precedent, that:

> Notwithstanding the government's references to AT&T, parties are presumed to be able to seek redress for violation of statutes with the courts. For statutes providing for "legislative oversight and enforcement," Congress should not be required to state in the statute or in the legislative history that the Congress intends to create a cause of action for private parties against the government.

United brief at 16.

This is contrary to the long established rule of law that a plaintiff possesses a cause of action in this Court only if there is a money mandating statute. As the Federal Circuit recently explained, the trial court at the outset of the action must determine, either in response to a motion by the Government, or *sua sponte,* whether the statute at issue is money mandating. Fisher v. United States, 402 F.3d 1167, 1173 (Fed. Cir. 2005) (en banc). A statute is money mandating if it "can fairly be interpreted as mandating compensation for damages sustained as a result of the duties [it] impose[s]." Id. (quoting United States v. Mitchell, 463 U.S. 206, 217 (1983).

Here, there is nothing in 10 U.S.C. §§ 2805 and 2811 that could fairly be interpreted as mandating compensation for United. In fact, as we have demonstrated, the legislative history indicates that it was not the intent of Congress to create any such remedy but merely to provide for congressional oversight of the military budget. United's brief contains no

contrary discussion of the legislative history. Thus, United's complaint fails to state a claim upon which relief may be granted.

United argues that a Federal Circuit decision issued prior to AT&T III requires the Court to make findings of fact to determine whether the contract was void *ab initio* or merely voidable. Godley v. United States, 5 F.3d 1473, 1476 (Fed. Cir. 1993). However, Godley must be read in light of the Federal Circuit's en banc decision in AT&T III. If, as we have established, the statutes at issue create no remedy for United, there is no need for the Court to make findings of fact concerning whether the contract is void *ab initio* or voidable. If there is no remedy, the complaint fails to state a cause of action and should be dismissed pursuant to RCFC 12(b)(6). American Telephone & Telegraph Co. v. United States, 307 F. 3d 1374, 1379 (2002) (AT&T V).

United also invokes the Federal Circuit's decision in United States v. Amdahl, 786 F.2d 387 (Fed. Cir. 1986) in support of its argument "that a private party may recover on [a] quantum meruit basis for the value of goods or services received by the government prior to the recision of an illegal contract." United brief at 14. However, it would be wholly inappropriate for the Court to apply Amdahl to the facts here. In both Amdahl and Godley, the Federal Circuit wrestled with an entirely different problem than that faced by the Court here. In those cases, the contractor furnished a benefit to the Government but faced the prospect of not receiving any payment from the Government for that benefit because of the illegality of the contract. Amdahl, 786 F.2d at 391-92; Godley, 5 F.3d at 1474.

Here, there is no dispute that United and the Government entered into a takeover agreement and that the Government has paid United all of the contract monies to which it is

entitled. Thus, unlike the contractors in Amdahl and Godley, United has received the full benefit for which it bargained.

In addition, unlike the contractors in Amdahl and Godley, United is the party seeking to have the contract declared illegal. United seeks to avoid the consequences of a business decision in which the United States played no role. United decided to extend bonding to a company whose president United ultimately determined was "robbing his own company," and which defaulted in its contract performance. Finding of fact (FF) 24, Appendix (App.) 21. Like the contractor in AT&T, United seeks to avoid the consequences of its business decision by searching for some irregularity in the funding of the contract. See AT&T III, 177 F.3d at 1370 (contractor paid full adjusted contract price of $34.5 million sought actual cost of $91 million due to violation of procurement statute).

In the absence of a remedy specifically providing for damages to the contractor, Federal Circuit precedent simply does not endorse payment to United of the windfall it seeks here. Any holding to the contrary would enable contractors to perform contracts, be paid in full by the Government, and, if the bargain turns out to be less favorable than it hoped, allow them to search for some illegality in the contract so that they can demand quantum meruit damages. Such a rule of law would, as one judge has aptly described it, provide "a court-made contractor's functional equivalent of 007's license to kill" which "would allow the devious to take undue advantage of government error, no matter how innocent, and prey on the public fisc." Hermes Consol., Inc. v. United States, 58 Fed. Cl. 3, 19 (2003)

(Hermes I).[1] In effect, United asks the Court to create an implied-in-law right for a surety to enter into a fixed price takeover agreement with the United States and then, subsequent to contract performance, have the contract converted to a cost reimbursement contract if the surety loses money performing the bonded work. However, Congress has created no such cause of action and has, in only limited instances, created programs that reimburse sureties for a percentage of the losses if a bonded contractor defaults (e.g., the Small Business Administration's "Surety Bond Guarantee Program," 13 CFR Part 115).

II. United Has Waived Its Illegal Contract Claim

In our opening brief, we established that United had waived its illegal contract claim because Castle entered into the contract without raising this issue, and then United took over and completed the contract without raising it. Whittaker Electronic Systems v. Dalton, 124 F.3d 1443 (Fed. Cir. 1997). In its opposition, United attempts to distinguish this case factually by arguing that "[i]n Whittaker, the parties were aware during the procurement process of technical problems which caused the contract price to exceed the scope of the contracting officer's authority to negotiate . . ." United brief at 9 (citing Whittaker, 124 F.3d at 1444, n.3). United argues that the circumstances are different here because it "did not possess documentation from which to determine the contract was illegal until approximately January 2000 . . ." United brief at 10.

[1] In this section of its brief (p. 14) United also alleges for the first time, nearly 10 years after the events in its question, "that the Air Force fraudulently violated the requirements" of the statutes at issue. However, there are no such allegations of fraud by the Air Force in United's complaint. RCFC 9(b) requires that "[i]n all averments of fraud . . ., the circumstances constituting fraud . . . shall be stated with particularity."

United misreads Whittaker. Although it is true that in footnote 3 of the opinion the Federal Circuit stated that, prior to bid the contractor noted that there could be a problem developing technology similar to that of the Soviet Union, the alleged illegality did not relate to this issue. Rather, it related to the inclusion of options in the contract. Whittaker, 124 F.3d at 1446. Moreover, even if United's argument had been accurate, it would not help its cause here because, as we stated in our opening brief and also below, the facts that United relies upon to assert that the contract was illegal were obvious or obtainable in 1995.

In support of its argument that it has not waived its illegal contract claim, United also relies upon this Court's decision in Tesoro Hawaii Corp. v. United States, 58 Fed. Cl. 65 (2003) (Tesoro I) (rev'd on other grounds, Tesoro Hawaii Corp. v. United States, – F.3d –, 2005 WL 949074 (Fed. Cir. 2005) (Tesoro II)). In Tesoro I, this Court ruled that economic price adjustment (EPA) clauses in several contracts were not authorized by the Federal Acquisition Regulation (FAR). Id. 58 Fed. Cl. at 68-70. In holding that the contractor did not waive this argument even though it waited several years before raising it, the Court distinguished Whittaker on the basis that, there, the breach of procurement regulations "occurred after the contract award" while in Tesoro I it was "inherent" in the award. Tesoro I, 58 Fed. Cl. at 73. However, no such distinction between inherent and post-award illegality appears in the Whittaker decision. More importantly, the Court in Tesoro I misread the Whittaker decision in stating that the alleged breach of procurement regulations occurred after contract award. In Whittaker, the Federal Circuit stated that the alleged illegality was an option included in the contract at the time of award, thus leading the plaintiff to argue that the contract was void *ab initio*. Whittaker, 124 F.3d at 1446.

Faced with a similar EPA clause, this Court in another case also held that the clause was not authorized by the FAR. Hermes I, 58 Fed. Cl. at 11-12. In Hermes, however, the Court held that the contractor waived the illegal contract argument like the plaintiff in Whittaker. Hermes Consolidated, Inc. v. United States, 58 Fed. Cl. 409 (2003) (Hermes II) (rev'd *sub nom*. on other grounds by Tesoro II). The Court compared Whittaker with two other cases that United cites here in support of its argument that the illegality claim cannot be waived: LaBarge Products, Inc. v. United States, 46 F.3d 1547 (Fed. Cir. 1995); Chris Berg, Inc. v. United States, 426 F.2d 314 (Ct. Cl. 1970); as well as Beta Systems, Inc. v. United States, 838 F.2d 1179 (Fed. Cir. 1988). In Hermes I, the Court drew an important distinction between the Chris Berg and Whittaker lines of cases which is applicable here. It stated that in the former line, "the contractors either complained during contract formation, or, at the very least, at an early stage in the history of the conflict." Hermes I, 58 Fed. Cl. at 19. In contrast, here, as in Whittaker and Hermes, United did not complain about the 1995 Castle contract until many years later, after it completed the contract work.

Morever, even the Tesoro I Court acknowledged that "waiver is certainly a valid defense to claims falling outside the Beta Systems line of cases - - i.e., those cases not involving the government's failure to abide by mandatory regulations intended for the benefit of the contractor. . ." Tesoro I, 58 Fed. Cl. at 75. Here, as we established in our opening brief in our discussion of the legislative history of 10 U.S.C. § 2805, Congress enacted this statute for legislative oversight and enforcement of the military's construction spending. There is simply no evidence that Congress intended to create a cause of action upon behalf of

contractors, or to somehow benefit contractors by enacting this statute. United has not challenged our discussion of the history or purpose of this statute.

The Courts in both Tesoro and Hermes certified questions to the Federal Circuit including whether the EPA clauses were illegal, and, if so, whether the illegal contract arguments had been waived. The Federal Circuit recently reversed both decisions. Tesoro II, – F.3d –, 2005 WL 949074 (Fed. Cir. 2005). In Tesoro II, the Federal Circuit held that, in both cases the Court erred in holding that the EPA clauses violated the FAR. Id. at slip. op. p. 8. Because the court of appeals ruled that the FAR did not prohibit the use of the EPA clauses, it did not reach the issue of the waiver of the alleged illegality. Id.

This Court should apply the waiver analysis in Hermes and not Tesoro I. As we established above, the Tesoro I decision was based upon a misreading of the Federal Circuit's decision in Whittaker, thereby creating an incorrect distinction between inherent and post-award illegalities. Tesoro I, 58 Fed. Cl. at 73. Moreover, the Tesoro I Court expressly limited its holding to those cases which involved a regulation promulgated for the benefit of the contractor. Tesoro I, 58 Fed. Cl. at 75. As we established in the legislative history in our initial brief, the statutes at issue here were not enacted for the benefit of sureties.

In contrast, the Hermes Court correctly recognized that the illegality in Whittaker involved the inclusion of the option in the original contract. Hermes, 58 Fed. Cl. at 15. It also carefully analyzed the Chris Berg line of cases and found them not applicable. The Court correctly recognized that, in those cases the contractor complained of the alleged illegality either at contract formation or very early in the history of the conflict. Hermes, 58

Fed. Cl. at 19. United failed to do so by waiting until after contract completion, and has waived its illegal contract claim.

III. United's Claims Are Not Saved By Accrual Suspension

In its brief, United clarifies that it is not seeking equitable tolling of the Tucker Act, but rather "accrual suspension" which it correctly states that the Court of Appeals for the Federal Circuit has recognized. Accrual suspension suspends or tolls the running of the statute of limitations until the plaintiff knew or should have known that a claim existed. Martinez v. United States, 333 F.3d 1295, 1319 (Fed. Cir. 2003) (en banc). Similar to equitable tolling, accrual suspension is "strictly and narrowly applied: ... [the plaintiff] must show that defendant has concealed his acts with the result that plaintiff was unaware of their existence or it must show that its injury was 'inherently unknowable' at the accrual date." Id. (quoting Welcker v. United States, 752 F.2d 1577, 1580 (Fed. Cir. 1985).

At pages 6-7 of its brief, United cites six Federal Circuit cases in support of its accrual suspension argument. However, in each of these cases, the Federal Circuit held that accrual suspension was not appropriate. Here, United makes the same mistake that the plaintiffs in several of those cases made: equating its alleged failure to find the alleged proof of its claims with concealment by the Government or an inherently unknowable claim.

United argues that the statute of limitations should not begin to run until it received the alleged proof of its illegal contract claim pursuant to the Freedom of Information Act in January 2000. United brief at 7. However, United never states in its complaint or its brief what it learned in 2000, or why this information was unknowable in 1995. Similarly, in Welcker which United cites, the plaintiff claimed that the statute should not begin to run until

after Congress had passed the Privacy Act which allowed him to obtain a copy of his file from the Federal Bureau of Investigation. Welcker, 752 F.2d at 1579. The court of appeals rejected this claim. It explained that "defendant is not required to wait until plaintiff has started substantiating his claims by the discovery of evidence. Once plaintiff is on inquiry that it has a potential claim, the statute can start to run." Id. at 1580 (quoting Japanese War Notes Claimants Assoc. v. United States, 178 Ct. Cl. 630, 634, 373 F.2d 356, 358-59 (1967).

In its brief United states: "[t]he determination by United of the illegality was necessarily dependent on its receipt of funding, contract and other documentation in the possession of the Government." United brief at 7. Thus, it appears to argue that its claim was "inherently unknowable" until it obtained this information. However, "any matter of public record is knowable." Central Pines Land Co. v. United States, 61 Fed. Cl. 527, 534 (2004). "A party will be charged with knowing any facts that are discoverable in public records, and ignorance of one's legal rights arising from those facts is not a sufficient excuse to justify tolling the statute of limitations." Id. Thus, if a party "could have asserted a claim if it had sought advice, launched an inquiry, or otherwise taken steps to discover information" the statute will not be tolled. Id.

Even if a claim is capable of being known only with difficulty, the statute of limitations is still not tolled. Thus, for example, in Entines v. United States, 39 Fed.Cl. 673 (1997), Filipino veterans of World War II sought compensation for fighting under American command during the war. Id. at 676. In support of their argument that the statute of limitations should be tolled, the plaintiffs argued that:

> conditions on the Philippine Islands during and immediately after World War II rendered all of their claims unknowable. Filipinos in this era faced invasion and occupation of their homeland, guerrilla warfare against the invaders, and, after the defeat of the Japanese, a period of intense rebuilding. All this took place while the nation was taking its first tentative steps toward political independence. Claims for back pay, breach of contract, and just compensation were simply too far removed to be considered by soldiers. Compounding the situation was the fact that the claims had to be asserted in a foreign legal system, in a nation located on the other side of the world. According to plaintiffs, it was simply unimaginable to the average Filipino soldier that he had a claim against the United States.

Id. at 680. The Court was not persuaded. It explained that "[i]t is important to remember that tolling is not appropriate for claims that are simply burdensome or inconvenient to discover. Instead, a claim must be 'inherently unknowable' before it is proper to toll the statute of limitations." Id. Thus, the Court granted the Government's motion to dismiss.

If a defendant or the court challenges jurisdiction or the plaintiff's claim for relief, the plaintiff cannot rely merely upon allegations in the complaint, but must instead bring forth relevant, competent proof to establish jurisdiction. Computervision Corp. v. United States, 62 Fed. Cl. 299, 307 (2004). Here, United has failed to allege specific facts which explain why its claim was inherently unknowable. Instead, it merely states in a conclusory manner three purported reasons why the Castle contract was illegal and that it did not obtain the alleged proof of the illegality until January 2000. United brief at 4, 7.

First, it claims that the Air Force accepted "an unjustified bid of $3,000 for constructing the connectors for the buildings . . ." United brief at 4. Second, it claims that the connectors made the three buildings "one Project involving interrelated buildings." Id. The problem with these arguments is that the existence of the connectors and United's bid upon them were eminently knowable in 1995 not only through the public record but also through

United's bonding relationship with Castle. United could have obtained a copy of the contract from either Castle or the Air Force, which contract states on page 1 of the specifications that the contract work includes all work to "construct two new connecting structures at the 2400 area." Supplemental Appendix (SA) 1. Similarly, the bid solicitation states that the optional requirement no. 3 work includes "[a]ll work to construct building connectors from Bldg. 2402, 2401 and 2403 as shown on drawing S-2." Compl., Ex. A, p. 13 of 46.

Moreover, United could have obtained a copy of Castle's bid from Castle in consideration of its agreement to bond Castle. It could have attended the public opening of bids which made public Castle's $3,000 price for the connectors as reflected in the bid abstract. SA 2. As the board found, the public record of Castle's bid price on the connectors also included a bid protest by one of the other bidders which specifically protested Castle's price for the connectors, which protest was ultimately withdrawn. FF 6, App. 17; SA 3.

Third, United argues that the Air Force improperly characterized much of the project as renovation or repair when "the vast majority" of the work was new construction. United brief at 4. This argument similarly fails. The contract which set forth all of the project work was available in 1995 both publicly and through Castle. The funding sources were also set forth in the contract. Compl., Ex. A, p. 1.

After Castle was determined to be the low bidder, in September 1995, the Air Force forwarded a request to its Air Mobility Command to request "actual funds" to allow the award of the contract. SA 4. The request stated that: "[t]he three projects were advertise[d] as a single contract." The funds request further stated that the "fund type/EEIC" were "522" and "529." 522 funds are O&M funds for repair work. 529 funds are O&M funds for minor

construction. SA 5-6. The 522 and 529 funding sources were then printed on page one of Castle's contract. Compl., Ex. A, p. 1. United could have obtained these documents in 1995 through a Freedom of Information Act Request.

As the testimony and exhibits from the ASBCA proceeding demonstrate, the funding information was available to United in 1995 through Castle or from the Government as a public record. United may not have reviewed the contract and determined how much of the contract was new construction and how much was repair. It may not have inquired how the contract was funded. It may not have noticed the connectors.[2] United does not explain why it waited so long to obtain this information, other than the fact that it began to spend money and wished to avoid its obligations pursuant to the performance bond. Simply because it did not make its inquiries until several years later, and then waited several more years before filing suit in this Court, does not mean that the Court should toll the statute of limitations.

IV. Collateral Estoppel Bars United's Claims

In our initial brief, we established that the board's dismissal of United's illegal contract claims for lack of jurisdiction does not prevent the Court from applying the bar of collateral estoppel to United's claims here. In its brief, United completely ignores our discussion of the cases and the Restatement (Second) of Judgments which support our argument.

---

[2] Even if United could not have known about the connectors or the ratio of repair and new construction in 1995, it would have learned about these aspects of the project when it took over the work in 1997. See, FF 28, App. 24 (finding that both United's completion contractor and a representative of United visited the project site prior to the default termination).

The application of collateral estoppel is particularly appropriate here because United is pursuing the same implied contract claims as it did at the board. As we set forth in our initial brief and below, United's claims are more properly characterized as implied-in-law claims, not implied-in-fact, because they are based upon United's argument that the Air Force owed a duty to sureties prior to the award of the contract. However, United argues on page 19 of its brief, that it seeks relief through "an implied-in-fact contract . . . based upon the (illegal) express contract." This is the same claim that United pursued at the board. App. 47-49. As the board stated: "UPI contends that the contract was illegal and that an implied-in-fact contract between it and the Air Force arose from the ashes." App. 47.

The board conducted a full hearing on this claim. It correctly stated that the burden of proof to show compliance with the jurisdictional statute, the CDA, was on United, which meant that United had to establish the existence of an implied-in-fact contract. App. 48. As the board further stated, an implied-in-fact contract with the United States requires the plaintiff to demonstrate: 1) mutuality of intent to contract; 2) consideration; 3) lack of ambiguity in offer and acceptance and 4) the Government representative whose conduct is relied upon must have actual authority to bind the government in contract. Id. (quoting City of El Centro v. United States, 922 F.2d 816, 820 (Fed. Cir. 1990)). Rejecting United's implied-in-fact contract claim, the board held that "the contractual elements necessary to a contract implied-in-fact that UPI would have us find as inherent in the contract between Castle and the Air Force and the bond are not established through Contract No. F28609-95-C-0036." App. 49. Because no implied-in-fact contract came into being, the board held that it did not possess jurisdiction over this claim. App. 49.

This case presents a text book example of a claim dismissed for lack of jurisdiction that should be barred by collateral estoppel. First, although the board dismissed the claim for lack of jurisdiction, since its decision was based upon United's failure to establish the existence of an implied-in-fact contract, it would have been entirely appropriate for the board to deny this claim upon the merits. Second, in granting both the boards and this Court jurisdiction to consider claims based upon contracts implied-in-fact, Congress did not intend for contractors to have a trial in both fora, but rather to elect one or the other. American Telecom Corp. v. United States, 59 Fed.Cl. 467 (2004). Here, United has had a nine day hearing at the board on its claims. The board found that United failed to prove the facts necessary to establish an implied-in-fact contract. United should not be allowed to have a second trial at this Court on the same claim simply because the board deemed its dismissal as being for lack of jurisdiction.

V. United Cannot Rely Upon The Doctrine Of Equitable Subrogation

United argues that it is entitled to recover pursuant to the doctrine of equitable subrogation. United attaches a talismanic significance to its use of the term equitable subrogation. Thus, it appears to argue that express and implied-in-fact contract claims that ordinarily would be barred by the election doctrine are not barred if it attaches the term equitable subrogation to these contract claims. United cites no precedent in support of its argument that invocation of equitable subrogation revives claims that otherwise would be waived pursuant to the election doctrine. Similarly, United seems to argue at pages 5-7 of its brief that its invocation of equitable subrogation not only shelters it from the one year CDA

statute of limitations, but also allows it to pursue breach of contract claims outside of the CDA. United cites no precedent in support of this argument and we are aware of none.

Contrary to United's argument, the types of equitable subrogation claims a performance bond surety may assert in the Court of Federal Claims are limited to two kinds. Most cases have involved contract retainage paid or progress payments made by the Government to the contractor after the surety notified the Government of the contractor's default. E.g., Ins. Co. of the West v. United States, 243 F.3d 1367, 1371 (Fed. Cir. 2001). Generally, as the court of appeals has explained, "the government owes no duty to the surety unless the surety notifies the government of the contractor's default under the bond." Id. In National Surety Corp. v. United States, 118 F.3d 1542 (Fed. Cir. 1997), the Federal Circuit also ruled that a surety could sue the Government when the Government committed a material departure from the terms of the contract (failing to retain mandatory 10-percent retainage), which departure increased the surety's risk. Id. at 1544. We are unaware of any case law in which a surety has been allowed to bring suit pursuant to the Tucker Act alleging that the contract it bonded was illegal when awarded. United cites none in its opposition.

A surety bond creates a three party relationship in which the surety becomes liable for its principal's debt or duty to the Government. Ins. Co. of the West, 243 F.3d at 1370. However, there is no contract or privity between the Government and the surety. Id. United has based its standing to assert (and this Court's jurisdiction to decide) the illegal Castle contract claim based solely upon its alleged equitable (implied-in-law) rights as a surety and the alleged equitable (implied-in-law) duties owed to it as a surety by the Government.

Similar to its argument here, at the board United argued that "[t]he Government had a legal obligation to the Surety to ensure that the Contract on which it required a bond was a legal contract and the Surety which relied on the Government's entry into a legal contract must have the right to pursue its illegal contract claim." App. 47.

United points to no precedent supporting its novel legal theories. Thus, it is "left to argue, sans decisional support, that the Air Force breached some undefined fiduciary or equitable duty" which "duties are ordinarily viewed as giving rise, if anything, to torts, the subject matter of which plainly is outside this court's jurisdiction." American Ins. Co. v. United States, 62 Fed. Cl. 151, 158 (2004). Because no such cause of action exists, the Court should dismiss United's complaint.

## VI. To The Extent United's Claims Are Implied-In-Fact, They Are Barred By The CDA Statute Of Limitations And The Election Doctrine

Because United's claim at the board and here is based upon the alleged pre-bid duties of the Government to sureties, the board correctly stated: "[f]ollowing United's arguments to what we believe is its logical conclusion, any obligation of the Government was implied-in-law, not implied-in-fact." App. 47. Recognizing that neither the board nor this Court possesses jurisdiction to consider implied-in-law contract claims, United argued at the board and now argues here (United brief at 19) that its claim is based upon an implied-in-fact contract. Perri v. United States, 340 F.3d 1337, 1343 (Fed. Cir. 2003). Both the board and the Court possess jurisdiction to consider such implied-in-fact claims. 41 U.S.C. § 602(a). Simply deeming its claims implied-in-fact do not save them. Since the board possesses jurisdiction to consider implied-in-fact contract claims pursuant to the CDA, if United's

claims are implied-in-fact, they are barred by the election doctrine and the one year CDA statute of limitations.

In its brief, United alleges that each count of its complaint is for breach of an express or implied contract. United brief at 5, 6, 19. Because the contracting officer denied United's claim on September 12, 2000 (FF 58, App. 41), the one year statute of limitations bars this action as it was not filed within one year of United's receipt of the contracting officer's final decision. 41 U.S.C. § 609(a)(3).

Although counts one to three of the complaint are entitled "illegal contract" and count four is entitled "quantum meruit/equitable subrogation," according to United all of these counts seek recovery upon an implied-in-fact contract basis. As United explains at page 19 of its brief, the crux of its argument is that the contract between the Air Force and Castle was illegal, and that this illegality resulted in an implied-in-fact contract between the Air Force and United. Because an implied-in-fact contract is a claim recognized by the CDA, United was required to file its complaint in this Court within one year of the September 12, 2000 contracting officer's final decision. 41 U.S.C. § 609(a)(3).

Similarly, as we established in our motion to dismiss, both counts five and six are also time barred. Count five is entitled "breach of contract" and appears to allege that the United States breached the takeover agreement with United. Compl. 57-61. Count six ("misrepresentation as inducement to contract") appears to allege that the United States made misrepresentations to United to induce it to enter into the takeover agreement. Compl. 57-61. As we stated in our motion to dismiss, it is either a tort claim for which this Court does not

possess jurisdiction (Colon v. United States, 35 Fed. Cl. 337, 342-43 (1996)), or a superior knowledge type of claim for which the Court could possess jurisdiction only pursuant to the CDA. Laidlaw Environmental Services (GS), Inc. v. United States, 43 Fed. Cl. 44 (1999).

Although United argues that the CDA does not apply to the takeover agreement between the Air Force and United, this is incorrect as a matter of law. The CDA applies to all express or implied contracts by an executive agency for the construction, alteration, repair or maintenance of real property. 41 U.S.C. § 602(a)(3). The CDA covers all claims by a contractor against the Government relating to a contract. Id. at § 605(a). It defines a contractor as a party to a Government contract other than the Government. Id. at § 601(4). Since United became a party to a contract with the Air Force in the takeover agreement and its claims here relate to that contract, the CDA applies. Thus, pursuant to the CDA, the one year statute of limitations applied. 41 U.S.C. § 609(a)(3).

Finally, as we established in our initial brief, since the board possessed jurisdiction to consider implied-in-fact contract claims, United's "election" of the board as its forum of choice precludes United from pursuing its claims here. E.g., American Telecom Corp. v. United States, 59 Fed.Cl. 467 (2004). Thus, to the extent that United is seeking relief for breach of an implied or express contract (counts one to five) and misrepresentation as inducement to contract (count six) these claims are barred by the election doctrine.

## CONCLUSION

For the foregoing reasons, and for the reasons set forth in our initial brief, defendant respectfully requests that the Court dismiss United's complaint.

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

DAVID M. COHEN
Director

s/James M. Kinsella
JAMES M. KINSELLA
Deputy Director

s/Michael N. O'Connell
MICHAEL N. O'CONNELL
Trial Attorney
Commercial Litigation Branch
Civil Division
United States Department of Justice
ATTN: Classification Unit
1100 L Street, N.W.
Washington, DC 20530
Tel: (202) 353-1618
Facsimile: (202) 514-8640

Attorneys for Defendant

OF COUNSEL:
WILLIAM M. LACKERMANN, JR.
Air Force Materiel Command Law Office
Wright Patterson Air Force Base
Dayton, OH

DATED: May 13, 2005

# SUPPLEMENTAL APPENDIX

| DOCUMENT | PAGE |
|---|---|
| Specifications p. 1 | 1 |
| Bid Abstract Excerpt | 2 |
| Bid Protest Letter | 3 |
| AMC Funds Message | 4 |
| Wilson Testimony Excerpt | 5-6 |

CERTIFICATE OF SERVICE

I hereby certify that on this 13th day of May 2005, a copy of the foregoing Reply to Plaintiff's Opposition to Defendant's Motion to Dismiss was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

Gary Alan Wilson
Post & Schell, P.C.
Four Penn Center
1600 John F. Kennedy Boulevard
Philadelphia, PA 19103-2808

s/Michael N. O'Connell