# In the United States Court of Federal Claims

**No. 05-107C**
**(Filed: September 28, 2005)**

| | | |
|---|---|---|
| * * * * * * * * * * * * * * * * * * * | * | |
| | * | |
| **UNITED PACIFIC INSURANCE CO., RELIANCE INSURANCE CO., and RELIANCE NATIONAL,** | * | |
| | * | **Action by Surety; Equitable Subrogation; Illegal Contract; Void ab initio** |
| **Plaintiffs,** | * | |
| **v.** | * | |
| **THE UNITED STATES,** | * | |
| **Defendant.** | * | |
| * * * * * * * * * * * * * * * * * * * | | |

*Gary A. Wilson*, Philadelphia, PA, for plaintiff.

*Michael O'Connell*, U.S. Department of Justice, Washington, DC, with whom were *Peter D. Keisler*, *Assistant Attorney General* and Director *David M. Cohen* for defendant. *Williams M. Lackermann, Jr.*, U.S. Air Force, Dayton, OH, of counsel.

**FIRESTONE**, *Judge*.

## OPINION

This case comes before the court on a motion by the United States ("government") to dismiss the complaint of the plaintiffs, United Pacific Insurance Company, Reliance Insurance Company, and Reliance National (hereinafter collectively referred to as "UPI"

or "plaintiff") under Rules 12(b)(1) and 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"). In this action, by the surety who completed performance for a defaulting government contractor, the plaintiff contends that the original construction contract was illegal and that it is therefore entitled to recover the costs it incurred in completing the project under a variety of theories. The government contends that the complaint fails to state a claim. For the reasons that follow the government's motion is **GRANTED** and the plaintiff's complaint must be **DISMISSED**.

## BACKGROUND

Unless otherwise noted, the following facts are taken from the plaintiff's complaint and have been accepted as true. On October 5, 1995, the government entered into a contract with Castle Abatement Corporation ("Castle") in which Castle agreed to furnish all labor, material, and equipment required to renovate three buildings at McGuire Air Force Base in New Jersey. The contract amount was $3,152,174. The contract contained three line items for "construction costs" for each of the three buildings. As required by the contract and by the Miller Act, 40 U.S.C. §§ 270a-270d (1994) (current version at 40 U.S.C. §§ 3131-3134 (2000 & Supp. 2002)), the plaintiff issued a performance bond in the penal sum of $3,152,174 and a labor and material payment bond in the penal sum of $1,576,087 to the government as obligee.

On July 21, 1997, the government terminated Castle for default and made a demand to UPI under its performance bond. On August 5, 1997, the plaintiff and the government entered into a written takeover agreement whereby the plaintiff agreed to

complete the remaining work under the contract between Castle and the government. The original contract was incorporated into the takeover agreement. UPI hired a contractor, Lattimer & Associates, to complete the work. The work was completed, and apparently the government took beneficial occupancy of one of the buildings in June 1998 and of the other two buildings in November 1998. In re Appeal of United Pac. Ins. Co., ASBCA No. 53051, 03-2 BCA ¶ 32,267, at 159,615, 2003 WL 21350374 (June 4, 2003). The plaintiff incurred a total of $3,525,757.25 in completing the contract, and has received $661,512.31 from the government.

On April 12, 2000, the plaintiff filed a Request for an Equitable Adjustment ("REA") with the contracting officer, which included a claim that the contract, as awarded, was illegal, requesting that the contract be terminated for convenience and seeking its actual costs of performance less sums received. In total UPI sought $3,194,490.59. The contracting officer denied the claim on September 12, 2000 and the plaintiff filed an appeal at the Armed Services Board of Contract Appeals ("ASBCA" or "Board") on September 21, 2000.

The Board issued a decision on July 20, 2001 holding that UPI did not have standing to assert Castle's pre-takeover illegal contract claims. In re United Pac. Ins. Co., ASBCA No. 53051, 01-2 BCA ¶ 31,527, at 155,640, 2001 WL 865380 (July 20, 2001). Then, following the Federal Circuit's decision in Fireman's Fund Ins. Co. v. England, 313 F.3d 1344 (Fed. Cir. 2002), which held that the Contract Disputes Act, 41 U.S.C. §§ 601-613 (2000), did not give the Contract Boards jurisdiction over equitable subrogation

claims based on events that took place before the takeover agreement, the Board issued another decision on reconsideration rejecting UPI's claim on jurisdictional grounds. The Board held that it did not have jurisdiction over the plaintiff's claims because the plaintiff was not a "contractor" under the Contract Disputes Act for claims based on pre-takeover agreement events. United Pacific, 03-2 BCA ¶ 32,267, at 159,622. The Board also held that it did not have jurisdiction over the plaintiff's illegal contract claim. Id. at 159,624.

UPI appealed, and the Federal Circuit affirmed, holding that the Board did not have jurisdiction over any of the plaintiff's claims that were based on events that occurred prior to the plaintiff entering into a takeover agreement with the government, including UPI's illegal contract claims. United Pac. Ins. Co. v. Roche, 380 F.3d 1352, 1356 (Fed. Cir. 2004). Specifically, the Federal Circuit stated, "Assuming without deciding that a surety has standing to challenge the validity of a completed contract, on its face United's claim appears covered by Fireman's Fund and therefore beyond the Board's jurisdiction." Id. at 1357.

After the Federal Circuit issued its decision, UPI filed the present complaint in this court on January 12, 2005. The complaint alleges that the underlying contract between the government and Castle was illegal. The complaint states that work was illegally funded as Operations and Maintenance ("O&M") work, when it was "obvious construction work." Compl. ¶ 23. The plaintiff charges that the Air Force's use of O&M funds to fund new construction violated 10 U.S.C. § 2811. The complaint asserts that new military construction projects must be approved and funded by Congress and that

this project had not been approved by Congress and thus the contract was illegal. UPI also alleges that the government illegally split the project into three projects, one for each building, in order to stay below the $300,000 ceiling for funding military construction projects with O&M funds. 10 U.S.C. § 2805(c)(1) (1994 & Supp. 1995). The plaintiff alleges that the three projects were, in fact, a single construction project. UPI alleges that had it known the contract between Castle and the government was illegal based on the violations of the above-noted statutory provisions, it would not have provided the bonds for the contract or entered into the takeover agreement, committing itself to complete the performance of the contract.

The plaintiff claims that because the original contract was illegal, the contract is voidable and therefore the plaintiff is entitled to have the takeover agreement terminated for convenience and to recover on a quantum meruit basis.[1] In the alternative the plaintiff claims that if the claim belongs to Castle, then UPI is equitably subrogated to the rights of Castle, and accordingly may bring Castle's claim for quantum meruit damages. UPI also argues that if the contract is void ab initio due to the illegality, then it is entitled to recover on a quantum meruit basis pursuant to an implied in fact contract. Finally, UPI alleges misrepresentation as inducement to contract and again seeks quantum meruit recovery.

---

[1] As this court does not possess subject matter jurisdiction over claims based on implied in law contractual theories, such as quantum meruit, see 28 U.S.C. § 1491 (2000), the court has treated the plaintiff's references to quantum meruit as merely describing the measure of damages, rather than as an equitable basis for recovery.

With regard to these illegal contract counts UPI also alleges that it "did not discover that the subject Contract was illegal, and had no reason to believe otherwise, until approximately January 2000, [and therefore] this action is timely." Compl. ¶¶ 17 and 48. It was at that time that the plaintiff received documents pursuant to a Freedom of Information Act ("FOIA") request.

The government has moved to dismiss UPI's complaint pursuant to RCFC 12(b)(1) and 12(b)(6) for lack of subject matter jurisdiction and for failure to state a claim. The government asserts that the plaintiff's claims are time-barred, or alternatively, that the plaintiff has failed to state a claim because, inter alia, the plaintiff may not state a claim for relief based on a theory of illegality when the alleged statutory violations were not written to protect the rights of contractors. The government also argues that UPI may not assert illegal contract claims belonging to Castle under the doctrine of equitable subrogation. The government further argues that to the extent UPI may assert illegal contract claims, the claims are barred under principles of waiver and collateral estoppel. Oral argument was held on September 20, 2005.

## DISCUSSION

### A. Standard of Review

The government has filed a motion to dismiss for failure to state a claim pursuant to RCFC 12(b)(6). "[I]n passing on a motion to dismiss, whether on the ground of lack of jurisdiction over the subject matter or for failure to state a cause of action, the allegations of the complaint should be construed favorably to the pleader. . . . '[A] complaint should

not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Scheuer v. Rhodes, 416 U.S. 232, 236 (1974) (quoting Conley v. Gibson, 355 U.S. 41, 45-46 (1957)). In other words, the issue is whether the plaintiff is "entitled to offer evidence to support the claims." Id.

**B. Motion to Dismiss for Failure to State a Claim**

In its complaint, the plaintiff asserts a claim (either Castle's or its own) for quantum meruit damages pursuant to an implied in fact contract, arguing that the government's violation of 10 U.S.C. §§ 2805 and 2811 in forming the contract rendered it void ab initio. The government argues that such a result is not favored, and therefore in order to state such a claim regarding a completed contract, even assuming that a statute was violated, the plaintiff must show that Congress intended that completed contracts would be invalidated for violation of the statute. In support of its position the government relies on American Telephone & Telegraph Co. v. United States, 177 F.3d 1368 (Fed. Cir. 1999) (en banc) ("AT&T III"), which held that a contract will only be invalidated for violation of a statute if invalidation is "essential to effectuating the public policy embodied in [the statute]." Id. at 1374 (quoting United States v. Mississippi Valley Generating Co., 364 U.S. 520, 563 (1961)).

The plaintiff, relying on such cases as Godley v. United States, 5 F.3d 1473 (Fed. Cir. 1993) and United States v. Amdahl Corp., 786 F.2d 387 (Fed. Cir. 1986), argues that it has stated a claim based on the illegality of the contract between Castle and the

government, which was caused by the government's violation of 10 U.S.C. §§ 2805 and 2811. The plaintiff argues that the court should rely on these cases rather than on AT&T III.

The plaintiff also asserts other claims for quantum meruit recovery, arguing that either Castle's contract should have been, or its own takeover agreement should be, terminated for convenience of the government based on the same alleged illegality of the contract between Castle and the government. The government in support of its position relies on a subsequent decision following remand, American Telephone & Telegraph Co. v. United States, 307 F.3d 1374, 1379 (Fed. Cir. 2002) ("AT&T V"), in which the Federal Circuit determined that AT&T did not state a claim for reformation based on the illegality of a completed contract where the statute at issue did "not create a cause of action inviting private parties to enforce the provision in courts." The government argues that like the statute in the AT&T cases, the statutes at issue here were not intended to benefit contractors or to create a cause of action for enforcement by private citizens. Indeed, the government argues, the case against a private cause of action is even more persuasive here because there is no nexus whatsoever between the harms Congress sought to avoid in enacting the statutes and the harm suffered by the plaintiff here. The plaintiff argues that the statute at issue in AT&T V is distinguishable, because there the legislative history of the statute contained an explicit statement that the statute was not intended to invalidate completed contracts; no such statement was made regarding the statutes at issue here.

For the reasons that follow, the court agrees with the government that under AT&T III and AT&T V, the plaintiff has failed to state a claim for a remedy based on violations of the statutes at issue.[2]

**1. Under AT&T III, the Plaintiff Has Failed to State a Claim for Relief Based on an Implied in Fact Contract Theory**

In the AT&T cases, at issue was the violation of a statute that required the Under Secretary of Defense for Acquisition to make certain written findings prior to obligating appropriated funds for fixed-price contracts for the development of major systems or subsystems in excess of $10,000,000. See Department of Defense Act, Pub. L. No. 100-202 § 8118, 101 Stat. 1329 (1987). The statute further required the Under Secretary to report to the House and Senate Appropriations Committees on a quarterly basis, identifying such contracts that had obligated funds. Id. The provision was enacted in part because Congress was concerned about "the burden of a fixed price contract on the contractor when the miscalculation of development cost may have been that of the government agency as well as the contractor." AT&T III, 177 F.3d at 1372. AT&T, which had completed performance and in doing so had incurred expenses in excess of its contract's fixed price, argued that the government had failed to make the required findings in violation of the statute, rendering the contract void ab initio. AT&T argued

[2] The court has assumed, without deciding, for purposes of the government's motion that the plaintiff may assert a claim based on an illegal contract pursuant to the doctrine of equitable subrogation.

that in such circumstances, AT&T could recoup its additional costs under quantum meruit pursuant to an implied in fact contract.

In AT&T III, the Federal Circuit, addressing questions certified from this court, held en banc that violation of the statute did not render the contract void ab initio. The court held that "[i]nvalidation of the contract is not a necessary consequence when a statute or regulation has been contravened . . . the policy underlying the enactment must be considered in determining the remedy for its violation, when the statute itself does not announce the sanction of contract invalidity." 177 F.3d at 1374. Thus, a "court shall inquire 'whether the sanction of nonenforcement [of the contract] is consistent with and essential to effectuating the public policy embodied in [the statute].'" Id. (quoting United States v. Mississippi Valley Generating Co., 364 U.S. 520, 563 (1961)).

After considering the language of the statute, its legislative history, and the agency's history of administering the statute, the court concluded that "Congress did not intend that this enactment would terminate fully performed contracts because of . . . flawed compliance." AT&T III, 177 F.3d at 1375. The court placed particular emphasis on reports by appropriations committees a few months after the statute's enactment, after the Department failed to comply with the statute, which stated: "It is the intent of the committee that . . . this section not be used as the basis for litigating the propriety of an otherwise valid contract." S. Rep. No. 100-326, at 105 (1988). The AT&T III court concluded that "[t]hese congressional responses, made with knowledge of the agency's imperfect compliance with § 8118, negate any reasonable inference that Congress

intended simply to render void ab initio . . . any fixed price contract . . . ." 177 F.3d at 1375. The court further held that "[p]recedent does not favor the invalidation, based on governmental non-compliance with internal review and reporting procedures, of a contract that has been fully performed by either contracting party." Id. at 1376. Having concluded that the contract was not void ab initio, the court did not reach the second certified question regarding the appropriate remedy.

As in the AT&T cases, here the statutory language and legislative history indicates that Congress did not intend fully performed contracts to be invalidated. In its complaint, the plaintiff alleges that the contract between Castle and the government was illegal because the Secretary was not authorized to enter into the contract under either 10 U.S.C. §§ 2805 or 2811. Generally, military construction projects must be funded from specific annual appropriations for military construction. See 31 U.S.C. § 1301(a) (1994). Sections 2805(c)(1) and 2811, however, allow the agency to fund repair projects and certain unspecified minor construction projects under a specified ceiling amount using O&M funds, which are not subject to as many oversight procedures as military construction funds. The plaintiff argues that the construction projects contracted for here did not fit sections 2805 or 2811 and that therefore the agency's failure to follow oversight procedures for major military construction projects renders the contract between Castle and the government illegal. In 1995, when the parties entered into the contract, section 2805, "unspecified minor construction," read:

> (a)(1) Except as provided in paragraph (2), within an amount equal to 125 percent of the amount authorized by law for such purpose, the Secretary

> concerned may carry out minor military construction projects not otherwise authorized by law. A minor military construction project is a military construction project (1) that is for a single undertaking at a military installation, and (2) that has an approved cost equal to or less than $1,500,000.
>
> (2) A Secretary may not use more than $5,000,000 for exercise-related unspecified minor military construction projects coordinated or directed by the Joint Chiefs of Staff outside the United States during any fiscal year.
>
> (b)(1) A minor military construction project costing more than $500,000 may not be carried out under this section unless approved in advance by the Secretary concerned.
>
> (2) When a decision is made to carry out a minor military construction project to which paragraph (1) is applicable, <u>the Secretary concerned shall notify in writing the appropriate committees of Congress of that decision</u>, of the justification for the project, and of the estimated cost of the project. The project may then be carried out only after the end of the 21-day period beginning on the date the notification is received by the committees.
>
> (c)(1) <u>Except as provided in paragraph (2), the Secretary concerned may spend from appropriations available for operation and maintenance amounts necessary to carry out an unspecified military construction project costing not more than $300,000</u>. . . .

10 U.S.C. § 2805 (1994 & Supp. 1995) (emphasis added). Section 2811 further provided:

> (a) Repairs using operational and maintenance funds.– Using funds available to the Secretary concerned for operation and maintenance, the Secretary concerned may carry out repair projects for an entire single-purpose facility or one or more functional areas of a multipurpose facility.
>
> (b) Approval required for major repairs.– A repair project costing more than $5,000,000 may not be carried out under this section unless approved in advance by the Secretary concerned. In determining the total cost of a repair project, the Secretary shall include all phases of a multi-year repair project to a single facility. In considering a repair project for approval, the Secretary shall ensure that the project is consistent with force structure plans, that repair of the facility is more cost effective than replacement, and that the project is an appropriate use of operation and maintenance funds.

> (c) Prohibition on new construction or additions.– Construction of new facilities or additions to existing facilities may not be carried out under the authority of this section.

10 U.S.C. § 2811 (1994 & Supp. 1995) (emphasis added).

Neither provision specifically provides for the invalidation of contracts that were made in violation of it. Because the invalidation of fully performed contracts is not favored, the court must consider whether invalidating the plaintiff's contract would be "consistent with and essential to effectuating the public policy embodied in [the statutes]." AT&T III, 177 F.3d at 1374 (quoting Mississippi Valley, 364 U.S. at 563). The court finds that it would not be.

The plain language of the statutes requires approval by the relevant Secretary or Congressional notification prior to the obligation of certain types of appropriated funds for certain types of construction and repair projects. The public policy embodied in the statutes appears to be balancing agency flexibility in planning construction projects and legislative oversight of spending decisions. Indeed, the legislative history supports this view. Similar provisions had been enacted each year as part of the annual appropriations bills for military construction, but in 1982 Congress decided to codify the provisions concerning military construction and military family housing. Military Construction Codification Act, Pub. L. No. 97-214, § 2, 96 Stat. 153 (1982). In the House Report accompanying the bill, Congress indicated that the purpose of the bill was "decentralization," to allow greater flexibility and responsibility in the lower levels of the

agency in obligating funds for certain kinds of military construction. H.R. Rep. No. 97-612 (1982), reprinted in 1982 U.S.C.C.A.N. 441, 444.

At the same time, Congress sought to maintain some oversight in certain circumstances. In summarizing new annual reporting requirements established by the bill for "unspecified minor construction," the House Report stated:

> Information supplied should enable the appropriate committees of Congress to monitor the relationships between budget requests and obligations for unspecified minor construction projects funded from military construction appropriations and unspecified minor construction projects funded from operations and maintenance appropriations. The maintenance and repair backlog at the end of the prior fiscal year will be used to evaluate the ratio of expenditures between minor construction and maintenance and repair. Data for the two fiscal years prior to the budget year should be supplied to evaluate trends.

1982 U.S.C.C.A.N. at 446 (emphasis added).

In discussing oversight of the use of O&M funds under section 2805(c)(1), the Armed Services Committee stated in its report:

> Since the Committee's objective for minor construction has been to increase a military department's flexibility in managing minor construction, the use of operations and maintenance funds for minor construction was retained. However . . . the Committee believes that annual reporting procedures to provide better oversight on operation and maintenance expenditures for minor construction is necessary. The Committee is most concerned that operations and maintenance funds used for minor construction may be at the expense of needed repair and maintenance of facilities.

1982 U.S.C.C.A.N. at 458 (emphasis added).

In addition, the conference report to the 1994 amendments to section 2811 states:

> The conferees are concerned that major repairs to facilities, funded through operation and maintenance accounts, are conducted without the oversight of the service secretaries or the Committees on Armed Services of the Senate and

> House of Representatives. The conferees believe improved oversight of the major repairs is required, but do not want to impose additional reporting requirements.

H.R. Conf. Rep. No. 103-701, at 789 (1994), reprinted in 1994 U.S.C.C.A.N. 2224, 2358.

Thus the public policy embodied in the statutes at issue is that of increasing flexibility in agency decisions while maintaining appropriate legislative oversight of appropriations for major construction and repair projects. The invalidation of a fully performed contract for violation of these oversight procedures is not essential to this public policy, and, indeed, would be inconsistent with it. In this case, for example, the plaintiff argues that the agency obligated approximately $3 million of appropriated funds for a major construction project in violation of these oversight provisions. The plaintiff argues that it is therefore entitled to an additional $3 million, without congressional approval, for the same major construction project. This result plainly would be inconsistent with the public policy of maintaining legislative oversight of obligations of appropriated funds.

In view of the foregoing, the plaintiff's reliance on Amdahl is misplaced. Amdahl stands for the proposition that when contracts are voided for illegality and the contractor has not been fully paid pursuant to the contract, the contractor may be entitled to relief under an implied in fact contract theory. In Amdahl, the contract at issue was invalidated on illegality grounds. It was because the contract was invalidated in that case that the court reached the issue of remedy and found that the plaintiff was entitled to relief under

an implied in fact contract theory. The contractor had provided the government with goods or services and had not been fully paid. In such circumstances, the court held that it was "only fair and just that the Government pay for goods delivered or services rendered and accepted." Prestex, Inc. v. United States, 320 F.2d 367, 373 (Ct. Cl. 1963), quoted in Amdahl, 786 F.2d at 393. Here, for the reasons stated above, the court finds that invalidation of the contracts is not appropriate. As a consequence the contracts at issue here remain in force and effect. Therefore, the court does not reach the issue of whether the plaintiff is entitled to relief under an implied in fact contract theory.[3] The need for a remedy has not been triggered where the contract has not been voided. The plaintiff's claim for quantum meruit damages pursuant to an implied in fact contract therefore fails as a matter of law.

**2. The Plaintiff's Other Claims Based on Violation of the Statutes Also Fail under AT&T V**

The plaintiff also seeks damages for violation of the statutes under theories that do not rise to the level of invalidating the contracts. These claims are covered by AT&T V. On remand to consider the availability of other remedies, such as reformation, where the

---

[3] The plaintiff's reliance on Godley is also misplaced. The plaintiff relies on Godley for the proposition: "Determining whether illegality taints a contract involves questions of fact." 5 F.3d at 1476. Based on this proposition, the plaintiff argues that dismissal for failure to state a claim would be inappropriate. However, under the Federal Circuit's subsequent en banc decision in AT&T III the court has determined as a matter of law that invalidating the contracts at issue here would be inconsistent with the public policy embodied in the statutes. In such circumstances the issue of whether the illegality "taints" the contract is irrelevant.

contract was not invalidated for violation of the statute in AT&T III, this court determined that "non-compliance with [section 8118] is not an actionable wrong . . . . [P]laintiffs cannot claim a protectable interest in the proper application of Section 8118 for Congress intended to give them none." Am. Tel. & Tel. Co. v. United States, 48 Fed. Cl. 156, 160 (2000). Accordingly, this court dismissed AT&T's reformation claim for failure to state a claim upon which relief could be granted. A panel of the Federal Circuit then affirmed. Relying on the language of the statute, administration history, and separation of powers principles, the court held that the statute: "provides for legislative oversight and enforcement. The section does not create a cause of action inviting private parties to enforce the provision in courts." 307 F.3d at 1379. Based on separation of powers principles, the court further noted that "it is not 'the judicial role to discipline the agency's noncompliance with the supervisory and reporting instructions of congressional oversight.'" AT&T V, 307 F.3d at 1379 (quoting AT&T III, 177 F.3d at 1375). Accordingly, AT&T could not state a claim for reformation of its contract based on a violation of the statute.

Thus, AT&T V stands for the proposition that even where the plaintiff suffers the sort of harm that the statute was designed to prevent,[4] the plaintiff may not enforce a legislative oversight provision through a private cause of action unless Congress so

[4] As noted above, section 8118 appeared to have been enacted in part to spare contractors from the burden of inaccurately priced fixed price contracts.

intended.[5]

As discussed above, the public policy embodied in sections 2805 and 2811 is that of maintaining legislative oversight of major construction projects while increasing flexibility for minor construction projects. The court must still determine whether Congress intended the statutes to be enforced through private causes of action in the courts. The government argues that even assuming a violation of the statutes, the language, legislative history, and history of enforcement of the statutes demonstrate that Congress did not intend enforcement through private causes of action and thus the plaintiff may not state a claim for damages based on their violation. The plaintiff argues that this case is distinguishable from the AT&T cases because in that case, there was an explicit statement in the legislative history indicating that the statute at issue was not to be "used as the basis for litigating the propriety of an otherwise valid contract." AT&T III, 177 F.3d at 1375. The plaintiff argues that because the legislative history here does not contain such an explicit statement against private causes of action it can be inferred that Congress did not intend to preclude that remedy.

The court agrees with the government that Congress did not intend sections 2805 and 2811 to be enforced through private causes of action. By their terms, these statutes

---

[5] This proposition was consistent with earlier Federal Circuit precedent holding that unless a statute explicitly creates a cause of action, "[t]he primary benefit of a statute or regulation must be to protect or benefit a class of persons in order for that class to be able to bring suit against the government for violating the statute or regulation." Cessna Aircraft Co. v. Dalton, 126 F.3d 1442, 1451-52 (Fed. Cir. 1997).

provide a system of legislative oversight over the obligation of appropriations for military construction projects. As noted above, these statutes represent exceptions to the general rule that military construction projects must be approved by Congress through annual appropriations bills. Therefore, like the provision at issue in the AT&T cases, these provisions represent portions of an appropriations oversight scheme that "permits the appropriation committees to properly monitor federal spending." AT&T V, 307 F.3d at 1377-78.

Neither section makes any mention of enforcement by private parties. Instead, section 2805(b)(2) specifically mentions notifying the appropriate congressional committees of the decision to carry out minor military construction projects, which plainly provides for only legislative oversight. Sections 2805(b)(1) and 2811(b) require advance approval by the Secretary, which, like the requirement of written findings in the AT&T cases, provide internal operating procedures for obligating funds. There is no mention of Congress providing for private enforcement if the agency fails to place a project in the proper category. All we know from the statutory scheme is that if a project does not fall into these categories it must be approved by Congress through its annual appropriations for military construction. In such circumstances it seems clear that, like the statute in AT&T V, sections 2805 and 2811 "envision[] enforcement, if any, in the form of legislative spending adjustments in future bills." AT&T V, 307 F.3d at 1378. Accordingly, based on the plain language of the statutes, the plaintiff cannot state a claim based on their violation.

The plaintiff does not dispute that the plain language of the statutes at issue does not explicitly provide for a private cause of action, but instead argues that a private cause of action may be implied. More specifically, the plaintiff argues that in contrast to the statute in the AT&T cases, where the legislative history explicitly barred a private claim, the statutes at issue here do not contain an explicit statement against enforcement by a private cause of action and thus a private cause of action may be implied. The government argues that while the legislative history does not contain an explicit statement against private causes of action, it gives no indication that a private cause of action was intended. The government further argues that the history of enforcement of the statutes supports its position that the statutes were not intended to benefit contractors, or to create a cause of action for their violation.

The court agrees with the government and finds that an intent to enforce sections 2805 and 2811 through private causes of action cannot be implied from Congressional silence in this instance. The U.S. Supreme Court has stated:

> In some cases, Congress intends silence to rule out a particular statutory application, while in others Congress' silence signifies merely an expectation that nothing more need be said in order to effectuate the relevant legislative objective. An inference drawn from congressional silence certainly cannot be credited when it is contrary to all other textual and contextual evidence of congressional intent.

Burns v. United States, 501 U.S. 129, 136 (1991).

Here, the textual and contextual evidence indicates a congressional intent to enforce the provisions through legislative oversight of major construction projects and

internal regulations and procedures. In explaining the definition of "minor military construction" in section 2805, the Committee on Armed Services' ("Committee's") report, incorporated into the House Report, stated:

> The following construction activities should not be accomplished as a minor military construction project: (1) splitting a project into increments solely to reduce the cost thereof below an approval threshold or the minor construction ceiling amount; . . . .
> The Committee expects the Secretary of Defense to publish regulations to prevent abuses in the use of minor military construction authority and to require the Secretaries of the military Departments to conduct inspections needed to assure compliance with such regulations.

1982 U.S.C.C.A.N. at 457.

Thus the Committee considered the possibility that agency officials would improperly place projects in the "minor construction" category and envisioned that enforcement would be handled through internal agency regulations and procedures.

Moreover, when the Department of Defense ("DOD") has been found to have improperly funded construction projects with O&M funds, the remedy has been to reimburse the O&M funds from the proper appropriation source. In 1984, Representative Bill Alexander asked the Comptroller General, the head of the Government Accountability Office ("GAO"), for a formal legal opinion on the propriety of DOD's funding of certain construction projects in Honduras. The Comptroller General opined that: "To the extent . . . that DOD has charged its O&M in excess of [the then-ceiling] $200,000, the excess charge was made in violation of the purposes-restriction of 31 U.S.C. § 1301(a). When adjusting its accounts to remedy any overcharge, O&M

appropriations may be reimbursed from any military construction funds available for such readjustment (and which were available at the time of the original obligation)." 63 Comp. Gen. 422, 437 (1984). Therefore, the GAO, the legislative agency charged with overseeing executive agency spending on behalf of Congress, held that the remedy for improper funding of military construction projects was reimbursement from the correct funding source, not a private cause of action by the construction contractor. Thus the history of administering the statutes further supports the court's conclusion that Congress did not intend that violations would be enforced through private causes of action in the courts. Accordingly, to infer from Congress' silence that it intended sections 2805 and 2811 to be enforced through private causes of action would be contrary to the textual and contextual evidence indicating that Congress intended enforcement through legislative oversight and internal procedures.

Finally, as the government has argued, the case against a private cause of action to enforce the statutes is even more compelling here than in AT&T V. Nowhere did Congress indicate that it had any concerns about contractors or sureties that motivated it to pass the legislation. As the government has put it, there is no nexus between the harms sought to be avoided and the harms suffered by the plaintiff here; the only harm Congress sought to avoid was the harm to itself or to the public when appropriated funds are obligated for military construction projects without its oversight.

**CONCLUSION**

For all of these reasons, the plaintiff may not rely on a violation of these statutes to support its claims. The plaintiff's causes of action to invalidate Castle's or its own contract based on the alleged violation of the statutes fail under AT&T III. The plaintiff's other causes of action for relief based on the violation of the statutes similarly fail under AT&T V. As the plaintiff has relied solely on violation of these statutes to support its claims, the plaintiff has failed to state a claim upon which relief may be granted.[6]

For the foregoing reasons, the government's motion to dismiss is **GRANTED** and all of the plaintiff's claims must be dismissed pursuant to RCFC 12(b)(6). The Clerk is directed to dismiss the plaintiff's complaint with prejudice. Each party to bear its own costs.

**IT IS SO ORDERED.**

s/Nancy B. Firestone
NANCY B. FIRESTONE
Judge

[6] Having concluded that the plaintiff has failed to state a claim, it is not necessary to consider the government's other arguments in favor of dismissal.